IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

METRC, INC., METRC ID, LLC

    Plaintiffs,

v.

MARCUS ESTES,

    Defendant.

Case No.

## COMPLAINT

Plaintiffs METRC, INC. ("METRC") and METRC ID, LLC (collectively, "Plaintiffs"), hereby file this Complaint seeking injunctive relief and damages against Defendant, Marcus Estes ("Defendant").

## JURISDICTION AND VENUE

1. Plaintiff, METRC, INC. ("Metrc") is a Delaware Corporation with its principal place of business in Lakeland, Florida.

2. Plaintiff METRC ID, LLC is a Delaware limited liability company. METRC ID, LLC was previously known as MCS Acquisition, LLC. METRC ID, LLC is a wholly owned subsidiary of Metrc, and was created for the sole purpose of executing the Asset Purchase Agreement described herein. METRC ID, LLC's sole member is Metrc LLC, a Florida limited liability company. Metrc LLC's sole member is Metrc.

3. Plaintiff is informed and believes, and on that basis alleges that Defendant is a resident of Hammond, Oregon. Defendant was formerly employed by Plaintiffs between on or about April 18, 2023 to on or about April 9, 2024.

1

4. This Court has federal diversity jurisdiction in this matter pursuant to 28 U.S.C. 1332, as plaintiff and defendants are diverse from one another and the amount in controversy exceeds $75,000.

5. Venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Middle District of Florida. This case arises from Defendant's breach of the offer letter agreement (the "Offer Letter Agreement") and the Assignment of Inventions, Non-Disclosure, Non-Competition and Non-Solicitation Agreement ("Non-Solicitation Agreement") he entered into with Plaintiffs, both of which were generated and executed by Plaintiff from its corporate headquarters in Lakeland, Florida.

6. Defendant initiated videoconference and email communications into the State of Florida, regularly communicated with Plaintiffs' employees in Plaintiff's Florida offices; and conducted/led Florida-based projects on Plaintiffs' behalf. The meetings that Defendant took part in which were based in Florida included weekly product review meetings, daily meetings with Florida-based developers for Metrc's Retail ID product; weekly go-to market meetings involving Florida-based personnel; and product planning meetings. Defendant also worked closely with Metrc's Retail ID Product Director, who is located in Florida. Although Defendant may have performed some work remotely, Defendant's supervisor(s) and project teams were located in Florida, and all of the work he was actually performing was for the benefit of Metrc's operational lines and business in Florida.

7. Accordingly, this Court has specific jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1)(a)(1), (1)(a)(2), (1)(a)(6)(a)-(b) and (1)(a)(7).

8. Defendant has engaged in substantial and not isolated activity within the state of

Florida, and therefore this Court has general jurisdiction over Defendants pursuant to Fla. Stat. § 48.193(2).

## GENERAL ALLEGATIONS

### A. Metrc's Business.

9. Headquartered in Lakeland, Florida, Metrc is the most trusted and experienced provider of cannabis regulatory systems in the United States. Through a Request for Proposal process, state regulatory agencies overseeing legalized cannabis programs and seeking a compliance management tool contract with Metrc to license its software-as-a-service ("SaaS") product, which combines advanced software and radio-frequency identification ("RFID") technology as a means to track and trace cannabis from growth, harvest, and processing to testing, transport, and sale to ensure no inversion or diversion of product.

10. Metrc's goal is to bring total visibility to cannabis supply chains through connection, transparency and reliability. When states legalize any form of cannabis use, regulators face a host of challenges, which includes protecting the public health. To do so, regulators must engage in comprehensive cannabis testing, have a way to track inventory and sales, and be able to secure the regulated marketplace against illicit product. Metrc and, in particular, its Retail ID RFID technology, are powerful allies in advancing these interests. Metrc closely monitors the cannabis supply chain to secure markets against theft and infiltration. Metrc's unique solutions and technology ensure that every cannabis plant and every cannabis product is accounted for from growth/production to consumption, preventing illicit and/or unregulated cannabis from entering the supply chain.

### B. Metrc Acquires Chroma Signet to Develop Their New Product, Retail ID.

11. On April 7, 2023, Metrc, through its subsidiary MCS Acquisition, LLC (now named Metrc ID, LLC), acquired Chroma Signet via an asset purchase agreement. Chroma Signet was engaged in developing open source barcode labelling software to create NFT-enabled QR codes that could be encoded with data for supply chain partners and consumers.

12. Defendant was the CEO/Founder of Chroma Signet. When Defendant sold Chroma Signet to Plaintiffs, he not only sold all assets, properties, and contractual rights to his company, he also explicitly sold all of the goodwill associated with the company and its assets. Defendant agreed to preserve the goodwill associated with the company and between the company and its suppliers, customers, and third-party business relationships.

13. Since the purchase, Metrc has modified and improved the Chroma Signet product to be a single source of compliance data, having direct linkage to real-time lab tests, Certificates of Analysis, and other cannabis-related product information, by way of its new product Retail ID. Retail ID allows consumers to verify product authenticity and makes the supply chain transparent, creating a seamless Metrc user experience. In short, Retail ID is a revolutionary product that allows an end-user or regulator to scan the QR code placed on the packaging of a cannabis plant or product and instantaneously verify its history from seed to sale.

14. Metrc has expended countless hours and significant expense acquiring the technology, property interests and knowledge to develop its Retail ID technology, which included the purchase of Chroma Signet.

15. In addition, Metrc has expended untold costs and time in researching and developing its Retail ID product and developing the product's customer base to ensure the successful launch of Retail ID.

16. Retail ID's customer and prospective customers are critical to the success of the product and the Plaintiffs' operations, as Defendant is well-aware.

### C. Defendant Executes the Offer Letter Agreement and Receives a One-Time Signing Bonus.

17. As part of its acquisition of Chroma Signet, Metrc offered Defendant the ability to stay on at Metrc in the role of Executive Vice President. The terms of Defendant's employment were memorialized in the Company's Offer Letter Agreement. *See* **Exhibit 1**, *Offer Letter Agreement.*

18. In the Offer Letter Agreement, Metrc provided substantial compensation to Defendant as consideration for his continued services. Part of Metrc's compensation package to Defendant included a one-time signing bonus of $100,000 to be paid within 15 days of Defendant's start date with the Company (the "Signing Bonus"). *Id.*

19. However, the Offer Letter Agreement provided that if Defendant's employment terminated prior to his second anniversary with the Company, for any reason whatsoever, Defendant was required to repay to Metrc the gross amount of the Signing Bonus within thirty (30) days following the effective date of Defendant's termination. *Id.*

20. The explicit language of the Signing Bonus provision is as follows:

> [T]he Company will pay you a one-time cash award of $100,000 (the "Signing Bonus")…If your employment with the Company terminates prior to the second-year anniversary of your start date for any reason, you agree to repay to the Company the gross amount of the Signing Bonus within thirty (30) days following the effective date of your termination of employment.

*Id.*

21. Defendant executed the Offer Letter Agreement on April 1, 2023.

**D.     Defendant Executes the Non-Solicitation Agreement.**

22.    In connection with his new employment at Metrc, Defendant executed the Non-Solicitation Agreement, attached as **Exhibit 2** hereto, on April 7, 2023.

23.    In the Non-Solicitation Agreement, Defendant agreed that, for a period of two years after the termination of his employment (the "Restrictive Period"), he would not:

> (iii) contact any past, present or potential customer of the Company or any of its Affiliates or an Acquiror, for the purpose of (x) providing any service provided by the Company or any of its Affiliates or an Acquiror or (y) **inducing or attempting to induce the entity to cease doing business with the Company or any of its Affiliates or an Acquiror, or reduce the amount of business previously done or contemplated to be done by the Company or any of its Affiliates or an Acquiror, for such entity or entities**…

**Exhibit 2**, § 1(a)(iii) (emphasis added).

24.    Defendant acknowledged that the covenants set forth in the Non-Solicitation Agreement constituted reasonable restraints in light of Defendant's role with Metrc, as well as Metrc's future business plans to which Defendant was privy. **Exhibit 2**, § 1(c).

25.    Further, the covenants set forth in the Non-Solicitation Agreement were tailored to protect the legitimate business interests of the Company to preserve its relationships with its customers and prospective customers, protect the goodwill of Metrc, and protect the goodwill associated with the recently acquired Chroma Signet so that Metrc could reap the benefits of its purchase.

26.    Defendant acknowledged and agreed that any breach of the Non-Solicitation Agreement would result in immediate and irreparable damage to Metrc, and that Metrc would be entitled to obtain an injunction in this court to restrain any further breaches of the Non-

Solicitation Agreement. *Id.* § 1(b).

        **E.**        **Defendant is Terminated, Breaches his Non-Solicitation Agreement, and Refuses to Return His Signing Bonus.**

27. Shortly after Defendant was terminated due to his performance on April 9, 2024, Defendant contacted two of Plaintiffs' principal customers involved with the development of their Retail ID technology, H and W.[1]

28. H is one of Canada's leading cannabis infused product developers and producers, and holds a significant share of Canada's cannabis market.

29. Similarly, W is a leading cannabis infused product developer and distributor in the United States, and has a significant share of the United States cannabis edibles market.

30. By virtue of his Executive Vice President role with Metrc, Defendant was well-aware of the importance of having H and W on board with the rollout of Metrc's new Retail ID technology. Indeed, given that Defendant was the Founder/CEO of Chroma Signet and now Executive Vice President at Metrc, Defendant was uniquely positioned to have influence over any customers, prospective customers, and business partners associated with or with knowledge of the product Chroma Signet and, later, Retail ID.

31. Metrc has spent significant time and expense marketing Retail ID to H and W, and creating the goodwill required for a successful product launch and business relationship with these two major cannabis product distributors.

32. Apparently disgruntled with his recent termination from Metrc, and in an effort to sabotage the rollout of Retail ID, Defendant used his high-level position and influence and sent disparaging and false information regarding Metrc and the development of Retail ID to key

---

[1] To maintain the confidentiality of Plaintiffs' customers and business partners, Plaintiffs will only use the entities' initials when identifying them.

contacts at W and H.

33. As a result of Defendant's communications with H and W, both clients contacted Metrc representatives and expressed their concerns about their continued involvement with the rollout of Retail ID.

34. Defendant's purpose in disparaging Metrc and Retail ID to H and W was clear—he wanted to poison the well for Metrc with its customers/business partners and tank the launch of the Retail ID product, all because he felt he was unfairly terminated.

35. Whilst disparaging and defamatory comments from a lower-level employee may not have resonated with Metrc's prospective clients and business partners, because of Defendant's high-level roles with Chroma Signet and Metrc, he was perfectly positioned to inflict maximum damage to Metrc by interfering with these relationships and breaching his Non-Solicitation Agreement.

36. As a result of Defendant's actions, H's and W's continued involvement with the launch of Retail ID is in jeopardy.

37. Additionally, Defendant has refused to return his Signing Bonus, despite being contractually obligated to do so.

38. On April 12, 2024, outside counsel for Plaintiff sent letter correspondence to Defendant reminding him of certain post-employment obligations, and demanding that he repay the $100,000 signing bonus within 30 days of April 9, 2024 (May 9, 2024).

39. After receiving no response to its original correspondence, outside counsel for Plaintiff sent a second correspondence to Defendant on April 26, 2024, again demanding that Defendant repay the Signing Bonus.

40. May 9, 2024 came and went, and Defendant did not repay the Signing Bonus.

41. Outside counsel for Plaintiff sent a third letter correspondence to Defendant on May 13, 2024 demanding repayment of the Signing Bonus. As of the date of this filing, and despite Plaintiffs' three separate correspondence demanding repayment, Defendant has not repaid any of the Signing Bonus.

### FIRST CAUSE OF ACTION
### Breach of Contract
### (Offer Letter Agreement)

42. Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above as if set forth fully herein.

43. This is an action against Defendant for breach of contract.

44. Defendant entered into a valid contract with Defendant when he executed his Offer Letter Agreement on April 1, 2023.

45. Defendant materially breached the Offer Letter Agreement by failing to "to repay to the Company the gross amount of the Signing Bonus within thirty (30) days following the effective date of [his] termination of employment" as required by the Agreement. Exhibit A, p. 1.

46. Defendant's breach of the Offer Letter Agreement has caused Plaintiffs substantial damages in the amount of the $100,000 Signing Bonus paid to Defendant, in additional to all other expenses incurred by Plaintiffs in negotiating, drafting, entering into and performing its obligations under the Offer Letter Agreement.

47. Defendant's breach of the Offer Letter Agreement has also caused damage to Plaintiffs because Plaintiffs lost the expected benefit of the Offer Letter Agreement.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

  a. Enter judgment for Plaintiffs and against Defendant on the First Cause of Action for Breach of Contract;

  b. Award Plaintiffs damages and/or restitution in the amount of at least $100,000, plus pre- and post-judgment interest accruing from May 9, 2024;

  c. Award Plaintiffs such other damages, restitution and interest as allowed by law;

  d. Award Plaintiffs such other relief as the Court deems just and proper.

### SECOND CAUSE OF ACTION
### Breach Of Contract
### (Non-Solicitation Agreement)

48. Plaintiffs reallege and incorporate by reference paragraphs 1 through 41 above as if set forth fully herein.

49. This is an action against Defendant for breach of his Non-Solicitation Agreement.

50. Defendant entered into a valid and enforceable Non-Solicitation Agreement with Plaintiffs on April 7, 2023.

51. Defendant breached the Non-Solicitation Agreement by inducing or attempting to induce Plaintiffs' customers to cease doing business with Plaintiffs or, at minimum, not to adopt Plaintiffs' new Retail ID product, thereby disrupting or attempting to disrupt the relationship between Plaintiffs and its business partners, customers, and prospective customers.

52. Defendant acknowledged that the covenants set forth in the Non-Solicitation Agreement constituted reasonable restraints in light of Defendant's role with Metrc, as well as Metrc's future business plans to which Defendant was privy. **Exhibit 2**, § 1(c).

53. Further, Defendant's high-level roles as founder and CEO of Chroma Signet and Executive Vice President at Metrc gave him uncommon access to and influence over Metrc's customers, prospective customers, and business partners, and the Non-Solicitation Agreement's narrowly tailored covenants are reasonable given the damage that Defendant had the potential to, and eventually did, inflict on Metrc by violating his Non-Solicitation Agreement.

54. Defendant acknowledged and agreed that any breach of the Non-Solicitation Agreement would result in immediate and irreparable damage to Metrc, and that Metrc would be entitled to obtain an injunction in this court to restrain any further breaches of the Non-Solicitation Agreement. *Id.* § 1(b).

55. Defendant should be enjoined for two years from inducing or attempting to induce any customers, prospective customers or business partners to: (1) cease doing business with the Plaintiffs or any of their affiliates, or (2) reduce the amount of business previously done or contemplated to be done by the Plaintiffs or their affiliates for any such customers, prospective customers or business partners.

56. Defendant caused and will continue to cause substantial and irreparable harm to Plaintiffs by violating the Non-Solicitation Agreement.

57. The restrictive covenants are supported by a legitimate business interest, including Plaintiff's relationships with its prospective and existing customers, Plaintiffs' goodwill and reputation, as well as Metrc's proprietary technology and systems, including Retail ID and all goodwill associated therewith.

58. The restrictive covenants at issue are reasonably necessary to protect Plaintiffs' legitimate business interests.

59. Plaintiffs have a substantial likelihood of success on the merits of their claims against Defendant.

**WHEREFORE**, Plaintiffs respectfully request that this Court award Plaintiffs:

a. permanent injunctive relief prohibiting Defendant from further violating the Non-Solicitation Agreement;

b. compensatory damages associated with Defendant's breach of the Non-Solicitation Agreement, together with pre- and post-judgment interest thereon;

c. attorneys' fees and costs as permitted under the Non-Solicitation Agreement; and

d. such other and further relief as is just and appropriate.

## THIRD CAUSE OF ACTION
**Tortious Interference with Advantageous Business Relationships**

60. Plaintiff realleges and incorporates by reference paragraphs 1 through 41 above as if set forth fully herein.

61. This is an action for damages against Defendant for tortious interference.

62. Plaintiffs have advantageous business relationships with their customers and business partners pursuant to which they have legal rights.

63. By virtue of his high-level position with Plaintiffs, Defendant learned of Plaintiffs' advantageous business relationships and set out to disrupt said relationships, thereby thwarting Metrc's reasonably business opportunities.

64. Defendant, with full knowledge of Plaintiffs' relationships with their customers, prospective customers, and business partners, as well as their involvement with Metrc's new

Retail ID product, disparaged, defamed, and spread misinformation regarding Metrc and its Retail ID product in an attempt to discredit Metrc and sabotage the product's launch.

65. Through Defendant's actions as described herein, Defendants have tortiously interfered with the advantageous business relationships between Plaintiffs and their customer, prospective customers, and business partners.

66. Defendant's acts in this regard were intentional and were done without justification. Defendant's sole purpose was to harm Plaintiffs, and he used dishonest and improper means to accomplish this task.

67. Defendant had actual knowledge of the wrongfulness of his unlawful conduct and the high probability that injury or damage to Plaintiffs would result and, despite that knowledge, intentionally pursued his course of conduct.

68. As a result of Defendant's actions, Plaintiffs' business relationships and goodwill with their customer(s), prospective customer(s) and business partner(s) were injured.

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Enter judgment in favor of Plaintiffs and against Defendant for the compensatory damages Plaintiffs suffered as a result of Defendant's tortious interference with Plaintiffs' customer(s), prospective customer(s), and business partner(s);

(2) Enter temporary and permanent injunctive relief against Defendant prohibiting him from continuing to interfere with Plaintiffs' customer and other business relationships;

(3) Award Plaintiffs punitive damages;

(4) Award Plaintiffs their costs incurred in prosecuting this action; and

(5) Award Plaintiffs such other and further relief as this Court deems just and proper.

Dated: May 23, 2024.

                FORDHARRISON LLP

By:   /s/ Edward B. Carlstedt
       Edward B. Carlstedt
       Florida Bar No. 0136972
       ecarlstedt@fordharrison.com
       Nicholas S. Andrews
       Florida Bar No. 0105699
       nandrews@fordharrison.com

       **FordHarrison LLP**
       401 East Jackson Street, Suite 2500
       Tampa, Florida 33602
       Telephone (813) 261-7800
       Facsimile (813) 261-7899

       Attorneys for Plaintiff