## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

METRC, INC., METRC ID, LLC

      Plaintiffs,

v.

MARCUS ESTES,

      Defendant.

Case No.: 8:24-cv-01252-WFJ-CPT

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Metrc, Inc. and Metrc ID, LLC ("Plaintiffs" or "Metrc") hereby move for partial summary judgment against Defendant Marcus Estes ("Defendant" or "Estes") as to liability on Count I Breach of Contract related to the requirements of his offer letter, and Count II for Breach of Contract related to his non-solicitation covenants breached with regard to customer and prospective customer Wyld and Khalifa Kush.

## INTRODUCTION

Metrc is entitled to Summary Judgment on the first two causes of action filed against Estes. Metrc filed a three-count complaint against Estes for breach of the terms of his offer letter ("Offer Letter Agreement"), breach of his Assignment of Inventions, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement ("Non-Solicitation Agreement"), and tortious interference with Metrc's customers (D.E. 1).

1

Relating to Count I of the Complaint, there is no dispute of material fact that Estes breached his valid Offer Letter Agreement by failing to return the $100,000 signing bonus, which Estes was required to return within 30-days if, for any reason, his employment was terminated prior to his two-year anniversary with Metrc. Estes was terminated for performance after just a year of employment with Metrc, and Estes refused to return the $100,000 signing bonus.

Relating to Count II, as part of the deal transaction where Estes sold the assets of a company he was part owner of to Metrc, Estes signed a Non-Solicitation Agreement, stating his agreement to not solicit or interfere with business from Metrc's customers or perspective customers. Estes clearly breached this Agreement by sending explicit communications aimed at enticing Metrc's customer Wyld to reduce or cease doing business with Metrc. Estes also sent similar communications to Metrc's prospective customer Khalifa Kush, and induced the company to refrain from doing business with Metrc.

Metrc is entitled to judgment as a matter of law as to liability on these two counts, as well as permanent injunctive relief from future violations. The only issue in dispute that remains is the amount of damages suffered by Metrc for Estes's breach of the Non-Solicitation Agreement, which may be determined at trial.

## STATEMENT OF UNDISPUTED FACTS

### A.    Metrc's Business.

1.      Plaintiff, Metrc, Inc. is a Delaware Corporation with its principal place of business in Lakeland, Florida. **Exhibit 1**, *Declaration of Michael Johnson* at ¶ 4. Metrc

ID, LLC was previously known as MCS Acquisition, LLC. *Id.* at ¶ **5**. Metrc ID, LLC is a wholly owned subsidiary of Metrc created for the sole purpose of executing the asset purchase agreement described herein. *Id.* Metrc ID, LLC's sole member is Metrc LLC, a Florida limited liability company.  *Id.* Metrc LLC's sole member is Metrc, Inc.[1]

2.      Headquartered in Lakeland, Florida, Metrc is a trusted and experienced provider of cannabis regulatory systems in the United States. *Id.* at ¶ **4.** Through a Request for Proposal process, state regulatory agencies overseeing legalized cannabis programs and seeking a compliance management tool contract with Metrc to license its software-as-a-service ("SaaS") product, which combines advanced software and radio-frequency identification ("RFID") technology as a means to track and trace cannabis from growth, harvest, and processing to testing, transport, and sale to ensure no inversion or diversion of product. *Id.*

3.      Metrc's goal is to bring total visibility to cannabis supply chains through connection, transparency and reliability. *Id.* at ¶ **6.** When states legalize any form of cannabis use, regulators face a host of challenges, which includes protecting the public health.  *Id.* at ¶ **6**.  To do so, regulators must ensure growers and sellers are engaging in comprehensive cannabis testing, track inventory and sales, and be able to secure the regulated marketplace against illicit product.  *Id.*  Metrc's SaaS product combined with

---

[1] Plaintiffs will collectively refer to these entities as "Metrc" in this motion for ease of reference.

its new Retail ID technology ("Retail ID"), is a powerful force in advancing these interests. *Id.*

> **B.    Metrc Acquires Chroma Signet to Develop Their New Product, Retail ID.**

4.    On April 7, 2023, Metrc, through its subsidiary MCS Acquisition, LLC (now named Metrc ID, LLC), acquired the assets of Chroma Signet in an asset purchase agreement ("Asset Purchase Agreement").    ***Id.* at ¶ 8**; **Exhibit 2**, *Asset Purchase Agreement*. Estes was the CEO/Founder of Chroma Signet. J**ohnson Decl. at ¶ 7**. Chroma Signet was engaged in developing open source barcode labeling software to create NFT-enabled QR codes that could be encoded with data for supply chain partners and consumers.    **Johnson Decl. at ¶ 9**. Pursuant to the Asset Purchase Agreement, Estes not only sold all assets, properties, and contractual rights to his company, he also explicitly sold all goodwill associated with the company and its assets, and agreed to conduct himself in a manner so as not diminish that goodwill. ***Id.* at ¶ 8**, **Exhibit 2** at Art. 1, § 1.1(g), Art. IV, § 4.1.

5.    Metrc sought to acquire and further develop the Chroma Signet technology to create its own proprietary QR code technology, which was subsequently named Retail ID. **Exhibit 3**, *Declaration of David Eagleson* at ¶¶ 5-6; **Exhibit 4**, ***Deposition of Marcus Estes* at 39:23-42:5** (explaining how the initial Chroma Signet technology worked)[2]; **Johnson Decl. at ¶¶ 10-11**. **Eagleson Decl. at ¶ 8.**

---

[2] Deposition transcripts will be cited as follows: Deponent Surname at [page number]:[line number].

4

6.     Since the purchase of Chroma Signet, Metrc has further developed the technology to create a single source of compliance data, having direct linkage to real-time lab tests, Certificates of Analysis, and other cannabis-related product information – what is known today as Retail ID. **Eagleson Decl. at ¶¶ 5-8; Johnson Decl. at ¶¶ 10-12.** Retail ID now allows consumers to verify product authenticity and makes the supply chain transparent, creating a seamless Metrc user experience. **Eagleson Decl. at ¶¶ 5-8; Johnson Decl. at ¶ 10.** In short, Retail ID is a revolutionary product that allows an end-user or regulator to scan the QR code placed on the packaging of a cannabis plant or product and instantaneously verify its history from seed to sale. ***See id.***

7.     Metrc has expended countless hours and significant expense acquiring the technology, property interests and knowledge to develop its Retail ID technology, which included the purchase of Chroma Signet assets. **Johnson Decl. at ¶ 12; Eagleson Decl. at ¶ 8.**

8.     In addition, Metrc has expended untold costs and time in researching and developing its Retail ID product and developing the product's customer base to ensure the successful launch of Retail ID. **Johnson Decl. at ¶ 12**.

9.     Retail ID's customer and prospective customers are critical to the success of the product and Metrc' operations, as Estes was well-aware during his employment with Metrc. **Johnson Decl. ¶¶ 15-20**.

**C.     Estes Executes the Offer Letter Agreement and Receives a One-Time Signing Bonus.**

10. As part of its acquisition of Chroma Signet, Estes became a Metrc employee with the title Executive Vice President, Chroma Signet. **Johnson Decl. at ¶ 13**. The terms of Estes's employment were memorialized in the Company's Offer Letter Agreement. *See* **Exhibit 5**, *Offer Letter Agreement.*

11. By virtue of his role with Metrc, Estes was well-aware of the importance of early adoption partners to the rollout of Metrc's new Retail ID technology. **Johnson Decl. at ¶¶ 15-20**. Indeed, Estes was uniquely positioned to have influence over any customers, prospective customers, and business partners associated with or with knowledge of Retail ID. *Id.* **at ¶ 15**. Estes' primary job duty was to contact potential partners/early adopters of Retail ID and secure pilot programs for these early adopters in different markets. **Estes at 70:3-18**; **Johnson Decl. at ¶ 15**. Thus, in many cases, Estes was the face of Retail ID.. *Id.* **at ¶ 15**.

12. In the Offer Letter Agreement, which was negotiated as part of the acquisition, Metrc provided substantial compensation to Estes as consideration for his continued services. *See* **Exhibit 5**. Part of Metrc's compensation package to Estes included a one-time signing bonus of $100,000 to be paid within 15 days of Estes's start date with the Company (the "Signing Bonus"). *Id.* Estes admits that he was paid the bonus in full. **Estes at 44:6-45:13.**

13. However, the Offer Letter Agreement provided that if Estes's employment terminated prior to his second anniversary with the Company, for any reason whatsoever, Estes was required to repay to Metrc the gross amount of the

6

Signing Bonus within thirty (30) days following the effective date of Estes's termination. *Id.*

14.    The explicit language of the Signing Bonus provision is as follows:

> [T]he Company will pay you a one-time cash award of $100,000 (the "Signing Bonus")...If your employment with the Company terminates prior to the second-year anniversary of your start date for any reason, you agree to repay to the Company the gross amount of the Signing Bonus within thirty (30) days following the effective date of your termination of employment.

*Id.*

15.    Estes executed the Offer Letter Agreement on April 1, 2023. *Id.*; **Estes at 43:24-46:15.**

**D.    Estes Executes the Non-Solicitation Agreement.**

16.    In connection with Metrc's acquisition of Chroma Signet, on April 7, 2023, Estes executed the Non-Solicitation Agreement. **Johnson Decl. at ¶ 8**; **Exhibit 6**, *Non-Solicitation Agreement*; **Estes at 50:3-6** (admitting execution of Non-Solicitation Agreement).

17.    In the Non-Solicitation Agreement, Estes agreed that, for a period of two years after the termination of his employment (the "Restrictive Period"), he would not:

> (iii) contact any past, present or potential customer of the Company or any of its Affiliates or an Acquiror, for the purpose of (x) providing any service provided by the Company or any of its Affiliates or an Acquiror or (y) **inducing or attempting to induce the entity to cease doing business with the Company or any of its Affiliates or an Acquiror, or reduce the amount of business previously done or contemplated to be done by the Company or any**

7

**of its Affiliates or an Acquiror, for such entity or entities**…

**Exhibit 6**, § 1(a)(iii) (emphasis added).

18.    Estes acknowledged that the covenants set forth in the Non-Solicitation Agreement constituted reasonable restraints in light of Estes's role with Metrc, as well as Metrc's future business plans to which Estes was privy. **Exhibit 6**, § 1(c).

19.    Further, the covenants set forth in the Non-Solicitation Agreement were tailored to protect the legitimate business interests of the Company to preserve its relationships with its customers and prospective customers, protect the goodwill of Metrc, and protect the goodwill associated with the recently acquired Chroma Signet so that Metrc could reap the benefits of its purchase. **Johnson Decl. at ¶ 8.**

20.    Estes acknowledged and agreed that any breach of the Non-Solicitation Agreement would result in immediate and irreparable damage to Metrc, and that Metrc would be entitled to: (1) obtain an injunction in this court to restrain any further breaches of the Non-Solicitation Agreement, and (2) seek any other remedies available at law, including monetary damages. **Exhibit 6,** § 1(b).

**E.    Estes is Terminated, Breaches his Non-Solicitation Agreement, and Refuses to Return His Signing Bonus.**

*i.    Estes Fails to Return the Signing Bonus.*

21.    Metrc employed Estes from on or about April 18, 2023 to April 9, 2024.

22.    On April 9, 2024, Metrc terminated Estes due to poor performance. **Johnson Decl. ¶ 21.**  Estes was asked to return the Signing Bonus of $100,000.  Estes refused to do so.  **Estes at 45:14-46:16, 232:7-19**; **Johnson Decl. at ¶ 27**; **Exhibit 7,**

*Estes's Amended Responses to Metrc's First Set of Interrogatories No. 3* (stating that Estes "did not return the $100,000 signing bonus to Metrc because Metrc wrongfully terminated Defendant…").

> ii.    *Estes Induces Metrc's Customers and Prospective Customers to Cease or Refrain From Using Retail ID.*

23.    Shortly after Metrc terminated Estes due to his poor performance, Estes began engaging Metrc's customers and prospective customers to convince them to cease or refrain from using Retail ID.

24.    For example, on April 22 and 23, 2024, Metrc worked to schedule a meeting with prospective client Stephanie Arakel of Khalifa Kush for 12 p.m. on April 29, 2024, regarding the adoption of Retail ID. *See* **Exhibit 8**, *Emails Between David Eagleson and Stephanie Arakel*; **Eagleson Decl. ¶¶ 17-18**. Khalifa Kush is a marijuana manufacturer that engages in the production of specialized strains of marijuana. **Eagleson Decl. at ¶ 17**. Khalifa Kush is currently sold in retail locations across the Western, Southeastern, and Northeastern United States. ***Id.***

25.    During his deposition testimony, Estes admitted that Arakel was a "friend" of his, and that he was aware she worked for various cannabis companies as a consultant. **Estes at 262:10-13**.

26.    On April 24, 2024, Estes and Arakel communicated via text message. *See* **Exhibit 9,** *Estes's Text Messages with Stephanie Arakel.* In his messages to Arakel, Estes stated that Metrc was "corrupt", that Metrc was trying to "muzzle" him, that Arakel's company, Khalifa Kush, shouldn't "touch" Retail ID, and that he would be pursuing

a campaign against Metrc in the press. *Id.* Estes further called Metrc "a bunch of fucking weasels" and stated that he would be suing Metrc. *Id.*

27.    In response, Arakel informed Estes of her scheduled meeting with Metrc set for Monday, April 29. *Id.* Estes responded "Tell them you talked to me. It'll do me a favor…I highly recommend you bail on that project. They're looking for brands to get behind them but their end goal is corrupt." *Id.* Estes added, "Don't align with the cops!" a reference to Metrc's and Retail ID's regulatory functions. *Id.*

28.    On April 29, 2024, fifteen minutes before her scheduled meeting with Metrc, Arakel cancelled the meeting via email to Eagleson, purportedly due to "medical complications." **Exhibit 8** at Plaintiff-003880-83; **Eagelson Decl. ¶ 19-20**. Two days later, on May 1, 2024, Arakel messaged Estes and confirmed that she cancelled her meeting due to Estes's statements. **Exhibit 9 at** DEF_000363. Estes responded, "I appreciate that." *Id.*[3]

29.    Metrc has been unable to re-establish communications with Arakel or Khalifa Kush since this incident. **Eagleson Decl. at ¶ 20**. Metrc lost this business opportunity and suffered reputational harm due to Estes's interference with Khalifa Kush.

30.    Estes made a similar statement to Metrc's customer Wyld on April 22, 2024. **Exhibit 10**, *Estes's Text Messages with Wyld's Director of New Market Operations,*

---

[3] Furthermore, in her messages with Estes, Arakel stated that she took the meeting due to Estes's involvement with Retail ID. *Id.* Thus, Estes had a substantial relationship with this prospective client, and was in the perfect position to interfere, which he did.

*Eric Mushrush.* Wyld is a leading cannabis infused product developer and distributor in the United States with a significant share of the United States cannabis edibles market. **Johnson Decl. ¶ 17**; **Eagleson Decl. at ¶ 22**. Metrc spent significant time and expense marketing Retail ID to Wyld and creating the goodwill required for a successful product launch and business relationship. **Johnson Decl. at ¶¶ 17-19; Eagleson Decl. at ¶¶ 22-23.**

31.     Ultimately, Metrc was successful in its efforts and Wyld became an adopter of Retail ID. **Johnson Decl. at ¶¶ 17-19; Eagleson Decl. at ¶ 23**. While Metrc disputes the extent of Estes's role in obtaining Wyld as an early adopter, it is undisputed that Estes was involved in the process of Wyld's implementation of Retail ID, including troubleshooting any technological or software issues that would arise. **Estes at 168:11-170:7** (Estes testifying that he was involved in pitching and development of Retail ID with several partners, including Wyld); **Eagleson Decl. at ¶ 23.**

32.     Specifically, Estes informed Wyld's Director of New Market Operations, Eric Mushrush, that Metrc had fired him "without cause,"[4] and that they had tried to get him to sign a "document saying I wouldn't tell you or anyone else what I saw working there." **Exhibit 10.** Estes added, "I declined that and will be speaking out across the whole industry, with support from my attorneys." ***Id.*** Estes continued, "I

---

[4] As set forth in Estes's Offer Letter Agreement, Estes's employment with Metrc was at-will, and could be terminated by either party at any time, with or without cause. *See* **Exhibit 5.**

don't think you guys should be one of the few MSOs to back them on this QR code [Retail ID]. I'll have to tell you more in person sometime." ***Id.*** Estes relevant text exchange with Mushrush is excerpted below**:**

> Hey Eric, sounds like no one filled you in: Metrc fired me without cause.
>
> They did it 9 days before I had a pay package coming in from the acquisition.
>
> Worse than that, they tried forcing me to sign a document saying I wouldn't tell you or anyone one else what I saw working there. I declined that and will be speaking out across the whole industry, with support from my attorneys.
>
> There are some good people there, but in the end I don't think you guys should be one of the few MSOs to back them on this QR code. I'll have to tell you more in person sometime.

33.     Estes informed other Metrc employees of his plan to interfere with Metrc's customers in the wake of his termination.  For example, in an April 11, 2024, text message with Metrc's Product Owner, Matt Goetz, Estes informed Goetz he had just spoken with another customer of Metrc's, John Brown of Holistic (one of Metrc's customers specifically named in the Complaint), and reported "I don't think you guys are going to have *any customers left* when I'm done sharing my side of the story." **Exhibit 11**, *Estes's Communications with M. Goetz* (emphasis added).

34.     In the wake of Estes's interference with Wyld, Wyld requested that it not be involved in any press related to Retail ID so as not to be involved in any litigation, and further curtailed its adoption of Retail ID in subsequent markets for several months until wider adoption of Retail ID was obtained in the marketplace. **Johnson**

**Decl. at ¶¶ 20-26; Eagleson Decl. at ¶¶ 24-29**.  In essence, as a result of Estes's interfering statements, Wyld no longer wanted to be seen as a pilot organization for Retail ID, and was not willing to scale its adoption of Retail ID to a point that would have enabled Retail ID to have sufficient market exposure to encourage wider adoption. *Id.*  For this reason, Metrc had to pivot, and instead of using a few brands with significant market position in limited jurisdictions as early adopters, Metrc had to locate smaller early adopters across multiple jurisdictions in order to obtain sufficient Retail ID adoption. **Johnson Decl. at ¶ 25 ; Eagleson Decl. at ¶ 27**.

<u>ARGUMENT</u>

**A.    Summary Judgment Standard**

Summary judgment is appropriate when there are no genuine issues of material fact for the jury to consider and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Audiology Distribution, LLC v. Simmons,* No. 8:12-CV-02427-JDW, 2014 WL 7672536, at *4 (M.D. Fla. May 27, 2014) (quoting *Kernel Records Oy v. Mosley,* 694 F.3d 1294, 1300 (11th Cir. 2012) (citations omitted)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).

The burden is on the moving party to demonstrate that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1260 (11th

13

Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, (1986)). Once the movant

establishes the absence of genuine material facts, the burden shifts to the nonmoving

party to show that specific facts exist that raise a genuine issue for trial. *Dietz v.*

*Smithkline Beecham Corp.,* 598 F.3d 812, 815 (11th Cir. 2010).

The evidence must be viewed in the light most favorable to the nonmovant. *Ross*

*v. Jefferson Cnty. Dep't of Health,* 701 F.3d 655, 658 (11th Cir. 2012). "Although all

justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cnty.*

*v. Purcell,* 971 F.2d 1558, 1563–64 (11th Cir. 1992), "inferences based upon speculation

are not reasonable." *Marshall v. City of Cape Coral,* 797 F.2d 1555, 1559 (11th Cir. 1986).

### B.    Metrc Is Entitled to Summary Judgment on Its First Cause of Action for Breach of the Offer Letter Agreement.

To establish a breach of contract, Metrc must plead and prove: (1) the existence

of a valid contract; (2) a material breach; and (3) damages. *See Beck v. Lazard Freres &*

*Co., LLC,* 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller,* 603 So. 2d 1338,

1340 (Fla. 1st DCA 1992)).  In order to establish that a valid contract exists, Metrc

must demonstrate: (1) an offer; (2) acceptance of the offer; (3) consideration; and (4)

sufficient specification of the essential terms of the agreement. *E.g., St. Joe Corp. v.*

*McIver,* 875 So. 2d 375, 381 (Fla. 2004).

Here, Plaintiff does not challenge the authenticity of the offer letter. **Estes at**

**44:6-47:20**. Estes, who was represented by deal counsel at the time, admits that he

understood its terms, and that he understood he would be required to return the

$100,000 Signing Bonus if his employment terminated, for any reason, prior to his

second anniversary with Metrc. *Id.* As part of the deal closing, Estes was required to acknowledge the terms of the offer letter by way of executing the same, which he did. *See* **Exhibit 5**. As consideration for Estes's execution of the offer letter, Metrc agreed to employ Estes in the position of Executive Vice President, Chroma Signet, and compensate Estes with a salary of $175,000, and provide him with the $100,000 Signing Bonus, among other benefits. *Id.* In accordance with the Agreement, Metrc paid Estes his salary and Signing Bonus. Accordingly, a valid agreement supported by sufficient consideration existed between Plaintiff and Metrc.

Plaintiff does not dispute that he failed to repay the Signing Bonus. Instead, Estes claims that he felt he didn't have to return the Signing Bonus because he was "wrongfully terminated" and it would have been financially burdensome. **Estes at 232:7-19**; **Exhibit 7**, *Estes's Amended Responses to Metrc's First Set of Interrogatories No. 3* ("Defendant did not return the $100,000 signing bonus to Metrc because Metrc wrongfully terminated Defendant and because returning the $100,000 would have been financially burdensome for Defendant"). The express terms of the Offer Letter Agreement were clear that Estes would be compelled to return his Signing Bonus if his employment terminated prior to his second-year anniversary with Metrc "**for any reason**." **Exhibit 5** (emphasis added). Financial burden, in and of itself, is also not a viable defense to a breach of contract claim under Florida law. *City of Tampa v. City of Port Tampa*, 127 So. 2d 119, 120 (Fla. 2d DCA 1961) ("Inconvenience or the cost of compliance, though they might make compliance a hardship, cannot excuse a party

15

from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful."); *CMR Constr. & Roofing, LLC v. ASI Preferred Ins. Corp.*, No. 219CV442FTM29MRM, 2021 WL 877560, at *7 (M.D. Fla. Mar. 9, 2021) ("Nor is it a defense to say that it would be costly for Buckley Towers to comply with the insurance contract as written.")  If a contract is clear and unambiguous, "it must be enforced according to its terms." *CMR Constr. & Roofing,* 2021 WL 877560, at *7 (citing *Acosta, Inc. v. Nat'l Union Fire Ins. Co.,* 39 So. 3d 565, 573 (Fla. 1st DCA 2010)).

Estes was obligated to return the Signing Bonus within thirty days of the effective date of his termination on April 9, 2024.  Estes refused to do so, and breached the terms of the Offer Letter Agreement. Estes's breach of the Offer Letter Agreement has caused Metrc substantial damages in the amount of the $100,000 Signing Bonus paid to Estes.

There is no genuine issue of material fact remaining as to Estes's breach of the Offer Letter Agreement.  Accordingly, Metrc respectfully requests that summary judgment be entered on its First Cause of Action for breach of the Offer Letter Agreement.

## C. Estes Breached His Non-Solicitation Agreement By Interfering With Khalifa Kush and Wyld.

Florida law permits restrictive covenant agreements such as the Non-Solicitation Agreement at issue here, so long as such contracts are set forth in writing between the parties, reasonable in time, area, and line of business, and supported by legitimate business interests justifying the covenant.  Fla. Stat. § 542.335(1); *Proudfoot*

*Consulting Co. v. Gordin,* 576 F.3d 1223, 1221 (11th Cir. 2009). These legitimate business interests include relationships with "specific *prospective or existing customers…or clients.*" Fla. Stat. § 542.335(1)(b)(3) (emphasis added). Further, customer or client goodwill associated with an ongoing business or specific marketing or trade area are legitimate business interests under the statute. Fla. Stat. § 542.335(1)(b)(4).

### 1. Metrc's Non-Solicitation Covenants Are Reasonable in Scope and Designed to Protect Its Legitimate Business Interests.

For a period of two (2) years following termination of his employment with Metrc, Estes was precluded from contacting any present or potential Metrc customer for the purpose of inducing or attempting to induce the entity to cease doing business with the Metrc, or to reduce the amount of business previously done or contemplated to be done by Metrc. **Exhibit 6** at § 1(a) and 1(a)(iii). Yet, Estes did exactly this immediately upon his separation with Metrc. Florida courts have regularly upheld two-year non-solicitation covenants when they are supported by legitimate business interests. *See, e.g., Arthur J. Gallagher Serv. Co. v. Egan,* No. 12-CV-80361, 2013 WL 11981917, at *3 (S.D. Fla. Apr. 8, 2013), *aff'd,* 567 F. App'x 857 (11th Cir. 2014)(upholding two-year non-solicitation covenant as reasonable in time and scope); *Milner Voice and Data, Inc. v. Tassy,* 377 F. Supp. 2d 1209, 1221 (S.D. Fla. 2005) (under Florida law, finding two-year non-solicitation covenant enforceable). *See also Avalon Legal Info. Servs., Inc. v. Keating,* 110 So. 3d 75, 82 (Fla. 5th DCA 2013) (finding three-year non-compete/non-solicitation covenants enforceable under unique circumstances at issue).

Metrc only seeks to enforce the covenant with respect to the current or prospective clients of Metrc with whom Estes had a relationship. In *Brown & Brown, Inc. v. Ali,* 494 F.Supp.2d 943 (N.D. Ill.2007) (applying Florida law), the court held: "There is little question under Florida law that an employer has a legitimate business interest in prohibiting solicitation of its customers with whom the employee has a substantial relationship." *Id.* at 950 (quoting *N. Am. Prods. Corp. v. Moore,* 196 F.Supp.2d 1217, 1228 (M.D. Fla. 2002)). "'[T]he right to prohibit the direct solicitation of existing customers' is a legitimate business interest, and a covenant not to compete which includes a non-solicitation clause is breached when a former employee directly solicits customers of his former employer." *Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 961 (Fla. 4th DCA 2010) (quoting *Atomic Tattoos, LLC v. Morgan,* 45 So. 3d 63, 65 (Fla. 2d DCA 2010) (citations omitted)). This same legitimate business interest exists for prospective customers, pursuant to Florida's restrictive covenant statute. *See* Fla. Stat. § 542.335 (1). *See also Tassy,* 377 F. Supp. 2d at 1221 (enforcing two-year non-solicitation covenant that prohibited solicitation of actively sought customers).[5] "As with many sales positions, regardless of the industry, forming relationships with prospective and existing customers is invaluable and often vital for

---

[5] Furthermore, this covenant is enforceable even where the customers or prospective customers in question were brought to the former employer by the former employee or where the former employee's relationship with the current or prospective customer predated his employment with the former employer. *See Hilb Rogal,* 48 So. 3d at 958-61 (enforcing two-year non-solicitation agreement even when defendant brought the customers in question to his ex-employer). "[I]t appears that that even though Grimmel brought these customers into HRH, Grimmel was HRH's employee and that was what his job entailed. He was a sales producer and it was his job to find customers." *Id.*

success." *Id.* (quoting *Reliance Wholesale, Inc. v. Godfrey*, 51 So. 3d 561, 565 (Fla. 3d DCA 2010). Further, this Court "shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." *Allied Universal Corp. v. Given*, 223 So. 3d 1040, 1043 (Fla. 3d DCA 2017) (granting temporary injunction where plaintiff had established legitimate business interests associated with prospective customers and that defendant had substantial relationships with the prospective customers) (citing § 542.335(1)(g)(4), Fla. Stat. (2016)).

Here, the two-year non-solicitation of Metrc's existing and prospective customers is both reasonable in time and scope. Further, Estes acknowledged the covenant's reasonableness in the Non-Solicitation Agreement. **Exhibit 6**, § 1(c) ("The parties agree that the covenants contained in this Section 1 impose reasonable restraint on the Employee in light of the Business, and the activities and future plans of the Company and its Affiliates."). And, the Agreement is tied to Estes selling the assets of his Company to Metrc. Accordingly, the Non-Solicitation Agreement should be enforced as written.[6]

## 2. *Estes Breached the Non-Solicitation Agreement.*

Estes cannot refute that he breached the Non-Solicitation Agreement. It is undisputed that Estes contacted both Wyld and Khalifa Kush with the purpose of

---

[6] The parties further agreed that to the extent the covenant was determined by the court to be unreasonable, that it was the parties intention that such covenant be "enforced to the fullest extent which such court deems reasonable, and the provisions of this Section 1 shall thereby be reformed." *Id.* at § 1(d).

enticing them to cease doing business with Metrc or refuse to adopt its new product, Retail ID (thereby reducing the business previously done or contemplated to be done with Metrc).  Estes's text messages with both Wyld and Khalifa Kush document this. Estes' text messages with these companies is in direct violation of the Non-Solicitation Agreement's terms.  As set forth above, these solicitations resulted in direct harm to Metrc in the form of a reduced business relationship with Wyld and the loss of prospective customer Khalifa Kush. Estes admitted that he understood the terms of the Non-Solicitation Agreement (**Estes at 60:25-11**), and Estes has not raised any defenses in his Answer, or otherwise, attacking the enforceability of the Non-Solicitation Agreement itself. *See* D.E. 42.  Accordingly, Metrc is entitled to judgment as a matter of law on its Second Cause of Action for Breach of the Non-Solicitation Agreement with respect to the unlawful solicitations of Wyld and Khalifa Kush.[8]

## CONCLUSION

Due to the absence of any material issues of fact on these claims, for the foregoing reasons Metrc respectfully requests that this Court enter an order granting summary judgment in favor Metrc on: (1) Count I for Estes's Breach of the Offer Letter Agreement, and (2) Count II for Breach of Estes's Non-Solicitation Agreement due to

---

[7] Metrc concedes that there are material issues of fact as to whether Estes breached the Non-Solicitation Agreement with respect to his solicitations of Metrc customer Holistic, and therefore is not seeking summary ruling on that solicitation.  Metrc will proceed to trial on this issue.

[8] In addition to a finding of liability, Metrc is requesting that the Court reserve jurisdiction to rule on whether Metrc is entitled to an award of attorneys' fees and costs as a prevailing party pursuant to Fla. Stat. § 542.335 (1)(k), as this is an action seeking enforcement of a restrictive covenant.

his solicitations of Wyld and Khalifa Kush, and granting any other such relief the Court deems just and proper.

Dated this day of July 21, 2025.

FORDHARRISON LLP

By:     /s/ Nicholas S. Andrews
        Edward B. Carlstedt
        Florida Bar No. 0136972
        ecarlstedt@fordharrison.com
        Nicholas S. Andrews
        Florida Bar No. 0105699
        nandrews@fordharrison.com
        FordHarrison LLP
        401 East Jackson Street, Suite 2500
        Tampa, Florida 33602
        Telephone (813) 261-7800
        Facsimile (813) 261-7899
        Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 21, 2025, a true and correct copy of the foregoing has been filed with the Clerk of Court via CM/ECF which will send a copy via electronic mail to counsel of record: Andrew DeWeese, andrew@andrewdeweese.com, 55 NW Yeon Ave # 527. Portland, OR 97210.

/s/ Nicholas S. Andrews
Attorney