IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| METRC, INC., METRC ID, LLC<br><br>Plaintiffs,<br><br>v.<br><br>MARCUS ESTES,<br><br>Defendant. | Case No. 8:24-cv-01252-WFJ-CPT |

### Declaration of Michael Johnson

I, Michael Johson, being duly sworn, depose and say:

1. I am over 18 years of age, and I make this declaration truthfully and based upon my personal knowledge as well as the business records of Metrc, which records are regularly maintained in the ordinary course of business by individuals whose responsibility it is to maintain the accuracy of such records.

2. I am Metrc's Chief Executive Officer.

3. As the Chief Executive Officer, I am familiar with Metrc's acquisition of the assets of Chroma Signet, the hiring of Marcus Estes, Estes's responsibilities and duties while Metrc employed him, the terms of Estes's Agreements with Metrc, and Estes's breach of his Non-Solicitation Agreement, failure to return his signing bonus paid to him pursuant to his offer letter, and his interference with Metrc's customers and prospective customers.

1

Exhibit 1

4.      Metrc, Inc. is a Delaware corporation with its principal place of business in Lakeland, Florida. Metrc, Inc. is a trusted and experienced provider of cannabis regulatory systems in the United States. Through a Request for Proposal process, state regulatory agencies overseeing legalized cannabis programs and seeking a compliance management tool contract with Metrc to license its software-as-a-service ("SaaS") product, which combines advanced software and radio-frequency identification ("RFID") technology as a means to track and trace cannabis from growth, harvest, and processing to testing, transport, and sale to ensure no inversion or diversion of product.

5.      Metrc ID, LLC is a Delaware limited liability company, and was previously known as MCS Acquisition, LLC. Metrc ID, LLC is now a wholly owned subsidiary of Metrc, Inc., and was created for the sole purpose of executing an asset purchase agreement with Estes's former company, Chroma Signet ("Asset Purchase Agreement"). Metrc ID, LLC's sole member is Metrc, LLC, a Florida limited liability company. Metrc LLC's sole member is Metrc, Inc. I will simply refer to the various Metrc entities as "Metrc" in my declaration.

6.      Metrc's goal is to bring total visibility to cannabis supply chains through connection, transparency and reliability. When states legalize any form of cannabis use, regulators face a host of challenges, which includes protecting the public health. To do so, regulators must engage in comprehensive cannabis testing, have a way to track inventory and sales, and be able to secure the regulated marketplace against illicit product. Metrc's SaaS platform, which uses RFID technology in supply chain

2

Exhibit 1

management, and its Retail ID technology, are powerful allies in advancing these interests. Metrc closely monitors the cannabis supply chain to secure markets against theft and infiltration. Metrc's unique solutions and technology ensure that every cannabis plant and every cannabis product is accounted for from growth/production to consumption, preventing illicit and/or unregulated cannabis from entering the supply chain.

7. In 2022, Metrc and Estes began discussions the sale of the assets of Chroma Protocol Corporation ("Chroma" or "Chroma Signet") to Metrc. Estes was one of the founders of Chroma Signet. Metrc and Estes negotiated the sale over several months.

8. On April 7, 2023, Metrc, Inc., through its subsidiary MCS Acquisition, LLC, acquired the assets of Chroma Signet, and all rights and property associated therewith, via the Asset Purchase Agreement. A true and correct copy of the Asset Purchase Agreement is attached to the Motion for Partial Summary Judgment as **Exhibit 2**. Metrc paid a considerable seven-figure sum for Chroma Signet. With the sale of the assets of Chroma Signet, Metrc not only acquired all assets, properties, and contractual rights to Chroma Signet, but also all of the goodwill associated with the company and its assets. Pursuant to the Asset Purchase Agreement, Estes agreed to preserve the goodwill associated with the company and between the company and its suppliers, customers, and third-party business relationships. In addition, as part of the Asset Purchase Agreement and given the significant sums paid in connection with this acquisition, Estes executed an Assignment of Inventions, Non-Disclosure, Non-

3

Exhibit 1

Competition, and Non-Solicitation Agreement (the "Non-Solicitation Agreement"). A true and correct copy of the Non-Solicitation Agreement is attached to the Motion for Partial Summary Judgment as **Exhibit 6**. The purpose of having Estes sign this Non-Solicitation Agreement was to both protect Metrc's confidential information and to protect our business relationships with current and prospective customers (and the customers of Chroma Signet), including the goodwill associated therewith, which Metrc expended substantial time and expense in obtaining and developing.

9. Chroma Signet was engaged in developing open-source barcode labeling software to create NFT-enabled QR codes that could be encoded with data to supply chain partners and end consumers of cannabis-containing products.

10. Metrc sought to acquire and further develop the Chroma Signet technology to create its own proprietary QR code technology, which was subsequently named Retail ID. Retail ID allows cannabis brands and distributors to generate unique QR codes for each individual retail item with one click, and then print and affix the QR code to each item for sale. This allows the product to seamlessly move through the supply chain without additional scanning, increasing efficiency and workflow. For the end consumer purchasing a Retail ID-labeled product at a retail store, the consumer can scan the Retail ID QR code for further product information, including certificates of lab-conducted analyses and specific ingredients in the product.

11. The goal of Retail ID is to demonstrate that products are legal, lab-tested, and safe for consumption. This further improves regulatory compliance and increases consumer confidence in the cannabis marketplace. It also allows cannabis brands,

distributors, retailers, and consumers to validate that their product is legal, which acts as a deterrent to illicit activity and protects the brands' reputations. Retail ID further allows enhanced communications with brands, distributors, and retailers for product recalls in the event that recalls are necessary.

12. Metrc has expended countless hours, significant labor, and substantial expense acquiring, developing, and improving its Retail ID technology, which includes the expenses incurred from the purchase of Chroma Signet. Metrc has also expended untold costs and time in researching and developing Retail ID and its associated customer base to ensure a successful product launch.

13. As part of Metrc's acquisition of the assets of Chroma Signet, Estes, through his deal counsel, negotiated the ability to become a Metrc employee with the title Executive Vice President, Chroma Signet. In taking on that role, Estes signed Metrc's offer letter (the "Offer Letter Agreement"). A true and correct copy of the Offer Letter Agreement is attached to the Motion for Partial Summary Judgment as **Exhibit 5**.

14. Estes's Offer Letter Agreement included several provisions, including that Metrc pay Estes a salary of $175,000 and a one-time signing bonus of $100,000 (the "Signing Bonus"). The language of the Signing Bonus provision provides as follows:

> [T]he Company will pay you a one-time cash award of $100,000 (the "Signing Bonus")…If your employment with the Company terminates prior to the second-year anniversary of your start date for any reason, you agree to repay to the Company the gross

amount of the Signing Bonus within thirty (30) days following the effective date of your termination of employment.

15. Metrc had clear objectives for Estes in his role. The principal objective was for Estes to continue to market Chroma Signet/Retail ID to brands and distributors for early adoption of the Retail ID technology. Early adoption of Retail ID was critical as we needed to test and further develop the product to be ready to roll it out to a wider market. Furthermore, early adoption with key cannabis multi-state operators ("MSOs") would allow Metrc to demonstrate the utility and effectiveness of Retail ID to other manufacturers, distributors, and retail organizations within the cannabis industry, encouraging further adoption. Achieving sufficient market saturation with Retail ID would also encourage customers to use Metrc's underlying application programming interface ("API"), Metrc Connect. Thus, Estes was, in many cases, the face of Retail ID for the product's customers and prospective customers. Estes was aware of how critical early adopters were to both Metrc's and Retail ID's success. Given his history with the product, Estes was uniquely positioned to have influence over any customers, prospective customers, and business partners who had adopted or may adopt Retail ID.

16. Metrc's goal for increasing early adoption was simple. Metrc needed to quickly scale Retail ID utilization so that it could achieve 50,000,000 QR codes printed by the end of Q4 2024. Metrc informed Estes of this goal, and he was well aware of it throughout his employment. Early adopters are integral to the adoption of any new and innovative product. Early adopters comprise approximately 13.5% of the

mainstream market base, and their use of new technologies is critical to obtaining future technological adoption across a wider swathe of the consumer base. For this reason, it was critical that Metrc ensure partnerships with its early adopters, and that it be able to market its successes with these partners.

17. During Estes's employment, Metrc was able to secure an early adoption partner with Wyld. Wyld is a leading cannabis infused product developer and distributor in the United States, and has a significant share of the United States cannabis edibles market. Wyld operates and produces cannabis from its facilities in Oregon, but distributes its products to cannabis retailers across the United States. Metrc spent significant time and expense marketing Retail ID to Wyld, convincing Wyld to become an early adopter of the product, and modifying Retail ID to Wyld's specifications so that it could properly implement and use Retail ID for its products. Through this process, Metrc established and created substantial goodwill and a positive reputation with Wyld, which was required for a successful product launch and business relationship.

18. As a developer of the Chroma Signet/Retail ID technology, Estes's role with Wyld post-adoption was critical. Through his employment with Metrc, Estes spent considerable time tailoring the Retail ID technology to Wyld's needs (including by obtaining Wyld's specifications for label creation), and assisting and addressing any technological concerns and issues that might arise from Wyld's implementation of Retail ID. Estes had a substantial relationship with Wyld as a result, as can be seen

from his personal text messages with Wyld's Director of New Market Operations, Eric Mushrush. *See* **Exhibit 10** to Motion for Partial Summary Judgment.

19. Metrc considered Wyld's early adoption of Retail ID as a key early success story for Retail ID, as Wyld's involvement was critical so that we could build out Retail ID, obtain sufficient market saturation, and ultimately encourage other MSOs and consumers to use the technology. Estes was well aware of how critical Wyld's participation as an early adopter of Retail ID was to Metrc.

20. Initially, Wyld was an early adopter for the use of Retail ID in Maryland only. But Metrc engaged in extensive discussions with Wyld regarding the adoption of Retail ID for its products in other markets and jurisdictions across the United States. Metrc and Wyld contemplated that after a successful rollout of Retail ID in Maryland, they would quickly adopt Retail ID in other states. Having a trusted partner like Wyld using Retail ID in multiple jurisdictions, particularly in those jurisdictions where QR labeling was not yet adopted or where Metrc had not obtained significant market share, was critical to the successful rollout of Retail ID.

21. On April 9, 2024, Metrc terminated Estes due to his poor performance in the role of Executive Vice President. Estes was clearly unhappy about Metrc's decision to part ways. While Metrc tried to negotiate a severance package with Estes, he was not interested and instead made threats to his Metrc colleagues, including Product Owner Matt Goetz, that he would attempt to drive away any current or prospective adopters of Retail ID.

22. Estes made good on his threats. As can be seen from his texts with Wyld's New Director of Market Operations, Estes specifically instructed Wyld to cease their adoption of Retail ID.

23. While the full substance of these conversations with Wyld were unknown to me at the time, during my conversations with Wyld in April 2024, Wyld informed me that they had concerns about their continued relationship with Metrc in light of Estes's statements and representations regarding Retail ID. Wyld specifically instructed both me and Metrc's Director of Product Management, David Eagleson, to refrain from engaging in any press or media discussing Wyld's relationship with Retail ID for the foreseeable future.

24. In addition, while Metrc conducted a successful rollout of Retail ID in Maryland, and the parties had contemplated and verbally agreed to near immediate adoption of Retail ID in other markets and jurisdictions, Wyld got cold feet and no longer had any interest in serving as our flagship early adoption partner in other markets due to Estes's statements. Instead, Wyld delayed its agreement to expand Retail ID into other markets until Metrc could establish itself in other jurisdictions and markets with other adoption partners.

25. For this reason, Metrc had to pivot, and instead of using a few brands with significant market position in limited jurisdictions as early adopters, Metrc had to spend considerable time and effort locating and convincing smaller early adopters across multiple jurisdictions in order to obtain sufficient Retail ID adoption.

26. While Wyld continued as a more limited adopter of Retail ID in the months after Estes's statements to Wyld, the loss of Wyld as a significant early adoption partner resulted in substantial and irreparable harm to Metrc's relationship with Wyld, loss of customer goodwill, and significant monetary damages.

27. Metrc paid Estes his salary in accordance with the terms of the Offer Letter Agreement. While Metrc asked Estes to repay his Signing Bonus, Estes has not made any effort to repay the $100,000 Signing Bonus to date.

**IN ACCORDANCE WITH THE PROVISIONS OF 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON THIS 21st DAY OF JULY, 2025.**

*Signed by:*
*Michael Johnson*
D64F6F5E012F4E5...

_____
Michael Johnson