**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

BY AND AMONG

**MCS ACQUISITION LLC**

**CHROMA PROTOCOL CORPORATION AND**

**MARCUS ESTES, SOLELY IN HIS CAPACITY AS THE REPRESENTATIVE**

**APRIL 7, 2023**

Exhibit 2

DEF_000006

## TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE ..................................................................................1

    1.1    Purchase and Sale .......................................................................1
    1.2    Excluded Assets .........................................................................3
    1.3    Excluded Liabilities ....................................................................4
    1.4    Assumed Liabilities ....................................................................5
    1.5    Closing ..................................................................................5
    1.6    Purchase Price; Allocation of Purchase Price. ....................................5
    1.7    Title Passage; Delivery of Purchased Assets. ......................................6
    1.8    Withholding Rights .....................................................................6
    1.9    Assignment of Contracts and Rights ................................................6

ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLER ................................7

    2.1    Organization, Authority, Enforceability ............................................7
    2.2    Noncontravention; Consents ..........................................................7
    2.3    Capitalization of Seller ................................................................8
    2.4    Seller Financial Statements. ..........................................................8
    2.5    Undisclosed Liabilities; Solvency ...................................................9
    2.6    Litigation ................................................................................9
    2.7    Assets ...................................................................................10
    2.8    Compliance with Laws ...............................................................10
    2.9    Taxes. ...................................................................................10
    2.10    Employees; Employee Benefits. ...................................................12
    2.11    Intellectual Property. .................................................................15
    2.12    No Brokers .............................................................................22
    2.13    Material Contracts. ...................................................................22
    2.14    No Other Representations and Warranties ........................................24

ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................24

    3.1    Organization, Authority, Enforceability ..........................................24
    3.2    Noncontravention; Consents ........................................................24
    3.3    Financial Capability ..................................................................25
    3.4    No Brokers .............................................................................25
    3.5    Litigation ...............................................................................25

ARTICLE IV CONDUCT OF BUSINESS PRIOR TO CLOSING; ADDITIONAL
AGREEMENTS .......................................................................................................25

    4.1    Conduct of Business of Seller ......................................................25
    4.2    Pre-Closing Access to Information .................................................25
    4.3    Consents and Notices ................................................................25
    4.4    Exclusivity .............................................................................26
    4.5    Employees ..............................................................................27
    4.6    Confidential Information .............................................................27
    4.7    Public Disclosure .....................................................................28

4.8     Expenses ....................................................................................................29
4.9     Further Assurances......................................................................................29
4.10    Tax Matters .................................................................................................29
4.11    Seller Cessation of Operation .....................................................................30
4.12    Use of Tradename ........................................................................................30
4.13    Waiver of Bulk Sales Requirements............................................................30
4.14    Joinder Agreements .....................................................................................30

ARTICLE V CONDITIONS AND CLOSING DELIVERIES ............................................31

5.1     Conditions to Obligations of Purchaser ......................................................31
5.2     Conditions to Obligations of Seller ............................................................33

ARTICLE VI HOLDBACK FUND AND INDEMNIFICATION.........................................34

6.1     Holdback Fund............................................................................................34
6.2     Survival of Representations and Warranties ...............................................35
6.3     Indemnification by Seller, Seller Stockholders and SAFE Holders .....................35
6.4     Indemnification by Purchaser .....................................................................36
6.5     Limitations ..................................................................................................36
6.6     Period for Claims ........................................................................................37
6.7     Claims .........................................................................................................38
6.8     Resolution of Objections to Claims ............................................................39
6.9     Third Party Claims ......................................................................................40
6.10    Treatment of Indemnification Payments; Exclusive Remedy ...............................41
6.11    Independent Investigation ...........................................................................41
6.12    Release and Waiver......................................................................................42

ARTICLE VII TERMINATION ........................................................................................43

7.1     Termination.  This Agreement may be terminated prior to the Closing:...............43
7.2     Effect of Termination ..................................................................................44

ARTICLE VIII GENERAL PROVISIONS..........................................................................44

8.1     Notices ........................................................................................................44
8.2     Amendment and Waivers.............................................................................44
8.3     Counterparts ................................................................................................45
8.4     Entire Agreement; Parties in Interest..........................................................45
8.5     Assignment .................................................................................................45
8.6     Severability .................................................................................................45
8.7     Remedies Cumulative; Specific Performance .............................................45
8.8     Governing Law; Jurisdiction; Consent to Service of Process......................46
8.9     Attorneys' Fees ...........................................................................................46
8.10    Waiver of Jury Trial....................................................................................46
8.11    Interpretation; Rules of Construction..........................................................46
8.12    Representative..............................................................................................47

ii

**EXHIBITS –**

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Requisite Stockholder Consent |
| Exhibit C | Form of Restrictive Covenants Agreement |
| Exhibit D | Joinder Agreement |
| Exhibit E | Trademark Assignment |
| Exhibit F | Domain Name Assignment |
| Exhibit G | Charter Amendment |
| Exhibit H | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit I | Form of SAFE Termination and Release Agreement |

***

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***") is made and entered into as of April 7, 2023 (the "***Agreement Date***"), by and among MCS Acquisition LLC, a Delaware limited liability company ("***Purchaser***"), Chroma Protocol Corporation, a Delaware corporation ("***Seller***"), and Marcus Estes, solely in his capacity as the representative of the Seller Stockholders and the SAFE Holders (the "***Representative***"). Certain other capitalized terms used herein are defined in Exhibit A.

## RECITALS

A.      Seller wishes to sell and assign to Purchaser, and Purchaser wishes to purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities, subject to the terms and conditions set forth herein.

B.      As a material inducement to Purchaser to enter into this Agreement, immediately prior to the execution of this Agreement, Seller has obtained and delivered to Purchaser, true, correct and complete copies of the approval and adoption by stockholders of Seller holding a majority of the outstanding shares of capital stock of Seller (voting together as a single class on an as converted basis) as of immediately prior to the Closing of this Agreement, the Ancillary Agreements to which Seller is a party and the Transactions (such approval and adoption, in the form attached hereto as Exhibit B, the "***Requisite Stockholder Consent***").

C.      Prior to or concurrently with the execution and delivery of this Agreement, and as a material inducement to Purchaser's willingness to enter into this Agreement, each of Marcus Estes and Leif Shackelford (the "***Founders***") shall have executed a non-compete and non-solicit agreement with Purchaser in the form attached hereto as Exhibit C (the "***Restrictive Covenants Agreement***"), in each case to become effective upon the Closing (as defined below).

D.      Prior to or concurrently with the execution and delivery of this Agreement, and as a material inducement to Purchaser's willingness to enter into this Agreement, each Founder shall have executed (i) an offer letter pursuant to which each shall become an employee of Purchaser (an "***Offer Letter***") and (ii) a proprietary information and invention assignment agreement (a "***Proprietary Information and Invention Assignment Agreement***"), in each case to become effective upon the Closing (as defined below).

NOW, THEREFORE, in consideration of the representations, warranties, covenants and other agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1      Purchase and Sale.  Upon the terms and subject to the conditions set forth in this Agreement, Purchaser agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, assign and deliver to Purchaser, free and clear of any and all Encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in and to the Purchased Assets. "***Purchased Assets***" shall mean all of the assets, properties, contractual rights, goodwill, going concern value,

rights and claims owned or purported to be owned by Seller related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Seller (other than the Excluded Assets), including, without limitation, each of the following assets, properties and rights:

(a)     (i) all of Seller's right, title and interest in and to any Seller Intellectual Property used, held for use, or intended to be used in the Business, including as set forth on Schedule 1.1(a) hereto and excluding any Excluded Intellectual Property (collectively, the "*Purchased Intellectual Property*"), and (ii) all tangible embodiments of the Purchased Intellectual Property, including without limitation the Seller Products;

(b)     all of Seller's rights under its Contracts, excluding the Excluded Assets (collectively, the "*Assumed Contracts*");

(c)     all revenues, fees, royalties or other amounts received by Seller after the Closing that are received as a result of or based upon the use or other exploitation of the Purchased Assets after the Closing;

(d)     all Confidential Information, books, records, documents, computer stored data, diskettes, files and papers of Seller, whether in hard copy or computer format, relating to or used in connection with the Purchased Assets or the Business, including engineering information, specifications, documentation, technical or engineers' notes and logs, manuals, files, instructions, architecture designs, designs, listings, flowcharts, plans, drawings, diagrams, testing and test case databases, marketing and sales information, price lists, marketing plans, business plans, financial and business projections, lists of present and former customers and suppliers, personnel records (other than confidential medical records) for Transferred Employees to the extent transfer of such records is not prohibited by Applicable Law, and copies of any information relating to Taxes imposed on the Purchased Assets; provided that Seller shall be entitled to retain duplicate copies of such Confidential Information, books, documents, computer stored data, diskettes, files, papers, and information relating to Taxes to the extent it reasonably believes is necessary to enable Seller to file Tax Returns, implement the wind-up, liquidation, dissolution, and/or cessation of Seller's business operations or to otherwise comply with Applicable Law; provided further that Confidential Information, books, documents, computer stored data, diskettes, files, papers, and information relating to Taxes imposed on the Purchased Assets in this Section 1.1(d) shall not include any originals of Seller income Tax Returns nor any communications involving attorney-client confidences between Seller and outside counsel;

(e)     all Permits used by Seller in the Business and all rights, and incidents of interest therein;

(f)     all web services accounts, payment processing accounts, email accounts, advertising and analytics accounts, and social media accounts used by the Business;

(g)     all goodwill associated with the Purchased Assets;

(h)     insurance proceeds paid or payable to Seller in respect of any damage to or destruction or loss of any of the Purchased Assets; and

2

Exhibit 2

DEF_000011

(i)    Seller's causes of action (whether known or unknown) and other enforcement rights under, or on account of, any of the Purchased Assets described in the foregoing, including all rights under express or implied warranties relating to such Purchased Assets and all rights, claims, credits, causes of action or rights of set-off against third parties relating to such Purchased Assets, including all rights to seek and obtain injunctive relief and to recover damages for past, present and future infringement relating to such Purchased Intellectual Property relating to the period prior to Closing, except to the extent such Seller's rights or causes of action under, or on account of, to the Excluded Assets and except for any causes of action and other enforcement rights of Seller under this Agreement or the Ancillary Agreements.

To the extent that any tangible or intangible assets or rights of the type described in clause (a) through (i) above are discovered or identified at any time after the Closing Date that, pursuant to this Agreement, constitute Purchased Assets (or would have been if such assets or rights had been listed in the applicable schedules) and should have been transferred to Purchaser, Seller shall promptly transfer and promptly deliver them (or cause them to be delivered) to Purchaser without additional payment.

1.2    <u>Excluded Assets</u>.  Notwithstanding anything contained herein or in any other instrument, conveyance or document delivered pursuant to this Agreement to the contrary, Purchaser shall not acquire any of Seller's rights, titles or interests in and to any asset or property that is not a Purchased Asset (collectively, the "***Excluded Assets***"), including, for the avoidance of doubt, each of the following assets:

(a)    all bank accounts of Seller;

(b)    all cash, cash equivalents, and investment securities of Seller;

(c)    all Contracts to which Seller is a party or by which it is bound other than the Assumed Contracts;

(d)    any lease of real or personal property;

(e)    all accounts receivable of Seller;

(f)    all originals of Seller income Tax Returns and all Tax refunds, credits, overpayments or prepayments (or credits in lieu thereof) of Seller, and all Tax claims, contests, appeals or causes of action of Seller or its Affiliates;

(g)    all of Seller's right, title and interest in and to those assets purchased by Seller pursuant to that certain Asset Purchase Agreement, dated April 7, 2022, by and between Smart Analytics, LLC and Seller that are not used, held for use, intended to be used, or necessary for the Business, as set forth on <u>Schedule 1.2(g)</u> hereto (the "***Smart Analytics Assets***");

(h)    all Seller Intellectual Property included in the Smart Analytics Assets and all of Seller's right, title and interest in and to any Seller Intellectual Property that is not used, held for use, or intended to be used in the Business, as set forth on <u>Schedule 1.2(h)</u> (collectively, the "***Excluded Intellectual Property***");

3

Exhibit 2

DEF_000012

(i)     the corporate seals, organizational documents, minute books, stock books, original Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(j)     all originals of personnel records for Transferred Employees that Seller is required by law to retain in its possession;

(k)     all tangible personal property of Seller;

(l)     all rights to insurance policies or rights to proceeds thereof (other than insurance proceeds paid or payable to Seller in respect of any damage to or destruction or loss of any of the Purchased Assets);

(m)     Seller's causes of action (whether known or unknown) and other enforcement rights under, or on account of, any of the Excluded Assets or Excluded Liability;

(n)     all Personal Data processed or otherwise held for use by or on behalf of Seller in connection with its operation of the Business (other than any Personal Data contained in any Assumed Contracts);

(o)     all assets set forth on Schedule 1.2(o) hereto; and

(p)     all rights that accrue to Seller under this Agreement and any other Ancillary Agreements and any causes of action and other enforcement rights of Seller under this Agreement or the Ancillary Agreements.

1.3     Excluded Liabilities. Purchaser will not assume or otherwise have any responsibility or liability for, and Seller will retain, and will be solely responsible for paying, performing and discharging promptly when due, any Liabilities of Seller other than Assumed Liabilities, whether currently existing or hereinafter created (collectively, the "**_Excluded Liabilities_**"), including, for the avoidance of doubt, each of the following Liabilities:

(a)     all Liabilities in respect of any services performed by or on behalf of Seller on or before the Closing;

(b)     (i) all Liabilities arising out of, under or in connection with Contracts that are not Assumed Contracts and, with respect to Assumed Contracts, Liabilities in respect of a breach or default by Seller under such Contracts and (ii) all Liabilities in respect of a breach or default by Seller under any Applicable Law;

(c)     all Liabilities in respect of any pending or threatened Legal Proceeding, or any claim arising out of, relating to or otherwise in respect of the operation of the Business to the extent such Legal Proceeding or claim relates to such operation on or prior to the Closing;

(d)     all Liabilities relating to any dispute with any client or customer of the Business existing as of the Closing or based upon, relating to or arising out of events, actions, or failures to act prior to the Closing;

(e)    all Liabilities relating to or arising out of any of the Excluded Assets;

(f)    all Liabilities arising out of or relating to the use or ownership of the Purchased Assets by Seller or any third party or the operation of the Business by Seller, in each case, prior to the Closing, including any and all Liabilities relating to or arising from any breach, violation, or default by Seller or such third party of any Applicable Law or any Contract to which Seller is party or is bound;

(g)    all Employee Liabilities;

(h)    all Liabilities for Excluded Taxes;

(i)    all Liabilities in respect of Seller Debt;

(j)    all accounts payable of Seller;

(k)    all fees and expenses incurred by Seller or any Affiliate of Seller in connection with the Transactions (including Transaction Bonuses); and

(l)    all Liabilities set forth on Schedule 1.3 hereto.

1.4    Assumed Liabilities.  At the Closing, Purchaser will undertake, assume and agree to satisfy or perform when due all Liabilities arising under or relating to the Purchased Assets, but only to the extent such Liabilities arise in respect of Purchaser's use or operation of the Purchased Assets after the Closing Date and do not relate to any breach, violation or default by Seller in any period prior to Closing and other than the Excluded Liabilities (collectively, the "***Assumed Liabilities***").

1.5    Closing.  The closing of the Transactions (the "***Closing***") shall be held at the offices of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP, 1250 Broadway, 23rd Floor, New York, New York 10001, or such other location as the parties hereto agree, on such date and at such time as the parties may mutually agree and which in no event will be later than two (2) Business Days following the satisfaction or waiver of all the conditions set forth in Article V, via electronic exchange of signatures.  The date on which the Closing actually occurs is herein referred to as the "***Closing Date***."

1.6    Purchase Price; Allocation of Purchase Price.

(a)    Purchase Price.  On the terms and subject to the conditions set forth in this Agreement, as consideration for the Purchased Assets, at the Closing, Purchaser shall pay to:

(i)    Seller, an amount equal to $▮▮▮▮▮▮ (the "***Purchase Price***"), *less* the Seller Debt as of immediately prior to Closing, *less* the Transaction Bonuses, *less* the Holdback Amount, *less* the Expense Fund Amount (the "***Closing Payment Amount***");

(ii)    holders of Seller Debt, an amount equal to the aggregate amount of Seller Debt as of immediately prior to Closing as set forth in the applicable payoff letters;

GDSVF&H\8775395.10

Exhibit 2

DEF_000014

(iii)     Seller, an amount equal to the aggregate amount of the Transaction Bonuses as set forth on Schedule 1.6(a)(iii), which bonus amount shall be paid by Seller to the recipients of the Transaction Bonuses on the first regular payroll date following the seventh Business Day after the Closing; and

(iv)     the Representative, an amount equal to the Expense Fund Amount.

Each payment pursuant to this Section 1.6(a) shall be payable by wire transfer of immediately available funds, to such bank account or accounts as designated in writing by Seller to Purchaser at least two Business Days prior to the Closing Date.

(b)     Allocation of Purchase Price.  Not later than ninety (90) days after the Closing Date, Purchaser shall prepare and provide Seller with the Allocation in accordance with the methodologies set forth on Schedule 1.6(b). The Allocation shall be conclusive and binding upon Purchaser and Seller for all Tax purposes, and the parties hereto agree that all Tax Returns (including IRS Form 8594) shall be prepared in a manner consistent with (and the parties hereto shall not otherwise take a Tax position inconsistent with) the Allocation unless otherwise required by a final determination under Section 1313(a) of the Code.

1.7     Title Passage; Delivery of Purchased Assets.

(a)     Title Passage.  Upon the Closing, all of the right, title and interest of Seller in and to all of the Purchased Assets shall pass to Purchaser.  Seller shall convey the Purchased Assets to Purchaser and Seller shall deliver to Purchaser possession of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     Method of Delivery of Assets; Transaction Taxes.  The Purchased Assets shall be delivered to Purchaser in the form and to the location to be reasonably determined by Purchaser; provided that to the extent practicable, Seller shall deliver all of the Purchased Assets through electronic delivery.  Each of Seller and Purchaser will pay one-half of all sales, transfer, documentary, registration, real property, bulk sales, stamp, excise, use or other similar Taxes and any penalties or interest with respect thereto, imposed with respect to the transactions contemplated by this Agreement (the "***Transaction Taxes***").

1.8     Withholding Rights.  Purchaser shall be entitled to deduct and withhold from the consideration otherwise deliverable under this Agreement, and from any other payments otherwise required pursuant to this Agreement, to Seller such Taxes as Purchaser is required to deduct and withhold with respect to any such deliveries and payments under any Applicable Law.  All such deducted or withheld amounts shall be paid over to the proper Tax Authorities and treated as having been delivered and paid to such recipients in respect of which such deduction and withholding was made.

1.9     Assignment of Contracts and Rights.  Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without consent of a third party thereto, would constitute a breach or other contravention thereof.  Subsequent to the Closing, if applicable, Seller will use commercially

GDSVF&H\8775395.10

Exhibit 2                    DEF_000015

reasonable efforts to obtain the consent of any third party required for the assignment of any such Purchased Asset excluding the consent of any third party required for the assignment of any Purchased Asset set forth in Schedule 1.9 (the "***Delayed Purchased Assets***"). If such consent is not obtained or if an attempted assignment thereof would be ineffective, Purchaser and Seller will cooperate in all reasonable respects in a mutually agreeable arrangement under which Purchaser would obtain the benefits and assume the obligations with respect to such Delayed Purchased Asset in accordance with this Agreement, including subcontracting, sublicensing or subleasing thereof to Purchaser. Seller will promptly pay to Purchaser when received all monies received by Seller with respect to any Purchased Asset or any claim or right or any benefit arising thereunder. Purchaser will promptly pay to Seller or the Representative when received all monies received by Purchaser with respect to any Excluded Asset or any claim or right or any benefit arising thereunder.

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Subject to the disclosures set forth in the disclosure letter of Seller delivered to Purchaser concurrently with the parties' execution of this Agreement (the "***Seller Disclosure Letter***") (it being understood and agreed that each disclosure set forth in the Seller Disclosure Letter with reference to any section of this Agreement will be deemed disclosed and incorporated into any other section of the Seller Disclosure Letter to the extent the applicability of the disclosure to such other section is reasonably apparent from the text of the disclosure made), Seller represents and warrants to Purchaser, as of the date hereof and as of the Closing Date (unless made as of a specific date), as follows:

2.1    Organization, Authority, Enforceability. Seller is a corporation duly organized, validly existing and in good standing under the laws of Delaware, has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted, and is duly qualified to do business as currently conducted by Seller in each jurisdiction where the failure to be so qualified would have a Material Adverse Effect. Seller has and, since its inception has had, no Subsidiaries or any equity or ownership interest, whether direct or indirect, in, any corporation, partnership, limited liability company, joint venture or other business entity. Seller has all requisite corporate power and authority to enter into this Agreement and the Seller Ancillary Agreements to which it will be a party and to consummate the Transactions. The execution and delivery of this Agreement and the Seller Ancillary Agreements to which Seller will be a party and the consummation of the Transactions have been duly authorized by all necessary corporate action on the part of Seller. This Agreement has, and as of the Closing each Seller Ancillary Agreement to which Seller will be a party will have, been duly executed and delivered by Seller and, assuming due authorization, execution and delivery by the other parties thereto, constitutes, or will constitute, as applicable, a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to the effect, if any, of (a) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (b) rules of law governing specific performance, injunctive relief and other equitable remedies.

2.2    Noncontravention; Consents. Assuming all consents and required filings, approvals, authorizations and notices set forth on Schedule 2.2 of the Seller Disclosure Letter

7

(collectively, the "**Seller Consents**") have been obtained, the execution and delivery by Seller of this Agreement and the Seller Ancillary Agreements to which Seller will be a party do not, and the consummation of the Transactions will not, (a) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any of the Purchased Assets or (b) conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consent, approval or waiver from any Person pursuant to, (i) any provision of the certificate of incorporation or bylaws of Seller, (ii) any Contract applicable to Seller or any of the Purchased Assets, or (iii) any Applicable Law.  No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person, is required by or with respect to Seller in connection with the execution and delivery of this Agreement or the Seller Ancillary Agreements to which Seller will be a party or the consummation of the Transactions.

2.3     Capitalization of Seller.

(a)     Authorized and Outstanding Capital Stock of Seller.  The authorized capital stock of Seller consists of 12,000,000 shares of Seller Common Stock and 3,064,803 shares of Seller Preferred Stock, of which 1,084,503 shares are designated as Seller Series Seed Stock and 1,980,300 shares are designated as Seller Series Seed 2 Stock.  A total of 7,162,811 shares of Seller Common Stock, 1,084,503 shares of Seller Series Seed Stock and 1,980,300 shares of Seller Series Seed 2 Stock are issued and outstanding as of the Agreement Date.  The numbers and kind of issued and outstanding shares of Seller Capital Stock held by each Seller Stockholder as of the Agreement Date are set forth on Schedule 2.3(a) of the Seller Disclosure Letter.  All issued and outstanding shares of Seller Capital Stock have been duly authorized and validly issued, are fully paid and nonassessable and were issued in compliance in all material respects with all applicable securities laws.

(b)     Options, Warrants and Rights.  Seller has reserved an aggregate of 1,175,829 shares of Seller Common Stock for issuance pursuant to Seller Equity Plan (including shares subject to outstanding Seller Options).  A total of 310,866 shares of Seller Common Stock are subject to outstanding Seller Options as of the Agreement Date, all of which shall terminate and be of no further force or effect as of the Closing.  Seller has no outstanding commitment (whether verbal or written, and whether or not qualified or contingent) by or on behalf of Seller to grant any Seller Option or any other equity award, interest, or security of Seller.

(c)     No Other Rights.  Except for Seller Options and the SAFEs set forth in Schedule 2.3(c) of the Seller Disclosure Letter, there are no stock appreciation rights, options, warrants, calls, rights, commitments, conversion privileges or preemptive or other rights or Contracts outstanding to purchase or otherwise acquire any shares of Seller Capital Stock or any securities or debt convertible into or exchangeable for Seller Capital Stock.  Seller is not a party to any Contract regarding the voting of any outstanding securities of Seller.

2.4     Seller Financial Statements.

(a)     Schedule 2.4(a) of the Seller Disclosure Letter contains a true, correct and complete list of (a) all of Seller's material assets and (b) any outstanding Seller Debt. For each

Exhibit 2                                    DEF_000017

item of Seller Debt, <u>Schedule 2.4(a) of the Seller Disclosure Letter</u> accurately lists the agreement governing such Seller Debt, if any.  All Seller Debt may be prepaid at the Closing without penalty under the terms of the Contracts governing such Seller Debt.

(b)     Seller has delivered to Purchaser its internal unaudited consolidated financial statements for the fiscal years ended December 31, 2021 and December 31, 2022 (including, in each case, balance sheets and profit and loss statements) and the internal unaudited consolidated financial statements as of and for the period ended as of February 28, 2023 (collectively, the "***Financial Statements***").  The Financial Statements (i) are derived from and in accordance with the books and records of Seller and (ii) fairly present in all material respects the financial condition of Seller at the dates therein indicated and the results of operations and cash flows of Seller for the periods therein specified.

2.5     <u>Undisclosed Liabilities; Solvency.</u>

(a)     As of the Agreement Date, Seller has no material liabilities, other than (a) liabilities reflected on the Financial Statement as of February 28, 2023 (the "***Seller Balance Sheet***" and such date, the "***Seller Balance Sheet Date***"), (b) liabilities incurred since the Seller Balance Sheet Date in the ordinary course of business consistent with past practice that do not result from any breach of contract, warranty, infringement, tort or violation of Applicable Law, (c) executory performance obligations under Contracts to which Seller is a party, which do not result from any breach of contract, warranty, infringement, tort or violation of Applicable Law, and (d) liabilities expressly created pursuant to this Agreement or any Ancillary Agreement.

(b)     After giving effect to the Transactions and taking in account the consideration received in connection therewith, Seller will not be insolvent and such transactions shall not constitute fraud or a fraudulent transfer under Applicable Laws relating to bankruptcy and insolvency.  Seller has not, at any time, (i) made a general assignment for the benefit of creditors, (ii) filed, or had filed against it, any bankruptcy petition or similar filing, or (iii) admitted in writing its inability to pay its debts as they become due.  Immediately after giving effect to the consummation of the Transactions, Seller will be able to pay its retained Liabilities as they become due in the usual course of business and Seller will have assets (calculated at fair market value) that exceed its retained Liabilities.  The cash available to Seller immediately after giving effect to the Transactions, after taking into account all other anticipated uses of the cash, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

2.6     <u>Litigation</u>.  Except as set forth on <u>Schedule 2.6 of the Seller Disclosure Letter</u>, there is no Legal Proceeding pending before any Governmental Entity, or to the Seller's Knowledge, threatened against Seller or any of the Purchased Assets or any of Seller's directors or officers (in their capacities as such or relating to their employment, services or relationship with Seller), nor, to Seller's Knowledge, is there any reasonable basis for any such Legal Proceeding.  There is no judgment, decree, injunction, rule or order against Seller, any of the Purchased Assets or any of Seller's directors or officers (in their capacities as such or relating to their employment, services or relationship with Seller).  To the Seller's Knowledge, there is no reasonable basis for any Person to assert a claim against Seller or any of the Purchased Assets, including, without limitation, based upon:   (a) Seller entering into this Agreement, the Ancillary Agreements or any of the Transactions; (b) any confidentiality or similar agreement entered into by Seller regarding the

9

Purchased Assets; or (c) any claim that Seller has agreed to sell or dispose of the Purchased Assets to any party other than Purchaser, whether by way of merger, consolidation, sale of assets or otherwise. Seller has no Legal Proceeding pending or threatened against any other Person.

2.7    <u>Assets</u>. Seller has good and marketable title to, or valid leasehold interests in, all of the property included in Purchased Assets, and is transferring to Purchaser, pursuant to the Transactions, all of its right, title and interest in the Purchased Assets, free and clear of any Encumbrances (other than Permitted Encumbrances). The Purchased Assets are sufficient for the continued operation of the Business in substantially the same manner as presently conducted by Seller. At the Closing, Purchaser will obtain good and valid title to the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Encumbrances created by Purchaser, and all account credentials related to the Assumed Contracts will be transferred to Purchaser, and after the Closing, Purchaser shall be able to use the Purchased Assets and exercise, and enjoy the benefits of, the Purchased Assets in substantially the same manner as Seller prior to the Closing. Except as set forth on <u>Schedule 2.7 of the Seller Disclosure Letter</u>, none of the Purchased Assets is licensed from any third party and no royalties, license fees or similar payments are due or payable (or may become due or payable) to any third party under any license or other agreement. None of the Purchased Assets is licensed to any third party, including any Affiliate of Seller.

2.8    <u>Compliance with Laws</u>.

(a)    Seller is, and has in the past five (5) years been, in compliance in all material respects with all Applicable Laws applicable to the Business or the ownership or operation of the Purchased Assets.

(b)    Seller has not received any written notice or, to Seller's Knowledge, oral notice, from a Governmental Entity of or been charged by a Governmental Entity with the violation of any Applicable Laws with respect to the Business or any of the Purchased Assets. To the Seller's Knowledge, Seller is not under investigation by a Governmental Entity with respect to the violation of any Applicable Laws relating to the Business or any of the Purchased Assets.

(c)    Seller currently has all Permits which are required for the operation of the Business as presently conducted and proposed to be conducted ("***Seller Permits***"). Seller is not in default or violation, and, to Seller's Knowledge, no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation, in any material respect of any term, condition or provision of any Seller Permit. There are no Legal Proceedings pending or, to the Seller's Knowledge, threatened, relating to the suspension, revocation or modification of any of the Seller Permits. To Seller's Knowledge, none of the Seller Permits will be impaired by the consummation of the transactions contemplated by this Agreement.

2.9    <u>Taxes</u>.

(a)    All Tax Returns of Seller have been timely filed and such Tax Returns are true, complete and correct in all material respects and have been completed in accordance with Applicable Law. All Taxes required to be paid by Seller or in respect of the Business and the

Purchased Assets (whether or not shown on a Tax Return) have been timely paid. No claim has ever been made against Seller by a Tax Authority in a jurisdiction where Seller does not file Tax Returns that Seller is subject to taxation by that jurisdiction or required to file Tax Returns in such jurisdiction.

(b)     There are no Liabilities for unpaid Taxes concerning or attributable to the Business or the Purchased Assets for which Purchaser or its Affiliates could become liable as a result of the transactions contemplated by this Agreement or that could result in any Encumbrances on the Purchased Assets.

(c)     There is (i) no claim for Taxes being asserted against Seller or in respect of the Business or the Purchased Assets, (ii) no Encumbrance on the Purchased Assets for Taxes (other than for Taxes not yet due and payable), (iii) no audit or pending audit of, or Tax controversy associated with, any Tax Return of Seller or with respect to the Business or the Purchased Assets being conducted by any Tax Authority, and (iv) no outstanding waiver of any statute of limitations or extension of the period for the assessment or collection of any Tax concerning or attributable to Seller, the Business or the Purchased Assets currently in effect. Seller does not know of any reasonable basis for the assertion of any claim relating or attributable to Taxes for which Purchaser or its Affiliates would become liable as a result of the Transactions or that would result in any Encumbrances on the Purchased Assets or otherwise adversely affect the Business or the Purchased Assets.

(d)     For all periods through and including the Closing, Seller (i) has complied in all material respects with all Applicable Law relating to the payment and withholding of Taxes (including the payment and withholding of Taxes pursuant to Sections 1441, 1442, 1445 and 1446 of the Code or similar provisions under any non-U.S. law); and (ii) has, within the time and in the manner prescribed by law, withheld from employee wages or consulting compensation and paid over to the proper Tax Authorities (or are properly holding for such timely payment) all Taxes required to be so withheld and paid over under all Applicable Law (including federal and state income Taxes, Federal Insurance Contribution Act, Medicare, Federal Unemployment Tax Act, and relevant federal and state income and employment Tax withholding laws).

(e)     None of the Purchased Assets is stock, partnership interests, membership interests, or any other equity interest in a Person for U.S. federal income Tax purposes. The Seller is and at all times since its formation has been properly classified as a corporation for U.S. federal and applicable state income Tax purposes.

(f)     No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets or the Business.

(g)     Seller is not subject to Tax in any country other than its country of formation or organization by virtue of having Employees, a permanent establishment or other place of business in that country.

(h)     Seller does not have a request for a private letter ruling, a request for administrative relief, a request for technical advice, a request for a change of any method of

11

accounting, or any other request pending with any Tax Authority that relates to the Taxes or Tax Returns of Seller.

(i)    Seller is not a party to or bound by any Tax allocation, indemnity, sharing or similar agreement (whether oral or written) (other than an agreement entered into in the ordinary course of business that is not primarily related to Taxes),

(j)    There is no taxable income relating to the Purchased Assets that will be required under Applicable Law to be reported by Purchaser or any of its Affiliates for any period after the Closing Date which taxable income was realized (or reflects economic income arising) prior to the Closing Date.

(k)    Seller has not been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group the common parent of which was Seller) and has no Liability for the Taxes of any Person (other than Seller) under Section 1.1502–6 of the Treasury Regulations (or any similar provision of state, local or foreign law) as a transferee or successor, by Contract or otherwise (other than a Contract entered into in the ordinary course of business that is not primarily related to Taxes).

(l)    Seller is not, and has never been, a party to, or a promoter of, a "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4 or any "tax shelter" within the meaning of Section 6662 of the Code.

(m)    There is no agreement, plan, arrangement or other Contract covering any Person to which Seller is a party or by which Seller is bound that, considered individually or considered collectively with any other such agreements, plans, arrangements or other Contracts, could, as a result of the Transactions (whether alone or upon the occurrence of any additional or subsequent events), give rise directly or indirectly to the payment of any amount that could reasonably be expected to be characterized as a "parachute payment" within the meaning of Section 280G of the Code (or any corresponding or similar provision of state, local or foreign Tax law).

2.10    Employees; Employee Benefits.

(a)    Schedule 2.10(a) of the Seller Disclosure Letter contains a complete and accurate list of current Employees as of the date hereof and shows with respect to each such Employee the Employee's name, position held, principal place of employment, base salary or wage rate, target bonus opportunity, start date, and such Employee's designation as either exempt or non-exempt from the overtime requirements of the Fair Labor Standards Act. Seller does not currently engage any Consultants.

(b)    Seller is and in the past five (5) years has been in compliance in all material respects with all Applicable Law relating to labor, employment and fair employment practices, and has not engaged in any unfair labor practice. Seller has withheld all material amounts required by Applicable Law or by agreement to be withheld from the wages, salaries, and other payments to employees; and is not liable for any material arrears of wages, compensation, Taxes, penalties or other sums for failure to comply with any of the foregoing. Seller has timely paid in full to all Service Providers all wages, salaries, commissions, bonuses, benefits and other compensation due

12

to or on behalf of such Service Providers.  Seller is not liable for any payment to any trust or other fund or to any Governmental Entity, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistently with past practice).  All Consultants providing services to Seller have been properly classified as independent contractors for purposes of federal and applicable state Tax laws, laws applicable to employee benefits and other Applicable Law.  Seller does not have any employment Contracts currently in effect that are not terminable at will without Liability (other than agreements with the sole purpose of providing for the confidentiality of proprietary information or assignment of inventions).  Seller does not have any material Liability with respect to any misclassification of: (i) any Person as an independent contractor or agent rather than as an employee; (ii) any Service Provider leased from another employer; or (iii) any current or former Employee classified as exempt from overtime wages.

(c)     There are no claims, lawsuits, complaints, investigations, audits, grievances, disputes, controversies or other proceedings pending or, to Seller's Knowledge, threatened relating to any current or former Service Provider or between Seller and any current or former Service Provider or any Person representing any current or former Service Provider, including any claims related to wages, salaries, commissions or benefits.

(d)     Seller is not, or has never been, a party to or bound by, and, to the Seller's Knowledge, no Service Provider is covered under, any collective bargaining agreement or other labor union contract (including any contract or agreement with any works council, trade union, or other labor-relations entity), and no such collective bargaining agreement or other union contract is being negotiated by Seller.

(e)     Except for the Transaction Bonuses, Seller is not a party to any (i) Contract with any Person the benefits of which are contingent, or the terms of which will be altered, upon the consummation of the Transactions, or (ii) Benefit Plan, any of the benefits of which shall be increased, or the vesting of benefits of which shall be accelerated, or the payment of any severance shall be triggered, by the consummation of the Transactions, or any event subsequent to the consummation of the Transactions such as the termination of employment of any person, or the value of any of the benefits of which shall be calculated on the basis of the Transactions.

(f)     To Seller's Knowledge, no Service Provider is in violation of any term of any agreement or restrictive covenant to a current or former employer relating to (A) the right of any such Service Provider to be employed by, or performing services for, Seller because of the nature of the Business or (B) the use of trade secrets or proprietary information of others.  Neither the execution and delivery nor the performance of this Agreement, nor the execution, delivery or performance of the Offer Letters and/or Proprietary Information and Invention Assignment Agreements, will result directly or indirectly in a violation or breach of any agreement or obligation by which any Service Provider is or may be bound.

(g)     Schedule 2.10(g) of the Seller Disclosure Letter contains an accurate and complete list as of the date of this Agreement of each material Benefit Plan.  Seller has not made any commitment to any Employee or Service Provider to (y) establish any new Benefit Plan, or (z) materially modify any Benefit Plan. Seller has made available to Purchaser with respect to each material Benefit Plan, to the extent applicable, (i) correct and complete copies of all current

13

documents embodying each such Benefit Plan including, all amendments thereto and all related trust documents, (ii) for each unwritten Benefit Plan, a written summary of the material terms, (iii) the most recent annual reports (Form Series 5500 and all audit reports, schedules and financial statements attached thereto), if any, required under ERISA or the Code or by any other applicable legal requirement, (iv) the most recent summary plan description together with the summary(ies) of material modifications thereto, if any, required under ERISA or by any other Applicable Law, and (v) all material written correspondence to or from any Governmental Entity from the past three years relating to such Benefit Plan or related to matters involving a Liability to Seller.

(h)     Each Benefit Plan has been established, maintained, funded, and administered in accordance with the terms of the applicable controlling documents and in compliance in all material respects with applicable Law.  All material contributions and other payments required by and due under the terms of each Benefit Plan have been timely and properly made or have been properly accrued in accordance with GAAP.  Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS or is the subject of a favorable opinion letter from the IRS on the form of such Benefit Plan, in either case, on which Seller can rely and there are no facts or circumstances that could be reasonably likely to adversely affect the qualified status of any such Benefit Plan.  To Seller's Knowledge, no "prohibited transaction," within the meaning of Section 4975 of the Code or Sections 406 and 407 of ERISA, and not otherwise exempt under Section 408 of ERISA, has occurred with respect to any Benefit Plan.

(i)     As of the date hereof, there are no actions, suits or claims pending, or, to Seller's Knowledge, threatened (other than routine undisputed claims for benefits) against any Benefit Plan or against the assets of any Benefit Plan.  As of the date hereof, there are no audits, inquiries or proceedings pending or, to Seller's Knowledge, threatened by the IRS, Department of Labor, or any other Governmental Entity with respect to any Benefit Plan.  Seller has not incurred any penalty or Tax with respect to any Benefit Plan under Section 502(i) of ERISA or Sections 4975 through 4980 of the Code.

(j)     Each Benefit Plan that is or has ever been a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code and associated Treasury Department guidance thereunder, has been maintained and administered, and is, and has been, in operational and documentary compliance with Section 409A of the Code in all material respects.  Each Seller Option granted by Seller has a per share exercise price not less than the fair market value (determined in accordance with Treasury Regulation Section 1.409A-1(b)(5)(iv)) of a share of Common Stock on the grant date of such Seller Option.  Neither Seller nor any of its Affiliates is a party to or is otherwise obligated under any plan, policy, agreement or arrangement that provides for the gross-up or reimbursement of Taxes, including those imposed under Section 409A or 4999 of the Code (or any corresponding provisions of state, local or non-U.S. Law relating to Tax).

(k)     Neither Seller nor any of its ERISA Affiliates has maintained, established, sponsored, participated in, or contributed to, any (i) pension plan subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code, (ii) "funded welfare plan" within the meaning of Section 419 of the Code, (iii) a multiemployer plan (as defined in Section 3(37) of ERISA), (iv) any multiple employer plan or to any plan described in Section 413 of the

14

Exhibit 2                    DEF_000023

Code, or (v) multiple employer welfare arrangement, as defined under Section 3(40)(A) of ERISA (without regard to Section 514(b)(6)(B) of ERISA).

(l)    No Benefit Plan provides, and Seller does not have any material Liability with respect to, post-termination or retiree life insurance, or post-termination or retiree health benefits, to any Person for any reason, except as may be required by COBRA or other applicable statute, at the sole expense of the participant or the participant's dependent or beneficiary.

(m)    Except as set forth on Schedule 2.10(m) of the Seller Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby could (alone or in combination with one or more events or circumstances, including any termination of employment or service): (i) result in any compensation or benefit (including severance, golden parachute, bonus or otherwise) becoming due to any Employee or Service Provider; (ii) increase or otherwise enhance any compensation or benefit otherwise payable to any such individual; (iii) result in the acceleration of the time of payment, funding or vesting of any compensation or benefit under any Benefit Plan; (iv) result in the acceleration or forgiveness (in whole or in part) of any outstanding loan to any Employee or Service Provider; (v) require any contributions or payments to fund any obligations under any Benefit Plan; or (vi) result in any limitation on the ability of Seller to amend or terminate any Benefit Plan.

2.11    Intellectual Property.

(a)    As used in this Agreement, the following terms have the meanings indicated below:

(i)    "**_Intellectual Property_**" means (A) Intellectual Property Rights; and (B) Proprietary Information and Technology.

(ii)    "**_Intellectual Property Rights_**" means any and all of the following and all rights, title and interest in, arising out of, or associated therewith, throughout the world: patents, utility models, and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights in inventions and discoveries anywhere in the world, including invention disclosures, common law and statutory rights associated with trade secrets, confidential and proprietary information, and know how, industrial designs and any registrations and applications therefor, trade names, logos, trade dress, trademarks and service marks, trademark and service mark registrations, trademark and service mark applications, and any and all goodwill associated with and symbolized by the foregoing items, Internet domain name applications and registrations, Internet and World Wide Web URLs or addresses, copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto, mask works, mask work registrations and applications therefor, and any equivalent or similar rights in semiconductor masks, layouts, architectures or topology, moral and economic rights of authors and inventors, however denominated, and any similar or equivalent rights to any of the foregoing.

(iii)    "**_Open Source Materials_**" means software or other material that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as

15

"free software" (as defined by the Free Software Foundation at http://www.fsf.org), "open source software" (as defined by the Open Source Initiative at www.opensource.org) or under similar licensing or distribution terms, or that requires as a condition of its use, modification or distribution that it, or other software incorporated, distributed with, or derived from it, be disclosed or distributed in source code form or made available at no charge (including the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards License (SISL) and the Apache License).

(i)    "*Personal Data*" means a natural person's name, street address, telephone number, e-mail address, photograph, social security number, driver's license number, passport number, or customer or account number, or any other piece of information that allows the identification of a natural person or is otherwise considered personally identifiable information or personal data under Applicable Laws, including without limitation under the Children's Online Privacy Protection Act of 1998, the EU General Data Protection Regulation and the California Consumer Privacy Act of 2018, and all amendments and superseding regulations thereto. For the avoidance of doubt, Personal Data shall include without limitation personally identifiable information or personal data relating to students.

(ii)    "*Proprietary Information and Technology*" means any and all of the following: works of authorship, computer programs, source code and executable code, whether embodied in software, firmware or otherwise, assemblers, applets, compilers, user interfaces, application programming interfaces, protocols, architectures, documentation, annotations, comments, designs, files, records, schematics, test methodologies, test vectors, emulation and simulation tools and reports, hardware development tools, models, tooling, prototypes, breadboards and other devices, data, data structures, databases, data compilations and collections, inventions (whether or not patentable), invention disclosures, discoveries, improvements, technology, proprietary and confidential ideas and information, know-how and information maintained as trade secrets, tools, concepts, techniques, methods, processes, formulae, patterns, algorithms and specifications, customer lists and supplier lists and any and all instantiations or embodiments of the foregoing in any form and embodied in any media.

(iii)    "*Seller Intellectual Property*" means any and all Seller Owned Intellectual Property and any and all Third Party Intellectual Property.

(iv)    "*Seller Intellectual Property Agreements*" means any Contract governing any Seller Intellectual Property to which Seller is a party or bound by.

(v)    "*Seller Owned Intellectual Property*" means any and all Intellectual Property that is owned or purported to be owned by Seller, including without limitation all Seller Registered Intellectual Property and the Seller Source Code, but excluding the Excluded Intellectual Property.

(vi)    "*Seller Products*" means all products or services produced, marketed, licensed, sold, distributed or performed by or on behalf of Seller and all products or services currently under active development, excluding the Excluded Intellectual Property and any

16

products or services produced, marketed, licensed, sold, distributed or performed by or on behalf of Seller or any products or services currently under active development related thereto.

(vii)     "***Seller Registered Intellectual Property***" means the United States, international and foreign: (A) patents and patent applications (including provisional applications); (B) registered trademarks, applications to register trademarks, intent-to-use applications, or other registrations or applications related to trademarks; (C) registered Internet domain names; and (D) registered copyrights and applications for copyright registration; in each case registered or filed in the name of, Seller.

(viii)     "***Seller Source Code***" means, collectively, any software source code or database specifications or designs, or any material proprietary information or algorithm contained in or relating to any software source code or database specifications or designs, of any Seller Intellectual Property or Seller Products.

(ix)     "***Third Party Intellectual Property***" means any and all Intellectual Property owned by a third party and used or held for use by Seller, excluding the Excluded Intellectual Property.

(b)     Status.  Seller has full title and ownership of, or is duly licensed under or otherwise authorized to use, and, to the extent that it does any of the following, to develop, make, have made, offer for sale, sell, import, copy, modify, create derivative works of, distribute, license, and dispose of all Purchased Intellectual Property, free and clear of any Encumbrances, and without any conflict with, infringement upon, or violation of the rights of others.  The Purchased Intellectual Property collectively constitutes all of the intangible assets, intangible properties, rights and Intellectual Property necessary for the conduct of, or that are used, or held for use for, the Business in substantially the same manner as presently conducted by Seller without: (i) the need for Purchaser to acquire or license any other intangible asset, intangible property or Intellectual Property in order to utilize the Purchased Assets, or (ii) the material breach or violation of any Contract.  Seller owns all right, title and interest in and to all Seller Owned Intellectual Property free and clear of all Encumbrances and licenses.  Seller has not transferred ownership of, or agreed to transfer ownership of, or granted any exclusive licenses to, or agreed to grant any exclusive licenses to, any Seller Owned Intellectual Property to any third party.  No third party has any ownership right, title, interest, claim in or lien on any of the Seller Owned Intellectual Property (other than non-exclusive customer license agreements on Seller's form that are entered into in the ordinary course of business).

(c)     Seller Registered Intellectual Property.  Schedule 2.11(c) of the Seller Disclosure Letter lists: (i) all Seller Registered Intellectual Property; (ii) the jurisdictions in which it has been issued or registered or in which any application for such issuance and registration has been filed, or in which any other filing or recordation has been made; and (iii) all actions that are required to be taken within sixty (60) days of the date hereof in order to avoid prejudice to, impairment or abandonment of such Seller Registered Intellectual Property.  Each item of Seller Registered Intellectual Property is valid and subsisting (or in the case of applications, applied for).  All registration, maintenance and renewal fees currently due in connection with such Seller Registered Intellectual Property have been paid, except where the failure to do so would not be material to the Business or the Purchased Assets, taken as a whole, and all documents,

17

recordations and certificates in connection with such Seller Registered Intellectual Property currently required to be filed have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of prosecuting, maintaining and perfecting such Seller Registered Intellectual Property and recording Seller's ownership interests therein, except, in each case, where the failure to do so would not be material to the Business or the Purchased Assets, taken as a whole.

(d)     <u>No Governmental Assistance or Academic Support</u>.  No government funding, facilities of a university, college, other educational institution or research center, or funding from third parties was used in the development of Seller Owned Intellectual Property or Seller Products.  At no time during the conception of or reduction to practice of any of the Seller Owned Intellectual Property was any developer, inventor or other contributor to such Seller Owned Intellectual Property operating under any grants from any university, academic institution, or Governmental Entity, or using facilities of a college or university or other educational institution or research center, performing research sponsored by any university, academic institution, or Governmental Entity or subject to any employment agreement, consulting agreement, invention assignment or nondisclosure agreement or other obligation with any such third party that would adversely affect Seller's rights in such Seller Owned Intellectual Property.

(e)     <u>Founders</u>.  All rights in, to and under all Intellectual Property that (i) is used or has at any point been used in the Business as currently conducted and (ii) was created by Seller's founders for or on behalf or in contemplation of Seller (A) prior to the inception of Seller or (B) prior to their commencement of employment or consulting engagement with Seller, have been duly and validly assigned to Seller, and Seller has no reason to believe that any such Person is unwilling to provide Seller or Purchaser with such cooperation as may reasonably be required to complete and prosecute all appropriate United States and foreign patent and copyright filings related thereto.

(f)     <u>Proprietary Information and Invention Assignment Agreement</u>.  Seller has secured from all Service Providers who independently or jointly contributed to or participated in the conception, reduction to practice, creation or development of any Intellectual Property that is used or has at any point been used in the Business as currently conducted for or on behalf of Seller (each an "***Author***"), unencumbered and unrestricted exclusive ownership of, all of the Authors' right, title and interest in and to such Intellectual Property in such contribution and has obtained the waiver of all non-assignable rights.  No Author has retained any ownership rights, claims or interest with respect to any Intellectual Property developed by the Author that is used or has at any point been used in the Business.  Without limiting the foregoing, Seller has obtained written and enforceable proprietary information and invention disclosure and Intellectual Property assignments from all current and former Authors substantially in the forms provided to Purchaser with no material deviations with respect to Intellectual Property rights.

(g)     <u>No Violation</u>.  To Seller's Knowledge, no Service Provider:  (i) is in violation of any material term or covenant of any Contract relating to employment, invention disclosure, invention assignment, non-disclosure or non-competition or any other material Contract with any other party by virtue of such Service Provider being employed by, or performing services for, Seller or using trade secrets or proprietary information of others without permission; or (ii) has developed any technology, software or other copyrightable, patentable or

Exhibit 2                                    DEF_000027

otherwise proprietary work for Seller that is subject to any agreement under which such Service Provider has assigned or otherwise granted to any third party any rights (including Intellectual Property Rights) in or to such technology, software or other copyrightable, patentable or otherwise proprietary work.

(h)    <u>Confidential Information</u>.  Seller has taken commercially reasonable steps to protect and preserve the confidentiality of confidential or non-public or proprietary information of Seller (including trade secrets) or provided by any third party to Seller with respect to the Purchased Assets ("***Confidential Information***").    All Service Providers and any third party having access to Confidential Information have executed and delivered to Seller a written legally binding agreement with terms protecting and preserving the confidentiality of such Confidential Information, except where the failure to do so would not be material to the Business or the Purchased Assets, taken as a whole.   Seller has maintains a reasonable data security plan consistent with industry practices of companies offering similar services.   Seller has not experienced any material breach of security or otherwise unauthorized access by third parties to the Confidential Information, including Personal Data in Seller's possession, custody or control.

(i)    <u>Non-Infringement</u>.  To Seller's Knowledge, there is no unauthorized use, unauthorized disclosure, infringement or misappropriation of (A) any Seller Owned Intellectual Property and (B) any Third Party Intellectual Property, by any third party.   Seller has not brought any Legal Proceeding for infringement or misappropriation of any Seller Owned Intellectual Property.    Neither Seller, nor Seller Product or Seller Intellectual Property is infringing, misappropriating or violating, or has infringed, misappropriated or violated, the Intellectual Property of any third party.   Seller has not been sued in any Legal Proceeding or received any written communications (including any third party reports by users) alleging that Seller has infringed, misappropriated, or violated or, by conducting its business as presently proposed, would infringe, misappropriate or violate, any Intellectual Property of any other Person or entity. No Seller Owned Intellectual Property or Seller Product, and to Seller's Knowledge, no Third Party Intellectual Property, is subject to any proceeding, order, judgment, settlement agreement, stipulation or right that restricts in any manner the use, transfer, or licensing thereof by Seller, or which may affect the validity, use or enforceability of any Seller Intellectual Property.

(j)    <u>Licenses; Agreements</u>.  Except as set forth in <u>Schedules 2.11(j)</u> and <u>2.11(n) of the Seller Disclosure Letter</u>, Seller has not granted any options, licenses or agreements of any kind relating to any Seller Owned Intellectual Property, nor is Seller bound by or a party to any option, license or agreement of any kind with respect to any of the Seller Intellectual Property. Seller is not obligated to pay any royalties or other payments to third parties with respect to the marketing, sale, distribution, manufacture, license or use of any Seller Products or Seller Owned Intellectual Property or any other property or rights.

(k)    <u>Other Intellectual Property Agreements</u>.    With respect to the Seller Intellectual Property Agreements:

(i)    There are no material disputes regarding the scope of any Seller Intellectual Property Agreements, or performance under any Seller Intellectual Property Agreements, including with respect to any payments to be made or received by Seller thereunder.

(ii)     No Seller Intellectual Property Agreement requires Seller to include any Third Party Intellectual Property in any Seller Product or obtain any Person's approval of any Seller Product at any stage of development, licensing, distribution or sale of that Seller Product.

(iii)     None of the Seller Intellectual Property Agreements grants any third party exclusive rights to or under any Seller Intellectual Property.;

(iv)     None of the Seller Intellectual Property Agreements grants any third party the right to sublicense any Seller Intellectual Property.

(v)     Except for Open Source Materials, no Third Party Intellectual Property is incorporated into, integrated or bundled by Seller with any of the Seller Products.

(vi)     No third party that has provided Intellectual Property to Seller that is and has been incorporated into Seller Products has ownership or license rights to improvements or derivative works made by Seller in the Third Party Intellectual Property that has been licensed to Seller.

(l)     Neither this Agreement nor the Transactions will result in: (i) a material breach of or default under any Seller Intellectual Property Agreements; (ii) Purchaser or any of its Affiliates granting to any third party any right to or with respect to any Intellectual Property Rights owned by, or licensed to Purchaser or any of its Affiliates, pursuant to the terms of any Contract of Seller, (iii) Purchaser or any of its Affiliates, being bound by or subject to, any exclusivity obligations, non-compete or other restriction on the operation or scope of their respective businesses, pursuant to the terms of any Contract of Seller or (iv) Purchaser being obligated to pay any royalties or other material amounts to any third party in excess of those payable by any of them, respectively, in the absence of this Agreement or the Transactions.

(m)     <u>Source Code</u>.  <u>Schedule 2.11(m) of the Seller Disclosure Letter</u> identifies all repositories containing any Seller Owned Intellectual Property or Seller Products.  Seller has not disclosed, delivered or licensed to any Person or agreed or obligated itself to disclose, deliver or license to any Person, or permitted the disclosure or delivery to any escrow agent or other Person of, any Seller Source Code, other than disclosures to Service Providers involved in the development of Seller Products or disclosures with respect to Open Source Materials.  No event has occurred, and no circumstance or condition exists, that will, or would reasonably be expected to, result in the disclosure, delivery or license by Seller of any Seller Source Code, other than disclosures to Service Providers involved in the development of Seller Products or disclosures with respect to Open Source Materials.  Without limiting the foregoing, neither the execution of this Agreement nor any of the Transactions will result in a release from escrow or other delivery to a third party of any Seller Source Code.

(n)     <u>Open Source Software</u>.  <u>Schedule 2.11(n) of the Seller Disclosure Letter</u> sets forth a true, correct and complete list of all Open Source Materials currently used in any Seller Owned Intellectual Property or Seller Products.  Except as set forth on <u>Schedule 2.11(n) of the Seller Disclosure Letter</u>, Seller has not (i) incorporated Open Source Materials into, or combined Open Source Materials with, the Seller Owned Intellectual Property or Seller Products; (ii) distributed Open Source Materials in conjunction with any Seller Owned Intellectual Property

20

or Seller Products; or (iii) used Open Source Materials, in such a way that, with respect to clause (i) or (ii), creates or purports to create obligations for Seller with respect to any Seller Owned Intellectual Property or grant, or purport to grant, to any third party, any rights or immunities under any Seller Owned Intellectual Property (including using any Open Source Materials that require, as a condition of use, modification and/or distribution of such Open Source Materials, that other software incorporated into, derived from or distributed with such Open Source Materials be (A) disclosed or distributed in source code form, (B) be licensed for the purpose of making derivative works, or (C) be redistributable at no charge).

(o)     <u>Software</u>.  None of Seller Products contain any "back door," "drop dead device," "time bomb," "Trojan horse," "virus" or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or without user intent will cause, any of the following functions: (i) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; (ii) damaging or destroying any data or file without the user's consent, or (iii) sending information to Seller or any third party.

(p)     <u>Privacy</u>.  Except as set forth on <u>Schedule 2.11(p) of the Seller Disclosure Letter</u>, Seller complies and has, in the past five (5) years, complied with Privacy Requirements (defined below) in all material respects.  The execution, delivery and performance of this Agreement will comply with: (i) all Applicable Laws relating to privacy, data collection, and Personal Data, and (B) to the extent applicable, laws and rules related to biometrics, internet of things, direct marketing, e-mails, text messages, robocalls, telemarketing, or other electronic communications; (ii) Seller's privacy policies; and (iii) the terms of any agreements by which Seller is bound relating to the use, collection, storage, disclosure and transfer of any Personal Data collected by Seller or by third parties having authorized access to the records of Seller (clauses (i)–(iii) collectively, "***Privacy Requirements***").  Seller has provided adequate notice of its privacy practices in its privacy policy or policies in accordance with Privacy Requirements in all material respects.  Seller's privacy policies are available on Internet websites owned, maintained or operated by Seller (collectively, the "***Seller Websites***").  Each of Seller Websites and all materials distributed or marketed by Seller have at all times made all material disclosures to users or customers required by Privacy Requirements, and none of such disclosures made or contained in any Seller Website or in any such materials have been inaccurate, misleading or deceptive or in violation of any Privacy Requirements in any material respect.  Seller has not received any written complaint or written notice regarding Seller's collection, use or disclosure of Personal Data.  No written claims have been asserted or, to Seller's Knowledge, are threatened against Seller by any person or entity alleging a violation of such person's or entity's privacy, personal or confidentiality rights under the privacy policies of Seller.  Seller has not received in writing and, to Seller's Knowledge, there is no circumstance (including any circumstance arising as the result of an audit or inspection carried out by any Governmental Entity) that would reasonably be expected to give rise to, any material Legal Proceeding, regulatory opinion, audit result or allegation from a Governmental Entity regarding Seller's compliance with Privacy Requirements.

(q)     <u>Personal Data</u>. To the extent the Purchased Assets include any Personal Data, Seller has obtained all necessary rights and consents in accordance with Privacy

21

Requirements to transfer such Personal Data to Purchaser in accordance with this Agreement and the Transactions. Seller has at all times taken commercially reasonable steps to ensure that Personal Data is protected against loss and against unauthorized access, use, modification, disclosure or other misuse. To Seller's Knowledge, there has been no unauthorized or illegal use of or access to any electronic or other database containing Personal Data maintained by or for Seller at any time and no breach or violation of any security policy adopted or maintained by or for Seller with respect to such database has occurred or is threatened. No circumstance has arisen in which Privacy Requirements would require Seller or any of its Subsidiaries to notify a Governmental Entity of a data security breach or security incident.

2.12    No Brokers. Neither Seller nor any Affiliate of Seller is obligated to pay any brokerage, finder's or other fee or commission in connection with the origin, negotiation or execution of this Agreement or in connection with the Transactions.

2.13    Material Contracts.

(a)    Schedules 2.13(a)(i) through 2.13(a)(xiv) of the Seller Disclosure Letter set forth a list of each of the following Contracts to which Seller is a party or by which any of its assets are bound (the "***Material Contracts***"):

(i)    any dealer, distributor or similar agreement, or any Contract providing for the grant of rights to reproduce, manufacture, license, market or sell the Seller Products to any other Person;

(ii)    (A) any joint venture Contract, (B) any Contract that involves a sharing of revenues, profits, cash flows, expenses or losses with other Persons or (C) any Contract that involves the payment of royalties to any other Person;

(iii)    any Contract with any of its officers or Service Providers providing for severance, equity acceleration or change of control benefits;

(iv)    any Contract pursuant to which any other party is granted exclusive rights or "most favored party" rights of any type or scope with respect to any of the Seller Products or Purchased Assets, or containing any non-competition covenants or other restrictions relating to the Seller Products or Purchased Assets; or materially limits the freedom of Seller to engage or participate, or compete with any other Person, in any line of business, market or geographic area with respect to the Purchased Assets, or to make use of any Purchased Assets;

(v)    all Contracts to which Seller is a party and pursuant to which Seller acquired or is authorized to use any Third Party Intellectual Property used in the development, marketing or licensing of the Seller Products or Purchased Assets, except Off-the-Shelf Software Licenses;

(vi)    any Contract to which Seller is a party and pursuant to which any Person is authorized to use any Seller Owned Intellectual Property;

Exhibit 2

(vii)    any Contract pursuant to which Seller has agreed to any restriction on the right of Seller to use or enforce any Seller Owned Intellectual Property or pursuant to which Seller agrees to encumber, transfer or sell rights in or with respect to any Seller Owned Intellectual Property;

(viii)    any Contract providing for the development of any software, technology or Intellectual Property Rights, independently or jointly, either by or for Seller (other than employee invention assignment agreements and consulting agreements with Authors on Seller's standard form of agreement, copies of which have been provided to Purchaser's counsel);

(ix)    any settlement agreement;

(x)    any Contract of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the Liabilities or indebtedness of any other Person;

(xi)    any Contract with a customer that materially deviates from Seller's standard form of customer Contract, a correct and complete copy of which has been provided to Purchaser prior to the Agreement Date;

(xii)    the Contracts for the ten largest customers of Seller, as measured by revenue from such customer during the twelve month period ended December 31, 2022;

(xiii)    the Contracts for the ten largest vendors of Seller, as measured by amounts payable to such vendor during the twelve month period ended December 31, 2022; and

(xiv)    any other Contract or obligation not listed in clauses (i) through (xiii) and material to the Purchased Assets.

(b)    All Material Contracts are in written form.  Seller has performed all of the material obligations required to be performed by it under, and is neither in default nor alleged to be in default in respect of, any Material Contract.  Each of the Material Contracts is in full force and effect, subject only to the effect, if any, of applicable bankruptcy and other similar laws affecting the rights of creditors generally and rules of law governing specific performance, injunctive relief and other equitable remedies.  None of Seller or, to Seller's Knowledge, any other party thereto is in material breach of or default under any Material Contract, and there exists no event, occurrence, condition or act, which, with the giving of notice or the lapse of time would reasonably be expected to (i) become a default or event of default under any Material Contract or (ii) give any third party (A) the right to declare a default or exercise any remedy under any Material Contract, (B) the right to a rebate, chargeback, refund, credit, penalty or change in delivery schedule under any Material Contract, (C) the right to accelerate the maturity or performance of any obligation of Seller under any Material Contract, or (D) the right to cancel, terminate or modify any Material Contract.  Seller has not received any written notice, or to Seller's Knowledge, any oral communication or other communication regarding any actual or possible violation or breach of, default under, or intention to cancel or modify any Material Contract.  Correct and complete copies of all Material Contracts have been provided to Purchaser prior to the Agreement Date.

Exhibit 2

2.14    No Other Representations and Warranties.  Except as expressly set forth in this Article II (including the related portions of the Seller Disclosure Letter) or in any Ancillary Agreement or any certificates delivered in connection thereto, neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Purchaser and its representatives (including any information, documents or material delivered to or made available to Purchaser, management presentations or in any other form in expectation of the Transactions) or as to the future revenue, profitability or success of the Business, or any such representation or warranty arising from statute or otherwise in law.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrant to Seller as follows:

3.1    Organization, Authority, Enforceability.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business and in good standing in each jurisdiction where the failure to be so qualified or in good standing, would reasonably be expected to have an effect that is materially adverse to the ability of Purchaser to perform its obligations under this Agreement.  Purchaser has all requisite limited liability company power and authority to enter into this Agreement and the Purchaser Ancillary Agreements and to consummate the Transactions.  The execution and delivery of this Agreement and the Purchaser Ancillary Agreements and the consummation of the Transactions have been duly authorized by all necessary limited liability company actions on the part of Purchaser.  Each of this Agreement and each Purchaser Ancillary Agreement has been duly executed and delivered by Purchaser and constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms, subject only to the effect, if any, of (i) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

3.2    Noncontravention; Consents.

(a)    The execution and delivery by Purchaser of this Agreement and the Purchaser Ancillary Agreements do not, and the consummation of the Transactions will not, conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consent, approval or waiver from any Person pursuant to, (i) any provision of the certificate of formation or limited liability company agreement of Purchaser or (ii) any Applicable Law.

(b)    No consent, approval, order, waiver or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person is required by or with respect to Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Ancillary Agreements or the consummation of the Transactions.

Exhibit 2                                                                DEF_000033

3.3    <u>Financial Capability</u>.  At Closing, Purchaser will have sufficient cash on hand and other sources of immediately available funds to satisfy all of its obligations under this Agreement, including payment of the Purchase Price (including the Holdback Fund) in accordance with the terms and subject to the conditions set forth in this Agreement and consummation of the Transactions.

3.4    <u>No</u>    Brokers.  Neither Purchaser nor any Affiliate of Purchaser is obligated to pay any brokerage, finder's or other fee or commission in connection with the origin, negotiation or execution of this Agreement or in connection with the Transactions.

3.5    <u>Litigation</u>.  There is no Legal Proceeding pending before any Governmental Entity or, to Purchaser's knowledge, threatened against Purchaser or any Affiliate of Purchaser that challenges or seeks to prevent, enjoin or otherwise delay the Transactions.  To Purchaser's knowledge, there is no reasonable basis for any Person to assert a claim against Purchaser or any of its Affiliates based upon Purchaser entering into this Agreement, the Ancillary Agreements or any of the Transactions.

**ARTICLE IV**
**<u>CONDUCT OF BUSINESS PRIOR TO CLOSING; ADDITIONAL AGREEMENTS</u>**

4.1    <u>Conduct of Business of Seller</u>.  During the period from the date hereof and continuing until the earlier of the termination of this Agreement or the Closing, except as authorized by Purchaser by prior written approval, Seller covenants that, in respect of the Business and the Purchased Assets, until the Closing it will: (i) conduct the Business in the ordinary course of business consistent with past practice; (ii) comply with all Applicable Laws and contractual obligations applicable to the operation of the Business or the Purchased Assets, including with respect to the payment of Taxes or filing of Tax Returns (<u>provided</u>, that any Tax Returns or amendments thereof with respect to the Business or the Purchased Assets that are filed during such period shall be provided for the Purchaser's prior review and approval); and (iii) use reasonable best efforts to preserve intact the Business and the Purchased Assets, keep available the services of the Business' officers, employees and agents and maintain the Business' relations and goodwill with suppliers, customers, creditors, employees, agents and others having business relationships with the Business, including by promptly paying all amounts owing to such Persons as and when such amounts are due.

4.2    <u>Pre-Closing Access to Information</u>.  Seller shall afford Purchaser and its accountants, counsel and other representatives, reasonable access during normal business hours during the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement to all properties, books, contracts, commitments, records and other information in each case concerning the Business, the Transferred Employees and the Purchased Assets as may reasonably be requested; <u>provided</u> that, Purchaser shall not have the right to schedule such access or visits if such access or visits will unduly interfere with the ordinary course operations of the Business during such time.

4.3    <u>Consents and Notices</u>.

GDSVF&H\8775395.10

Exhibit 2                                    DEF_000034

(a)    Seller shall promptly apply for or otherwise seek and use commercially reasonable efforts to obtain all consents and approvals required to be obtained by it for the consummation of the Transactions; <u>provided</u> that Seller shall not be required to pay any consideration therefor.

(b)    Seller and Purchaser shall use their respective commercially reasonable efforts to not take, or fail to take, any action that from the date hereof through the Closing would cause or constitute a breach of any of its respective representations, warranties, agreements and covenants set forth in this Agreement.  In the event of, and promptly after becoming aware of, the actual, pending or threatened occurrence of any event that would cause or constitute such a breach or inaccuracy, each party shall give detailed notice thereof to the other parties and shall use commercially reasonable efforts to prevent or promptly remedy such breach or inaccuracy.

(c)    Promptly (and in any case (i) within five (5) Business Days thereafter and (ii) no later than one (1) Business Day prior to the Closing Date) after Seller obtains the Requisite Stockholder Consent, Seller shall prepare and to deliver to each Seller Stockholder other than the Seller Stockholders who executed the Requisite Stockholder Consent, a notice (as it may be amended or supplemented from time to time, the "***Seller Stockholder Notice***") comprising (i) the notice contemplated by Section 228(e) of the Delaware General Corporation Law (the "***DGCL***") of the taking of a corporate action without a meeting by less than a unanimous written consent, and (ii) an information statement to the Seller Stockholders in connection with the solicitation of their signatures to the Requisite Stockholder Consent. The Seller Stockholder Notice shall include (x) a statement to the effect that the board of directors of Seller had unanimously recommended that the Seller Stockholders vote in favor of the adoption of this Agreement and (y) such other information as Purchaser and Seller may agree is required or advisable under DGCL to be included therein. Purchaser and Seller agree to cause their respective representatives to cooperate in the preparation of the Seller Stockholder Notice and any amendment or supplement thereto.

4.4    <u>Exclusivity</u>.  Until the earlier of the Closing or the termination of this Agreement, Seller shall not, and shall cause its Affiliates and their respective agents, directors, investors, stockholders, officers, advisors (including, without limitation, financial, legal and accounting advisors) and representatives not to, directly or indirectly encourage, solicit, initiate or conduct negotiations with or provide any information to, or enter into any agreement with, any corporation, partnership, person or other entity or group concerning any merger, consolidation, private stock offering, sale of assets or other similar transaction involving the Business, Seller or the Purchased Assets.  In addition, Seller will promptly, and in any event within one (1) Business Day, notify Purchaser after receipt by Seller at any time during such period of any unsolicited proposal for, or inquiry respecting, any third party acquisition transaction involving the Business, Seller or the Purchased Assets or any request for nonpublic information in connection with such a proposal or inquiry, or for access to the properties, books or records relating to the Purchased Assets by any person or entity that informs Seller that it is considering making, or has made, such a proposal or inquiry.  Such notice to Purchaser will indicate in reasonable detail the identity of the person making the proposal or inquiry and the terms and conditions of such proposal or inquiry.

4.5     Employees.

(a)     Each of the Founders (the "***Transferred Employees***") shall have his employment with Seller terminated as of the Closing Date.  Seller hereby consents to the hiring of all Transferred Employees by Purchaser and waives, with respect to the employment by Purchaser of such Transferred Employees, any claims or rights Seller would otherwise have against Purchaser or any such Transferred Employees due to such Transferred Employee's employment with Purchaser.  Upon termination of employment or engagement with Seller as contemplated in this Section 4.5(a), Seller shall pay to each Transferred Employee any Liability for accrued compensation, vacation, paid time off, sick leave or similar benefits with respect to such Transferred Employee attributable to periods of employment or service with Seller prior to the Closing and shall make such payment within the statutory time period therefor.

(b)     Seller shall be liable and responsible for and obligated to pay for and hold Purchaser and its Affiliates harmless from any damages, expenses, claims, Contracts, suits, obligations and other liabilities of any nature whatsoever relating, directly or indirectly, to: (i) any termination benefits, including (without limitation) payment of any vacation, paid time off or similar obligations or benefits, to any current or former Service Provider of Seller, including any Transferred Employees, which accrue or accrued, or become or became payable in connection with such person's periods of employment or service with Seller prior to the Closing or arise out of the termination of such person's employment or service with Seller, (ii) any of Seller's obligations under Section 4.5(a); (iii) any current or former Service Providers of Seller arising from, or with respect to, any act or omission of Seller or any event occurring prior to the Closing Date (including any failure by Seller or its Affiliates to comply with any Applicable Law or Contract relating to the employment or engagement of any current or former Employee or Service Provider); (iv) any Benefit Plan; (v) any duties of Seller or administrators under any current, former or future employee benefit plans of Seller, or under ERISA, COBRA, WARN or any similar Applicable Laws in connection with the Transactions; (vi) any present or future Liabilities of Seller to former, current or future Service Providers of Seller, whether or not specifically described in this Section 4.5(b), or (vii) any claim by any future, current or former Service Provider arising from a failure or omission by Seller to calculate and pay any of the Liabilities referred to in this Section 4.5(b) (the liabilities described in sub-clauses (i) through (vii) being collectively referred to herein as the "***Employee Liabilities***").

(c)     To the extent permitted by Applicable Law, Seller shall be solely responsible for providing continuation coverage under COBRA, or similar statute, if applicable, to each Transferred Employee who declines Purchaser's offer of employment and their qualified beneficiaries (as defined in Section 4980B(g)(1) of the Code).

4.6     Confidential Information.

(a)     Seller covenants and agrees with Purchaser that, from and at all times after the Closing, Seller agrees to, and shall cause its members, managers, agents, representatives, Affiliates, Service Providers, officers and directors to, treat and hold as confidential all Confidential Information and refrain from using any Confidential Information except in connection with this Agreement.  In the event that Seller or any of its managers, members, agents, representatives, Affiliates, Service Providers, officers or directors becomes legally compelled to

Exhibit 2

disclose any Confidential Information, such Person shall provide Purchaser with prompt written notice of such requirement so that Purchaser may seek a protective order or other remedy or waive compliance with the provisions of this Section 4.6.  In the event that a protective order or other remedy is not obtained or if Purchaser waives compliance with this Section 4.6, such Person shall furnish only that portion of such Confidential Information that is legally required to be provided and exercise its reasonable best efforts to obtain assurances that confidential treatment will be accorded such information.  Without limiting any of the foregoing, Seller shall not release any person from or waive any provisions of any employment, confidentiality, invention assignment, or similar agreements with Seller's current and former Service Providers.  For purposes of this Section 4.6, the term "Confidential Information" shall also include information relating to the Transactions or this Agreement, including the terms of this Agreement and Transactions, and information received by Seller after the Closing or relating to the period after the Closing.

(b)      Notwithstanding anything to the contrary contained in Section 4.6(a), (i) the obligations of Seller and its members, managers, agents, representatives, Affiliates, Service Providers, officers and directors under this Section 4.6 will not apply to any information that exclusively relates to any Excluded Assets or Excluded Liabilities and (ii) Seller may disclose any Confidential Information as contemplated by this Agreement or to directors, officers, employees, consultants, stockholders, Affiliates, representatives or agents (including its financial, legal or accounting advisors) on a need-to-know basis for the purposes of managing or discharging any Excluded Liabilities or implementing the wind-up, liquidation, dissolution, and/or cessation of Seller's business operations pursuant to Section 4.12 (to the extent the use of such information by Seller is necessary to implement wind-up, liquidation, dissolution, and/or cessation of Seller's business operations), or in connection with the preparation of any Tax Returns of Seller or any Tax contest of Seller which are necessary to such preparation or defense of such Tax contest; provided that such recipients of Confidential Information are subject to similar confidentiality obligations with respect thereto.  Notwithstanding anything to the contrary contained in Section 4.6(a), the obligations of Seller and its members, managers, agents, representatives, Affiliates, Service Providers, officers and directors under this Section 4.6 will also not apply to information that: (A) is or becomes generally available to the public without breach of the commitment provided for in this Section 4.6; or (ii) is required to be disclosed by Applicable Law or order of a Governmental Entity (provided that, in such case, the disclosing party shall provide prompt notice to Purchaser so that Purchaser and its Affiliates may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of Section 4.6).

4.7    Public Disclosure.  Neither Purchaser and its Affiliates, on the one hand, nor Seller and its Affiliates, on the other, shall issue any public statement relating to the terms of this Agreement or the Transactions or refer to either party directly or indirectly in connection with Purchaser's relationship with Seller, whether or not in response to an inquiry, without the prior written approval of the other party.  Notwithstanding anything herein, Purchaser may issue an initial press release or other communication announcing the Transactions and thereafter Purchaser may make such other public statements regarding this Agreement or the Transactions as Purchaser may determine is reasonably appropriate.

28

4.8     <u>Expenses</u>.  Except as set forth in <u>Section 4.10(a)</u>, <u>Section 8.9</u> and <u>Article VI</u>, all costs and expenses incurred in connection with this Agreement and the Transactions by (a) Seller or the Seller Stockholders shall be borne by Seller and (b) Purchaser shall be borne by Purchaser.

4.9     <u>Further Assurances</u>.  Upon the terms and subject to the conditions set forth in this Agreement, each of the parties hereto shall use all reasonable efforts, and shall cooperate with each other party hereto, to take, or cause to be taken, all actions reasonably necessary to consummate the Transactions, including the satisfaction of the respective conditions set forth in <u>Article V</u>.  Each party hereto, at the reasonable request of the other party hereto, shall execute and deliver such other instruments and do and perform such other acts and things as may be reasonably necessary for effecting completely the consummation of the Transactions, including the transfer and assignment (and recordation of same) of the Purchased Intellectual Property.

4.10    <u>Tax Matters</u>

(a)     <u>Transaction Taxes</u>.  Each of Seller and Purchaser shall bear and pay one-half of all Transaction Taxes consistent with <u>Section 1.7(b)</u>.  Transaction Taxes shall be timely paid, and all Tax Returns with respect thereto shall be filed by the party required to do so, as provided by Applicable Law. The paying party shall be entitled to reimbursement from the non-paying party in accordance with this <u>Section 4.10(a)</u>.  Upon payment of any such Transaction Taxes, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under this <u>Section 4.10(a)</u> together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed and confirming that such amounts have been properly paid.  The non-paying party shall make such reimbursement promptly but in no event later than fifteen (15) Business Days after the presentation of such statement.

(b)     <u>Straddle Period Tax</u>.  In the case of any real property Taxes, personal property Taxes or any similar ad valorem Taxes attributable to the Purchased Assets that are in respect of a period commencing on or before the Closing Date and that ends after the Closing Date (a "***Straddle Period Tax***"), any such Straddle Period Taxes shall be prorated between Purchaser and Seller on a per diem basis with Seller responsible for such Straddle Period Tax attributable to the period ending on the Closing Date and Purchaser responsible for such Straddle Period Tax attributable to the period commencing after the Closing Date.  Straddle Period Taxes shall be timely paid, and all Tax Returns with respect thereto shall be filed, as provided by Applicable Law.  The paying party shall be entitled to reimbursement from the non-paying party in accordance with this <u>Section 4.10(b)</u>.  Upon payment of any such Straddle Period Taxes, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under this <u>Section 4.10(b)</u> together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying party shall make such reimbursement promptly but in no event later than fifteen (15) Business Days after the presentation of such statement.  Seller is and will remain solely responsible for all Excluded Taxes and all other Taxes and Tax matters arising from or relating to the Purchased Assets through the Closing Date.

(c)     <u>Tax Cooperation</u>. Each party shall (i) provide the other with such assistance as may reasonably be required in connection with the preparation of any Tax Return and the

conduct of any audit or other examination by any Tax Authority or any other Tax proceeding, and (ii) retain for at least six years following the Closing Date and provide the other with all records or other information that may be relevant to the preparation of any Tax Returns, or the conduct of any audit or examination, or other proceeding related to Taxes. Notwithstanding anything to the contrary in this Agreement, Purchaser shall not be required to disclose to Seller any consolidated, combined, affiliated or unitary Tax Return which includes Purchaser or any of its affiliates or any Tax related work papers.

(d)    <u>Tax Consequences</u>. Purchaser makes no representations or warranties to Seller regarding the Tax treatment of transactions contemplated by this Agreement, or any of the Tax consequences to Seller under this Agreement or the transactions contemplated by this Agreement. Seller acknowledges that Seller is relying solely on its own Tax advisors in connection with this Agreement and the transactions contemplated by this Agreement.

4.11    <u>Seller Cessation of Operation</u>. Seller shall cease operating the Business or any other business immediately following the Closing and shall adopt a plan of liquidation for Seller reasonably acceptable to Purchaser within sixty (60) days of the Closing (the "***Plan of Liquidation***"). After the Closing, Seller may not (a) repurchase or redeem any Seller Capital Stock, (b) make any distribution to its equityholders or (c) dissolve or liquidate, in each case unless (i) Seller has satisfied any creditor claims for which Purchaser could reasonably become liable, including as a result of any failure by either Purchaser or Seller to comply with the requirements of any applicable bulk sales or transfer laws, and (ii) all Delayed Purchased Assets have been transferred and assigned to Purchaser or appropriate arrangements have been made with respect to all of the Delayed Purchased Assets pursuant to <u>Section 1.9</u>. Seller shall not amend, modify or abandon the Plan of Liquidation without Purchaser's prior written consent.

4.12    <u>Use of Tradename</u>. Within ten (10) Business Days following the Closing, Seller shall: (a) cease using all Purchased Assets, including doing business with or otherwise using the tradename "Chroma", "Chroma Signet" or any other name or trademark associated with the Business and any logos or designs associated therewith; (b) take all necessary or appropriate action to amend any materials, signage, documents, stationary, letterhead, or other printed materials to remove the "Chroma" and "Chroma Signet" tradename or any other name or trademark associated with the Business and any logos or designs associated therewith; and (c) file the necessary and appropriate documents with the appropriate governmental agencies to change its name to any other name not related or confusingly similar to any the "Chroma" and "Chroma Signet" tradenames or any other names or trademarks associated with the Business.

4.13    <u>Waiver of Bulk Sales Requirements</u>. Each of the parties hereto waives compliance with any Applicable Laws regarding bulk sales, including the Uniform Commercial Code Bulk Transfer provisions and any similar laws.

4.14    <u>Joinder Agreements</u>. Subject to (and without limiting) <u>Section 5.1(b)(i)</u>, Seller acknowledges and agrees that Seller shall make distribution of any portion of the Closing Payment Amount by Seller to a Seller Stockholder contingent upon delivery to Seller (with a copy also delivered to Purchaser) of a Joinder Agreement. Subject to (and without limiting) <u>Section 5.1(b)(i)</u>, Seller shall use its commercially reasonable efforts to obtain a Joinder Agreement from each Seller Stockholder entitled to a portion of the Closing Payment Amount allocable to such

GDSVF&H\8775395.10

Exhibit 2    DEF_000039

Seller Stockholder pursuant to the terms of the certificate of incorporation and other organizational documents of Seller.

## ARTICLE V
## CONDITIONS AND CLOSING DELIVERIES

5.1    Conditions to Obligations of Purchaser.

(a)    Conditions.  The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Purchaser):

(i)    Accuracy of Representations and Warranties.  (A) The representations and warranties of Seller set forth in this Agreement that are qualified by materiality or Material Adverse Effect will be true and correct in all respects on the date hereof and as of the Closing Date with the same force and effect as if made on the Closing Date (except that those representations and warranties that address matters only as of a particular date need only have been true and correct on such date), and (B) the representations and warranties of Seller set forth in this Agreement that are not qualified by materiality or Material Adverse Effect will be true and correct in all material respects on the date hereof and as of the Closing Date with the same force and effect as if made on the Closing Date (except that those representations and warranties that address matters only as of a particular date need only have been true and correct on such date).

(ii)    Covenants.  Seller will have performed and complied in all material respects with all of its covenants and obligations contained in this Agreement (to the extent that such covenants and obligations require performance by Seller on or before the Closing).

(iii)    Compliance with Law; No Legal Restraints.  There will not be issued, enacted or adopted, or threatened by any Governmental Entity, any order, decree, injunction, legislative enactment, statute, regulation, or action, or any judgment or ruling that prohibits or imposes limitations on:  (a) the Transactions or (b) Purchaser's right to own, retain, use or operate any of the Purchased Assets on or after the Closing or seeking a disposition or divestiture of any of the Purchased Assets ("***Legal Restraints***").

(iv)    No Material Adverse Effect.  There shall not have occurred any Material Adverse Effect that is continuing.

(v)    Seller Closing Deliverables.  Seller shall have delivered the agreements, instruments, certificates and other documents specified in Section 5.1(b).

(b)    Receipt of Seller Closing Deliverables.  At or prior to the Closing, Seller shall deliver:

(i)    A Joinder Agreement from each Founder and from such Seller Stockholders who, together with the Founders, collectively hold at least seventy five percent (75%) of all shares of Seller Capital Stock outstanding as of immediately prior to the Closing (on an as converted basis), in each case, in the form attached hereto as Exhibit D (each, a "***Joinder***

31

*Agreement*," and collectively, the "***Joinder Agreements***") (and upon execution by Purchaser, such Joinder Agreements shall be in full force and effect and shall not have been repudiated);

(ii)    A Trademark Assignment, in substantially the form attached hereto as Exhibit E (the "***Trademark Assignment***"), dated as of the Closing Date and duly executed by Seller;

(iii)    A Domain Name Assignment, in substantially the form attached hereto as Exhibit F (the "***Domain Name Assignment***"), dated as of the Closing Date and duly executed by Seller;

(iv)    A certificate attesting to the satisfaction of the conditions set forth in Sections 5.1(a)(i), (ii) and (iv), duly executed by an officer of Seller;

(v)    The Offer Letters and Proprietary Information and Invention Assignment Agreements duly executed by the Transferred Employees (and such Offer Letters and Proprietary Information and Invention Assignment Agreements shall be in full force and effect and shall not have been repudiated);

(vi)    The Restrictive Covenants Agreements from each Founder (and upon execution by Purchaser, the Restrictive Covenants Agreements shall be in full force and effect and shall not have been repudiated);

(vii)    Payoff letters and any necessary UCC authorizations or other releases as may be reasonably required to evidence the satisfaction of the Seller Debt and the release, upon receipt of the amounts indicated in the payoff letters, of all Encumbrances on the Purchased Assets related to such Seller Debt;

(viii)    A copy of the current certificate of incorporation and bylaws of Seller and all resolutions adopted by each of the board of directors and the stockholders of Seller in connection with this Agreement or the Transactions, in each case certified by the Secretary of Seller;

(ix)    Written evidence of the approval and adoption by Seller Stockholders holding at least seventy six percent (76%) of all shares of Seller Capital Stock outstanding as of immediately prior to the Closing (on an as converted basis), with such approval and adoption in the form attached hereto as Exhibit B;

(x)    A certificate from the Delaware Secretary of State, dated within five (5) days prior to the Closing Date certifying that Seller is in good standing;

(xi)    A true, correct and complete list of all of Seller's material assets and all Seller Debt as of the Closing Date (the "***Closing Assets and Debt List***");

(xii)    A consideration spreadsheet, which shall be dated as of the Closing Date and shall set forth all of the following information: (A) the names of all equityholders of Seller, (B) the number of shares of each class or series of Seller Capital Stock and shares of Seller

Exhibit 2

Capital Stock underlying Seller Options held by each equityholder of Seller, and (C) the Pro Rata Share of each Seller Stockholder and SAFE Holder;

(xiii)    A properly completed and executed IRS Form W-9 of Seller;

(xiv)    <u>Change of Name</u>.  A copy of the certificate of amendment in the form attached hereto as <u>Exhibit G</u>, as filed with the Delaware Secretary of State, pursuant to which Seller will change its name as reflected in such amendment;

(xv)    A Bill of Sale and Assignment and Assumption Agreement, in substantially the form attached hereto as <u>Exhibit H</u> (the "***Bill of Sale and Assignment and Assumption Agreement***"), dated as of the Closing Date and duly executed by Seller; and

(xvi)    The SAFE Termination and Release Agreements from each SAFE Holder, in the form attached hereto as <u>Exhibit I</u> (the "***SAFE Termination and Release Agreements***") setting forth, among other things, the consideration that may become payable to the SAFE Holders for the cancellation and termination of the SAFEs in connection with the Transactions (the "***SAFE Payments***").

5.2    <u>Conditions to Obligations of Seller</u>.

(a)    <u>Conditions</u>.  The obligations of Seller hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (any one or more of which may be waived by Seller):

(i)    <u>Accuracy of Representations and Warranties</u>.  (i) The representations and warranties of Purchaser set forth in this Agreement that are qualified by materiality or material adverse effect will be true and correct in all respects, and (ii) the representations and warranties of Purchaser set forth in this Agreement that are not qualified by materiality or material adverse effect will be true and correct in all material respects.

(ii)    <u>Covenants</u>.  Purchaser will have performed and complied in all material respects with all of its covenants and obligations contained in this Agreement (to the extent that such covenants and obligations require performance by Purchaser on or before the Closing).

(iii)    <u>Compliance with Law; No Legal Restraints</u>.  There will not be issued, enacted or adopted, or threatened in writing by any Governmental Entity, any Legal Restraints.

(iv)    <u>Purchaser Closing Deliverables</u>.  Purchaser shall have delivered the agreements, instruments, certificates and other documents specified in <u>Section 5.2(b)</u>.

(b)    <u>Receipt of Purchaser Closing Deliverables</u>.  At or prior to the Closing, Purchaser shall deliver to Seller the following documents:

(i)    A certificate attesting to the satisfaction of the conditions set forth in <u>Sections 5.2(a)(i)</u> and <u>(ii)</u>, duly executed by an officer of Purchaser;

Exhibit 2                                            DEF_000042

(ii)    All resolutions adopted by the board of directors of Parent and all resolutions adopted by the manager or sole member of Purchaser, as the case may be, in connection with this Agreement or the Transactions, in each case certified by the Secretary of Parent or Purchaser, as applicable;

(iii)    A certificate from the Delaware Secretary of State, dated within five (5) days prior to the Closing Date certifying that Purchaser is in good standing; and

(iv)    Each Purchaser Ancillary Agreement duly executed by Purchaser.

## ARTICLE VI
## HOLDBACK FUND AND INDEMNIFICATION

6.1    Holdback Fund.

(a)    At the Closing, Purchaser shall withhold the Holdback Amount from the Purchase Price (the aggregate amount of cash so held by Purchaser from time to time, the "**Holdback Fund**").  The Holdback Fund shall constitute partial security for the benefit of Purchaser (on behalf of itself or any other Indemnified Person) exclusively with respect to any Seller Indemnifiable Damages pursuant to the indemnification obligations of the Seller Indemnifying Persons under this Article VI.  Purchaser shall hold the Holdback Fund until 11:59 p.m. local time on the date (the "**Holdback Release Date**") that is eighteen (18) months after the Closing Date. None of Seller, the Seller Stockholders or the SAFE Holders shall receive interest or other earnings on the cash in the Holdback Fund.  Neither the Holdback Fund (including any portion thereof) nor any beneficial interest therein may be pledged, subjected to any Encumbrance, sold, assigned or transferred by Seller (or any Seller Stockholder or SAFE Holder), or be taken or reached by any legal or equitable process in satisfaction of any debt or other Liability of Seller (or any Seller Stockholder or SAFE Holder), in each case prior to the disbursement of the Holdback Fund to Seller (or, following the date that all or a portion of the Purchase Price is distributed to the Seller Stockholders and SAFE Holders, the Representative on behalf of Seller Stockholders and SAFE Holders), except that each Seller Stockholder and SAFE Holder shall be entitled to assign such Seller Stockholder's or SAFE Holder's rights to such Seller Stockholder's or SAFE Holder's Pro Rata Share of the Holdback Fund (i) by will, by the laws of intestacy or by other operation of law or (ii) if such Seller Stockholder or SAFE Holder is a venture capital fund, to such Seller Stockholder's or SAFE Holder's Affiliates.

(b)    Within five (5) Business Days following the Holdback Release Date, Purchaser (or its agent) will distribute to Seller (or, following the date that all or a portion of the Purchase Price is distributed to the Seller Stockholders and SAFE Holders, the Representative on behalf of Seller Stockholders and SAFE Holders) the Holdback Fund *less* that portion of the Holdback Fund subject to a Claim Certificate delivered to Representative on or prior to the Holdback Release Date in accordance with this Article VI that Purchaser and the Representative have not resolved pursuant to the procedure set forth in this Article VI and Section 8.8 as of the Holdback Release Date. Any portion of the Holdback Fund held by Purchaser following the Holdback Release Date with respect to pending but unresolved claims for indemnification that is not awarded to Purchaser (on behalf of itself or any other Indemnified Person) upon the resolution of such claims shall be distributed to Seller (or, following the date that all or a portion of the

Exhibit 2

Purchase Price is distributed to the Seller Stockholders or SAFE Holders, the Representative on behalf of Seller Stockholders and SAFE Holders) within five (5) Business Days following the resolution of such claims. As soon as possible following the release of any portion of the Holdback Fund by Purchaser, Seller or the Representative, as the case may be, shall distribute such amount to the Seller Stockholders and SAFE Holders in accordance with their respective Pro Rata Shares.

6.2     Survival of Representations and Warranties.  All representations and warranties of the parties contained in Article II and Article III of this Agreement shall survive the Closing until the date that is eighteen (18) months following the date of the Closing; provided that (i) the representations and warranties in Section 2.1 (Organization, Authority, Enforceability), clause (b)(i) of the first sentence of Section 2.2 (Noncontravention; Consents), Section 2.5(b) (Solvency), Section 2.7 (Assets), Section 2.9 (Taxes), Section 2.12 (No Brokers), Section 3.1 (Organization, Authority, Enforceability), and Section 3.4 (No Brokers) (collectively, "*Fundamental Representations*") shall survive the Closing until the 60th day after expiration of the applicable statute of limitations with respect to such claims, and (ii) the representations and warranties in Section 2.11 (Intellectual Property) shall survive Closing until the date that is three (3) years following the date of Closing (the "*IP Representations*").

6.3     Indemnification by Seller, Seller Stockholders and SAFE Holders.

(a)     Indemnification by Seller, Seller Stockholders and SAFE Holders.  Subject to the limitations set forth in this Article VI, Seller and, following the date that all or a portion of the Purchase Price is distributed to the Seller Stockholders and the SAFE Holders, each Seller Stockholder and SAFE Holder (the "*Seller Indemnifying Persons*") shall, severally and not jointly, and in the case of the Seller Stockholders and the SAFE Holders, in accordance with their respective Pro Rata Share, indemnify and hold harmless Purchaser and its Affiliates and their respective officers, directors, agents, employees, successors and assigns (the "*Purchaser Indemnified Persons*") from and against any and all Liabilities, obligations, deficiencies, any demands, claims, proceedings or causes of action, assessments, losses, interest, fines, penalties, damages, costs and expenses, including settlement costs and costs of investigation and defense, and reasonable and documented fees and expenses of lawyers, experts and other professionals, directly or indirectly, whether or not due to a Third-Party Claim (collectively, "*Seller Indemnifiable Damages*"), arising out of, relating to, or resulting from (i) any failure of any certification, representation or warranty made by Seller or any Seller Stockholder or any SAFE Holder in this Agreement or any Seller Ancillary Agreement to be true and correct as of the Closing Date (or if another date is set forth in such certificate representation or warranty, as of such date); (ii) any breach of or default in connection with any of the covenants, agreements or obligations made by Seller or any Seller Stockholder or any SAFE Holder in this Agreement or any Seller Ancillary Agreement; (iii) any claims by (A) any then-current or former holder or alleged then-current or former holder of any capital stock or other Equity Interest of Seller (including any predecessors), arising out of, resulting from or in connection with this Agreement and the Transactions, or (B) any Person to the effect that such Person is entitled to any payment in connection with the Transactions; (iv) any Excluded Liabilities (including, for the avoidance of doubt, Excluded Taxes); (v) any error, omission or inaccuracy in the calculation of the Pro Rata Share or any other failure to properly allocate the Closing Payment Amount in accordance with the organizational documents of Seller, Applicable Law or any rights to acquire equity in

35

Exhibit 2                                    DEF_000044

Seller that results in a misallocation of such amount; and (vi) any Fraud, willful misconduct or intentional misrepresentation by or on behalf of Seller ("***Seller Fraud***") or a Seller Stockholder or SAFE Holder, solely as relating to the Transaction; <u>provided</u> that no Seller Stockholder or SAFE Holder shall be liable for the Fraud, willful breach or intentional misrepresentation committed by any other Seller Stockholder or SAFE Holder (other than as constitutes Seller Fraud).

(b)      "Materiality," "in all material respects" and "Material Adverse Effect" qualifications and other similar qualifications in any representation, warranty, covenant, agreement or obligation shall not be taken into account in determining whether an inaccuracy in such representation or warranty, or a breach of such covenant, agreement or obligation, exists, and shall not be taken into account in determining the amount of any Seller Indemnifiable Damages with respect to such breach, default or failure to be true and correct.

6.4    <u>Indemnification by Purchaser</u>.  Subject to the limitations set forth in this Article VI, Purchaser shall indemnify and hold harmless Seller, the Seller Stockholders and the SAFE Holders and each of their respect Affiliates and their respective officers, directors, agents, employees, successors and assigns (the "***Seller Indemnified Persons***") from and against any and all Liabilities, obligations, deficiencies, any demands, claims, proceedings or causes of action, assessments, losses, interest, fines, penalties, damages, costs and expenses, including settlement costs and costs of investigation and defense, and reasonable and documented fees and expenses of lawyers, experts and other professionals, directly or indirectly, whether or not due to a Third-Party Claim (collectively, "***Purchaser Indemnifiable Damages***"), arising out of, relating to, or resulting from (i) any failure of any certification, representation or warranty made by Purchaser in this Agreement or any Purchaser Ancillary Agreement to be true and correct as of the Closing Date (or if another date is set forth in such certificate representation or warranty, as of such date); (ii) any breach of or default in connection with any of the covenants, agreements or obligations made by Purchaser in this Agreement or any Purchaser Ancillary Agreement; or (iii) any Assumed Liabilities.

6.5    <u>Limitations</u>.

(a)      Notwithstanding anything to the contrary contained herein: (i) the Purchaser Indemnified Persons, as a group, may not recover any Seller Indemnifiable Damages pursuant to an indemnification claim under clause (i) of <u>Section 6.3(a)</u> (other than claims arising out of, resulting from or in connection with the Fundamental Representations) with respect to a single claim or series of related claims arising out of the same or related facts, events or circumstances, unless and until the Purchaser Indemnified Persons, as a group, shall have paid, incurred, suffered or sustained at least $▮▮▮▮ (the "***Deductible Amount***") in Seller Indemnifiable Damages; <u>provided</u> that if and when the aggregate Seller Indemnifiable Damages exceed the Deductible Amount, the Purchaser Indemnified Persons will be entitled to be indemnified for the aggregate Seller Indemnifiable Damages in excess of the Deductible Amount; (ii) the aggregate Liability of the Seller Indemnifying Persons arising out of, relating to or in connection with the matters listed in clause (i) of <u>Section 6.3(a)</u> (other than the Fundamental Representations and the IP Representations) shall not exceed the Holdback Amount; (iii) the aggregate Liability of the Seller Indemnifying Persons arising out of, relating to or in connection with any failure of the IP Representations made by Seller to be true and correct, but excluding, for the avoidance of doubt, claims with respect to Fraud, shall not exceed the Purchase Price; (iv)

36

the aggregate Liability of the Seller Indemnifying Persons for claims for Seller Indemnifiable Damages arising out of, resulting from or in connection with the matters listed in <u>Section 6.3(a)</u> (other than, for the avoidance of doubt, with respect to Fraud) shall be limited to the Purchase Price; (v) the total Liability of a Seller Stockholder or SAFE Holder for any claims for Seller Indemnifiable Damages arising out of, relating to or in connection with the matters listed in clause (i) of <u>Section 6.3(a)</u> (other than claims arising out of, resulting from or in connection with the Fundamental Representations and the IP Representations) to be true and correct as aforesaid shall be limited to such Seller Stockholder's or SAFE Holder's Pro Rata Share of the Holdback Amount; (vi) the total Liability of a Seller Stockholder or SAFE Holder for any claims for Seller Indemnifiable Damages, including claims arising out of, resulting from or in connection with any failure of the Fundamental Representations made by Seller, but excluding, for the avoidance of doubt, claims with respect to Fraud, shall be limited to the lesser of (x) the Pro Rata Share of the Purchase Price or (y) the dollar amount equal to the amount actually paid to such Seller Stockholder or SAFE Holder as a result of the Transactions (including indirectly through distributions or dividends by Seller following the Closing or the dissolution of Seller following the Closing) in accordance with the Plan of Liquidation; and (vii) any limitation of Liability in this <u>Section 6.5</u> shall not apply in the case of Fraud.

(b)    The amount of Seller Indemnifiable Damages and Purchaser Indemnifiable Damages recoverable by any Purchaser Indemnified Person or Seller Indemnified Person, as applicable, under this <u>Article VI</u> with respect to any indemnity claim shall be reduced by the amount of any actual cash payments, setoffs or recoupment of any payments (including insurance proceeds, indemnity or contribution payments and third party recoveries), in each case actually received by the Purchaser Indemnified Person or Seller Indemnified Person, as applicable, as a result of any event giving rise to such indemnity claim (net of any actual costs of recovery or collection, deductibles, premium adjustments, reimbursement obligation or other costs directly related to the insurance, indemnification, or contribution arrangement in respect to such amounts).

(c)    If an Indemnified Person's claim under this <u>Article VI</u> may be brought under different sections of this <u>Article VI</u>, then such Indemnified Person shall have the right to bring such claim under any applicable section(s) of this <u>Article VI</u> it chooses; <u>provided</u>, <u>however</u>, that the Indemnified Persons shall not be entitled to recover for any Indemnifiable Damages more than once under this Agreement, under any Ancillary Agreement, at law or in equity.

(d)    Any claim for Indemnifiable Damages will be calculated without regard to any punitive damages unless such punitive damages are actually awarded to a third party by a Governmental Entity.

6.6    <u>Period for Claims</u>.  The period (the "***Claims Period***") during which claims may be made (a) for Seller Indemnifiable Damages arising out of, resulting from or in connection with the matters listed in clause (i) of <u>Section 6.3(a)</u> (other than with respect to the failure of any of the Fundamental Representations or IP Representations to be true and correct as aforesaid) shall commence at the Closing and terminate at 11:59 p.m. local time on the Holdback Release Date, (b) for Seller Indemnifiable Damages arising out of, resulting from or in connection with the failure of any of the IP Representations to be true and correct as aforesaid shall commence at the Closing and terminate at 11:59 p.m. local time on the date that is three (3) years following the date of Closing, (c) for Seller Indemnifiable Damages arising out of, resulting from or in connection with

37

all other matters, including the failure of any of the Fundamental Representations to be true and correct as aforesaid, shall commence at the Closing and terminate at 11:59 p.m. local time on the date that is the 60th day after the expiration of the applicable statute of limitations, (d) for Purchaser Indemnifiable Damages arising out of, resulting from or in connection with the matters listed in clause (i) of Section 6.4 (other than with respect to the failure of any of the Fundamental Representations to be true and correct as aforesaid) shall commence at the Closing and terminate at 11:59 p.m. local time on the Holdback Release Date and (e) for Purchaser Indemnifiable Damages arising out of, resulting from or in connection with all other matters, including the failure of any of the Fundamental Representations to be true and correct as aforesaid, shall commence at the Closing and terminate at 11:59 p.m. local time on the date that is the 60th day after the expiration of the applicable statute of limitations. The covenants or other agreements contained in this Agreement shall survive the Closing Date until the date that is eighteen (18) months following the date of the Closing, other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. No right to indemnification pursuant to Article VI in respect of any claim that is set forth in a Claim Certificate delivered to an Indemnifying Person (or, following the date that all or a portion of the Purchase Price is distributed to the Seller Stockholders and the SAFE Holders, the Representative on behalf of Seller Stockholders and SAFE Holders) prior to 5:00 p.m., Eastern Standard Time, on the expiration of the Claims Period shall be affected by the expiration of such representations and warranties; and provided, further, that such expiration or release shall not affect the rights of any Indemnified Person under Article VI or otherwise to seek recovery of Indemnifiable Damages arising out of Fraud.

6.7    Claims.

(a)    The party making a claim under this Article VI is referred to as the "***Indemnified Person***," the party against whom such claims are asserted under this Article VI is referred to as the "***Indemnifying Person***," and the damages under this are referred to as "***Indemnifiable Damages***."

(b)    During the Claims Period and after becoming aware of any actual or potential claim for Indemnifiable Damages, whether or not in connection with a Third-Party Claim, the Indemnified Person shall deliver to the Indemnifying Person one or more certificates signed by the Indemnified Person or any officer of the Indemnified Person (each, a "***Claim Certificate***"):

(i)    stating that an Indemnified Person has incurred, paid, reserved or accrued, or reasonably anticipates that it may incur, pay, reserve or accrue Indemnifiable Damages (or that with respect to any Tax matters, that any Tax Authority may raise such matter in audit of Purchaser or its Subsidiaries that could give rise to Seller Indemnifiable Damages);

(ii)    stating the amount of such Indemnifiable Damages (which, in the case of Seller Indemnifiable Damages not yet incurred, paid, reserved or accrued, may be the maximum amount reasonably anticipated by the Indemnified Person to be incurred, paid, reserved, accrued or demanded by a third party); and

GDSVF&H\8775395.10

Exhibit 2                                                    DEF_000047

(iii)     specifying in reasonable detail (based upon the information then possessed by the Indemnified Person) the individual items of such Indemnifiable Damages included in the amount so stated and the nature of the claim to which such Indemnifiable Damages are related.

(c)     Such Claim Certificate shall be provided reasonably promptly after the Indemnified Person becomes aware of any actual or potential claim for Indemnifiable Damages whether or not in connection with a Third-Party Claim, provided that no delay in providing such Claim Certificate within the Claims Period shall affect the Indemnified Person's rights hereunder, unless (and then only to the extent that) the Indemnifying Person is actually and materially prejudiced thereby.

(d)     Subject to this <u>Article VI</u> including the survival periods set forth in <u>Section 6.2</u> and the limitations set forth in <u>Section 6.5</u>, if the Purchaser Indemnified Person makes any claims for Seller Indemnifiable Damages after the Holdback Release Date or to the extent the Purchaser Indemnified Person has exhausted or made claims upon all amounts of cash in the Holdback Fund, each Seller Stockholder and SAFE Holder shall be liable for such holder's Pro Rata Share of the amount of any Seller Indemnifiable Damages resulting from such claim. In such event, Purchaser shall deliver the Claim Certificate to each Seller Stockholder and SAFE Holder and each such holder shall promptly (and in no event later than ten (10) days after receiving such notice or after the final resolution of any disputed claims pursuant to <u>Section 6.8</u>) pay its Pro Rata Share of such Seller Indemnifiable Damages to Purchaser.

6.8     <u>Resolution of Objections to Claims</u>.

(a)     With respect to claims by Purchaser Indemnified Persons, if the Representative does not contest, by written notice to the Indemnified Person, any claim or claims by the Purchaser Indemnified Person made in the Claim Certificate within the thirty (30)-day period following receipt of the Claim Certificate, then Purchaser shall reclaim an amount of cash from the Holdback Fund having a total value equal to the amount of the Seller Indemnifiable Damages specified in such Claim Certificate prior to seeking any direct recourse from the Seller Indemnifying Person. With respect to claims by Seller Indemnified Persons, if the Purchaser does not contest, by written notice to the Indemnified Person, any claim or claims by the Seller Indemnified Person made in the Claim Certificate within the 30-day period following receipt of the Claim Certificate, then Purchaser shall pay such Purchaser Indemnifiable Damages to such Seller Indemnified Person.

(b)     If the Indemnifying Person objects in writing to any claim or claims by the Indemnified Person made in any Claim Certificate within the thirty (30)-day period set forth in <u>Section 6.8(a)</u>, the Indemnified Person and the Indemnifying Person shall attempt in good faith for sixty (60) days after the Indemnified Person's receipt of such written objection to resolve such objection. The Indemnified Person shall reasonably assist the Indemnifying Person's investigation by giving reasonable access to information relating to such matter as the Indemnifying Person or any of its professional advisors may reasonably request. If the Indemnified Person and the Indemnifying Person shall so agree, a memorandum setting forth such agreement shall be prepared and signed by both the Indemnified Person and the Indemnifying Person.

Exhibit 2                                                    DEF_000048

(c)    If no such agreement can be reached during the sixty (60)-day period for good faith negotiation set forth in Section 6.8(b), but in any event upon the expiration of such sixty (60)-day period, the Indemnified Person shall be free to pursue remedies as may be available to the Indemnified Person on the terms and subject to the provisions of this Agreement.

6.9    Third Party Claims.

(a)    In the event an Indemnified Person becomes aware of a claim by a third party (a "**Third-Party Claim**") that the Indemnified Person in good faith believes may result in a claim for Indemnifiable Damages by or on behalf of an Indemnified Person, the Indemnified Person shall give the Indemnifying Person reasonably prompt written notice thereof by delivering a Claim Certificate to the Indemnifying Person in accordance with Section 6.7(b).

(b)    The Indemnifying Person shall have the right to participate in (at Indemnifying Person's sole cost and expense) or, by giving written notice to the Indemnified Person on or before the 30th day following receipt of a Claim Certificate delivered pursuant to Section 6.9(a), to assume the defense of any Third-Party Claim at the Indemnifying Person's sole cost and expense and by the Indemnifying Person's own counsel (which counsel shall be reasonably acceptable to the Indemnified Person), and the Indemnified Person shall cooperate in good faith in such defense in each case at the Indemnifying Person's sole cost and expense; provided that without the prior written consent of the Indemnified Person, the Indemnifying Person shall not assume, defend or direct the defense of any such Third-Party Claim (A) that is asserted directly by or on behalf of a Person that is a supplier or customer of the Business, (B) that seeks an injunction or other equitable relief or criminal sanctions or penalties against the Indemnified Person, (C) that has a reasonable likelihood of resulting in monetary damages that would exceed an amount equal to the amount of potentially recoverable Seller Indemnifiable Damages or Purchaser Indemnifiable Damages, as the case may be, pursuant to this Article VI, or (D) if in the reasonable opinion of counsel to the Indemnified Person, (i) there are legal defenses available to an Indemnified Person that are different from or additional to those available to the Indemnifying Person, or (ii) there exists a conflict of interest between the Indemnifying Person and the Indemnified Person that cannot be waived.  In the event that the Indemnifying Person assumes the defense of any Third-Party Claim, subject to Section 6.9(b), it shall use its reasonable best efforts to defend diligently such Third Party Claim and shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Person. The Indemnified Person shall have the right to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Person's right to control the defense thereof pursuant to this Section 6.9(b).  The fees and disbursements of such counsel shall be at the expense of the Indemnified Person, provided, that if in the reasonable opinion of counsel to the Indemnified Person, (i) there are legal defenses available to an Indemnified Person that are different from or additional to those available to the Indemnifying Person, or (ii) there exists a conflict of interest between the Indemnifying Person and the Indemnified Person that cannot be waived, the Indemnifying Persons shall be liable for the reasonable fees and expenses of counsel to the Indemnified Person in each jurisdiction for which the Indemnified Person determines counsel is required.  If the Indemnifying Person elects not to compromise or defend such Third-Party Claim, fails to promptly notify the Indemnified Person in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third-Party

40

Exhibit 2

Claim, the Indemnified Person may, subject to <u>Section 6.9(c)</u>, assume the defense of, pay and compromise such Third-Party Claim and seek indemnification for any and all Seller Indemnifiable Damages based upon, arising from or relating to such Third-Party Claim. The Indemnifying Persons and the Indemnified Persons shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available records relating to such Third-Party Claim.

(c)    Notwithstanding any other provision of this Agreement, the Indemnifying Person shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Person, except as provided in this <u>Section 6.9(c)</u>. If a firm offer is made to settle a Third-Party Claim without leading to (A) liability or the creation of a financial or other obligation on the part of the Indemnified Person, (B) any admission of guilt or liability, (C) imposition of an injunction or other equitable relief or any non-monetary conditions or obligations or (D) any material adverse effect on the business of the Indemnifying Person or its Affiliates, and provides, in customary form, for the unconditional release of each Indemnified Person from all liabilities and obligations in connection with such Third-Party Claim (such offer, the "***Eligible Offer***") and the Indemnifying Person desires to accept and agree to such offer, the Indemnifying Person shall give written notice to that effect to the Indemnified Person. If the Indemnified Person fails to consent to an Eligible Offer within ten (10) days after its receipt of such notice, the Indemnified Person may continue to contest or defend such Third-Party Claim or, at its election, may request the Indemnified Person to assume the defense of such Third-Party Claim. If the Indemnified Person fails to consent to an Eligible Offer and also fails to assume defense of such Third-Party Claim within seven (7) days after its receipt of such request from the Indemnified Person pursuant to the foregoing sentence, the Indemnifying Person may settle the Third-Party Claim upon the terms set forth in such Eligible Offer to settle such Third-Party Claim. If the Indemnified Person has assumed the defense pursuant to <u>Section 6.9(b)</u>, it shall not agree to any settlement without the written consent of the Indemnifying Person (which consent shall not be unreasonably withheld, conditioned or delayed).

6.10    <u>Treatment of Indemnification Payments; Exclusive Remedy</u>.

(a)    Purchaser, Seller, the Seller Stockholders and the SAFE Holders agree to treat (and cause their respective Affiliates to treat) any payment received by the Indemnified Persons pursuant to this <u>Article VI</u> as adjustments to the Purchase Price for all Tax purposes to the extent permitted by Applicable Law.

(b)    Following the Closing, resort to the indemnification under this <u>Article VI</u> will be the sole and exclusive monetary remedy of any Indemnified Person for Seller Indemnifiable Damages or other damages against Seller, any Seller Stockholder or any SAFE Holder for any claim related to the subject matter of this Agreement, other than any claim based upon Fraud; it being understood and agreed that nothing in this Agreement will affect Purchasers' rights to equitable remedies under <u>Section 8.7</u>.

6.11    <u>Independent Investigation</u>. Purchaser acknowledges, covenants and agrees that (i) Purchaser has conducted an independent investigation, review and analysis of the Business and the Seller's operations, assets (including the Purchased Assets) and liabilities (including the Assumed Liabilities) in making its determination as to the propriety of the transactions

41

contemplated by this Agreement; (ii) in entering into this Agreement, Purchaser has relied solely on the results of such investigation, review and analysis and not on any factual representations or opinions of Seller, any Seller Stockholder or SAFE Holder, other than the representations and warranties expressly contained in <u>Article II</u> of this Agreement or in any Ancillary Agreement or any certificates delivered in connection thereto; and (iii) except for the representations and warranties contained in <u>Article II</u> of this Agreement or in any Ancillary Agreement or any certificates delivered in connection thereto, none of Seller, any Seller Stockholder or SAFE Holder or any of their respective Affiliates or representatives makes any other express, implied or statutory representation or warranty with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the Transactions, including any implied warranties of merchantability, fitness for a particular purpose, title, enforceability or noninfringement.  In connection with such investigation, Purchaser and its representatives and Affiliates have received from or on behalf of Seller certain estimates, budgets, forecasts, plans and future financial projections ("***Forward-Looking Statements***"), and the Purchaser acknowledges that there are uncertainties inherent in making Forward-Looking Statements and that Purchaser are familiar with such uncertainties and are taking full responsibility for making their own evaluation of the adequacy and accuracy of all Forward-Looking Statements furnished to them and their representatives (including the reasonableness of the assumptions underlying Forward-Looking Statements where such assumptions are explicitly disclosed), and that none of Seller nor any other Person has made or makes any representation or warranty with respect to any Forward-Looking Statements.  Each of Seller, Seller Stockholders and SAFE Holder acknowledges, covenants and agrees that except for the representations and warranties contained in Article II of this Agreement or in any Ancillary Agreement or any certificates delivered in connection thereto, none of Purchaser or any of its Affiliates or representatives makes any other express, implied or statutory representation or warranty with respect to Purchaser, its Affiliates or the Transactions.

6.12    <u>Release and Waiver.</u>

(a)     Seller and each Seller Stockholder and SAFE Holder, for itself, himself, or herself, and on behalf of such Person's directors and officers (in their capacities as such), representatives, agents, estates, heirs, successors and assigns (individually and collectively, the "***Releasing Parties***"), hereby irrevocably, unconditionally and forever acquits, releases, waives and discharges, and further covenants and agrees that they will not assert any claims against Purchaser, Seller (with respect to each Seller Stockholder and SAFE Holder and their respective Releasing Parties) and any of their respective officers, directors, employees, agents, divisions, affiliated corporations, affiliated non-corporation entities, representatives, successors, predecessors and assigns (individually and collectively, the "***Released Parties***") arising from or related to any and all past, present and future debts, losses, costs, bonds, suits, actions, causes of action (including for infringement or misappropriation of any Seller Intellectual Property or of any third party or any breach of fiduciary duty in connection with the approval of this Agreement or the consummation of the Transactions), liabilities, contributions, attorneys' fees, interest, damages, punitive damages, expenses, claims, potential claims, counterclaims, cross-claims, or demands, in law or in equity, asserted or unasserted, express or implied, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, that any of the Releasing Parties had, presently has or may hereafter have or claim or assert to have against any of the Released Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has

Exhibit 2                                    DEF_000051

occurred or existed at any time from the beginning of time up to and including the Closing Date, that in any way arise from or out of, are based upon or relate to (i) the negotiation of this Agreement and the Ancillary Agreements, (ii) the employment by Purchaser of, or the offer of employment by Purchaser to any employee (other than rights to accrued but unpaid wages, salaries or other cash compensation due to any employee by or on behalf of Purchaser solely in respect of services provided to Purchaser after the Closing), (iii) the operation of Seller and its business, including after the Closing, the termination of any of Seller's employees or other Service Providers, or the wind-up, liquidation, dissolution or cessation of Seller's business operations, (iv) absent manifest error, the calculation of any Seller Stockholder's or SAFE Holder's Pro Rata Share pursuant to the Asset Purchase Agreement, including, without limitation, a breach of fiduciary duty in connection with the approval of this Agreement, and (v) the provision of any services provided by the Transferred Employees to Purchaser (including the use of any intellectual property developed by such employees during their employment with Seller, or otherwise developed or owned by Seller) ((i) through (iv), collectively, the "***Released Claims***"). The Releasing Parties hereby further covenant not to sue or otherwise seek to enforce or assert any rights against Purchaser or any of the Released Parties; provided that that the foregoing release shall not cover rights of Seller, any Seller Stockholder or any SAFE Holder under this Agreement.

(b)    The Released Claims are intended to be complete, global and all-encompassing and specifically includes claims that are known, unknown, fixed, contingent or conditional with respect to the matters described herein as of the Agreement Date and the Closing. Seller, each Seller Stockholder and SAFE Holder, for itself, himself and herself, and on behalf of their respective Releasing Parties hereby expressly waive any and all rights conferred upon them by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with the Released Party, including the following provisions of California Civil Code Section 1542: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

## ARTICLE VII
## TERMINATION

7.1    Termination.  This Agreement may be terminated prior to the Closing:

(a)    upon the mutual agreement of Purchaser and Seller;

(b)    by either Purchaser or Seller, if a Legal Restraint shall be in effect and shall have become final and non-appealable;

(c)    by either Purchaser or Seller, in either case if there shall been any material breach of any representation, warranty, covenant or agreement, on the part of, respectively, Seller or Purchaser that would give rise to the failure of any of the conditions specified in Article V and such breach has not been cured by Seller or Purchaser, as applicable, within 10 days of such

party's receipt of written notice of such breach from Purchaser or Seller, as applicable (provided that the right to terminate this Agreement pursuant to this <u>Section 7.1(c)</u> shall not be available to a party where such party is at that time in breach in any material respect of this Agreement);

      (d)    by Purchaser, if there shall have occurred a Material Adverse Effect that is continuing; and

      (e)    by either Purchaser or Seller, after May 8, 2023 (provided that the right to terminate this Agreement pursuant to this <u>Section 7.1(e)</u> shall not be available to a party where such party is in breach in any material respect of this Agreement).

In the event of termination by Purchaser or Seller pursuant to this <u>Section 7.1</u> (other than <u>Section 7.1(a)</u>), written notice thereof shall be given to other party hereto.

    7.2    <u>Effect of Termination</u>.  If this Agreement is terminated pursuant to Section 7.1, except as set forth in this Section 7.2, it shall become void and of no further force and effect, with no liability on the part of any party to this Agreement.  The provisions of Section 4.7 (Public Disclosure), Section 4.8 (Expenses), this Section 7.2 (Effect of Termination), Article VIII (General Provisions) and any confidentiality agreement between Seller and Purchaser or any of its Affiliates (the "***Confidentiality Agreement***") shall survive any termination of this Agreement.  Such termination will not affect any right or remedy which accrued hereunder or under Applicable Law prior to or on account of such termination, and the provisions of this Agreement shall survive such termination to the extent required so that each party may enforce all rights and remedies available to such party hereunder or under Applicable Law in respect of such termination.

**ARTICLE VIII**
**<u>GENERAL PROVISIONS</u>**

    8.1    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given on the date of delivery, if delivered personally, by electronic transmission in .pdf format or similar format or by commercial delivery service or mailed by registered or certified mail (return receipt requested) to a party hereto at the address set forth on the applicable signature page hereto (or at such other address for a party as shall be specified by like notice).

    8.2    <u>Amendment and Waivers</u>.  Subject to Applicable Law, any term of this Agreement may be amended, terminated or waived only pursuant to an instrument in writing signed on behalf of each of the parties hereto; provided that after the Requisite Stockholder Consent is obtained, no amendment, termination or waiver shall be made to this Agreement that by Applicable Law requires further approval by the Seller Stockholders without such further approval.  Without limiting the generality or effect of the immediately preceding sentence, no failure to exercise or delay in exercising any right under this Agreement shall constitute a waiver of such right, and no waiver of any breach or default shall be deemed a waiver of any other breach or default of the same or any other provision herein.  To the extent permitted by Applicable Law, Purchaser, Seller and the Representative may cause this Agreement to be amended at any time after the Closing by execution of an instrument in writing signed by Purchaser, Seller, and the Representative (on behalf of the Seller Stockholders and the SAFE Holders) respectively.

44

8.3     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be considered one and the same instrument.  A signed copy of this Agreement delivered by facsimile or email or other electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

8.4     Entire Agreement; Parties in Interest.  This Agreement and the documents and instruments and other agreements specifically referred to herein or delivered pursuant hereto, including all the exhibits and schedules hereto and thereto, (a) constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersede all prior representations, warranties, agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof, except for the Confidentiality Agreement which shall continue in full force and effect, and shall survive any termination of this Agreement in accordance with its terms, and (b) are not intended to confer, and shall not be construed as conferring, upon any Person other than the parties hereto any rights or remedies hereunder, except that Article VI is intended to benefit the Purchaser Indemnified Persons and the Seller Indemnified Persons.

8.5     Assignment.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by any party hereto without the prior written consent of all other parties hereto, and any such assignment without such prior written consent shall be null and void; provided that Purchaser may assign or delegate this Agreement or any of its rights, interests or obligations under this Agreement to Metrc Inc., a Delaware corporation ("*Parent*") or any direct or indirect wholly-owned Subsidiary of Parent, without the consent of any other party hereto; provided, further, that in the event of any such assignment or delegation, Purchaser shall remain liable in full for the performance of its obligations hereunder.  Subject to the immediately preceding sentence, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and assigns.

8.6     Severability.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement shall continue in full force and effect and shall be interpreted so as reasonably necessary to effect the intent of the parties hereto.  The parties hereto shall use all reasonable best efforts to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.7     Remedies Cumulative; Specific Performance.  Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party hereto shall be deemed cumulative with and not exclusive of any other remedy conferred hereby or by law or equity upon such party, and the exercise by a party hereto of any one remedy shall not preclude the exercise of any other remedy and nothing in this Agreement shall be deemed a waiver by any party of any right to specific performance or injunctive relief.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which

GDSVF&H\8775395.10

Exhibit 2                                             DEF_000054

they are entitled at law or in equity, and the parties hereby waive the requirement of any posting of a bond in connection with the remedies described herein.

8.8  Governing Law; Jurisdiction; Consent to Service of Process.  This Agreement shall (save as expressly provided for in this Agreement) in all respects be construed in accordance with and governed by the internal laws of the State of Delaware, as applied to contracts entered into and to be performed solely within the state, solely between residents of the state, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).  Each of the parties irrevocably consents to the exclusive jurisdiction of and venue in any state or federal court located in the State of Delaware (and of and in any court to which an appeal of the decisions of any such court may be taken), in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein, agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons, and waives and covenants not to assert or plead any objection which it might otherwise have to such jurisdiction or such process; provided, however, that any party will be entitled to seek injunctive or other equitable relief in connection with any matter based upon or arising out of this Agreement or the matters contemplated herein in any forum having proper legal jurisdiction over such matter.

8.9  Attorneys' Fees.  Should any Legal Proceeding be brought to enforce or interpret any part of this Agreement, the prevailing party will be entitled to recover, as an element of the costs of suit and not as damages, reasonable attorneys' fees and its costs of suit, regardless of whether such Legal Proceeding proceeds to final judgment.

8.10  Waiver of Jury Trial.  EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHTS WHICH IT MAY HAVE TO A JURY TRIAL WITH RESPECT TO ANY SUIT, LEGAL ACTION OR PROCEEDING BROUGHT BY OR AGAINST IT OR ANY OF ITS AFFILIATES RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS.

8.11  Interpretation; Rules of Construction.  When a reference is made in this Agreement to Articles, Sections or Exhibits, such reference shall be to an Article or Section of, or an Exhibit to this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."  The phrases "provided to," "furnished to," and phrases of similar import when used herein, unless the context otherwise requires, shall mean that a true, correct and complete paper or electronic copy of the information or material referred to has been provided to the party to whom such information or material is to be provided.  Unless the context of this Agreement otherwise requires: (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; and (c) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement.  The parties hereto have been represented by counsel during the negotiation of this Agreement and the Transactions and, therefore waive the application of any law or rule of construction providing that ambiguities in an agreement shall be construed against the party drafting such agreement.

46

8.12    Representative.

(a)    By virtue of the approval of this Agreement by the Seller Stockholders and the SAFE Holders and without any further action of any of the Seller Stockholders or SAFE Holders, at the Closing, Marcus Estes will be constituted and appointed as the Representative, and the Representative hereby accepts such appointment.  Each Seller Stockholder and SAFE Holder, by virtue of its adoption of this Agreement and approval of the transactions contemplated by this Agreement and/or execution and delivery of a Joinder Agreement or a SAFE Termination and Release Agreement (as applicable), and without any further action of any of the Seller Stockholders, SAFE Holders or Seller, will be deemed to have appointed and constituted the Representative as their exclusive agent and true and lawful attorney-in-fact with the powers and authority as set forth in this Agreement.  The Representative will be the exclusive agent for and on behalf of the Seller Stockholders and SAFE Holders to take any and all actions, and make any decisions, required or permitted to be taken or made by the Representative under this Agreement, including (1) giving and receiving notices and communications to or from Purchaser, relating to this Agreement or any of the other documents contemplated by the transactions; (3) making all determinations and taking all actions in connection with any action or payments contemplated by Article VI; (4) executing and delivering all agreements, certificates, receipts, consents, elections, instructions and other documents (including any amendments thereto or waivers thereof) required or contemplated by, or deemed necessary or advisable by the Representative in its sole discretion in connection with this Agreement and the transactions contemplated hereby or thereby and (5) taking all other things and to performing all other acts required or contemplated by, or deemed necessary or advisable by the Representative in its sole discretion in connection with, this Agreement or the transactions contemplated hereby or thereby.  Notwithstanding the foregoing, the Representative shall have no obligation to act on behalf of the Seller Stockholders or SAFE Holders, except as expressly provided herein, and for purposes of clarity, there are no obligations of the Representative in any ancillary agreement, schedule, exhibit or the Seller Disclosure Letter.  The powers, immunities and rights to indemnification granted to the Representative Group hereunder:  (i) are coupled with an interest and shall be irrevocable and survive the death, incompetence, bankruptcy or liquidation of any Seller Stockholder or SAFE Holder and shall be binding on any successor thereto, and (ii) shall survive the delivery of an assignment by any Seller Stockholder or SAFE Holder of the whole or any fraction of his, her or its interest in the Holdback Amount.

(b)    All actions taken by the Representative under this Agreement shall be binding upon each Seller Stockholder and SAFE Holder and such holder's successors as if expressly confirmed and ratified in writing by such holder, and all defenses which may be available to any Seller Stockholder or SAFE Holder to contest, negate or disaffirm the action of the Representative taken in good faith under this Agreement are waived.  The Representative may resign at any time and may be removed or replaced by a majority vote of the Seller Stockholders and SAFE Holders (based on the Pro Rata Share).  The Seller Stockholders and SAFE Holders acknowledge and agree that the foregoing indemnities and immunities will survive the resignation or removal of the Representative and the Closing and/or the termination of this Agreement.  The Representative shall be entitled to: (i) rely upon any signature believed by it to be genuine, and (ii) reasonably assume that a signatory has proper authorization to sign on behalf of the applicable Seller Stockholder, SAFE Holder or other party.

(c)     Neither the Representative nor its members, managers, directors, officers, contractors, agents and employees (collectively, the "***Representative Group***"), will be liable to any Seller Stockholder or SAFE Holder for any action or failure to act in connection with the acceptance or administration of the Representative's responsibilities hereunder, unless and only to the extent such action or failure to act constitutes fraud, gross negligence or willful misconduct. The Seller Stockholders and SAFE Holders will jointly and severally indemnify and defend the Representative Group and hold the Representative Group harmless from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs, judgments, amounts paid in settlement and expenses (including the fees and expenses of counsel and experts and their staffs, in connection with seeking recovery from insurers and all expense of document location, duplication and shipment) (collectively, "***Representative Expenses***") arising out of or in connection with the Representative's execution and performance of this Agreement, as such Representative Expense is suffered or incurred; except that in the event that any such Representative Expense is finally adjudicated to have been directly caused by the gross negligence or willful misconduct of the Representative, the Representative will reimburse the Seller Stockholders and SAFE Holders, as applicable, the amount of such indemnified Representative Expense to the extent attributable to such gross negligence or willful misconduct. If not paid directly to the Representative by the Seller Stockholders and SAFE Holders, any such Representative Expenses may be recovered by the Representative first, from the Expense Fund, and second, directly from the Seller Stockholders and SAFE Holders.  In no event will the Representative be required to advance its own funds on behalf of the Seller Stockholders, SAFE Holders or otherwise incur any financial liability in the exercise or performance of any of its powers, rights, duties or privileges or pursuant to this Agreement or the transactions contemplated hereby.  Furthermore, the Representative shall not be required to take any action unless the Representative has been provided with funds, security or indemnities which, in its determination, are sufficient to protect the Representative against the costs, expenses and liabilities which may be incurred by the Representative in performing such actions.

(d)     On or immediately after the Closing, Seller shall wire to the Representative $███ (the "***Expense Fund Amount***").  The Expense Fund Amount shall be held by the Representative in a segregated client account and shall be used for the purposes of paying (i) directly or reimbursing the Representative for any Representative Expenses incurred pursuant to this Agreement and (ii) the Representative an engagement fee $███ to compensate the Representative for his, her or its service as the Representative (the "***Expense Fund***").  The Representative is not providing any investment supervision, recommendations or advice and shall have no responsibility or liability for any loss of principal of the Expense Fund other than as a result of its gross negligence or willful misconduct.  The Representative is not acting as a withholding agent or in any similar capacity in connection with the Expense Fund and has no tax reporting or income distribution obligations.  The Seller Stockholders and SAFE Holders will not receive any interest on the Expense Fund and assign to the Representative any such interest.  As soon as reasonably determined by the Representative that the Expense Fund is no longer required to be withheld, the Representative shall distribute the remaining Expense Fund (if any), less the Representative's engagement fee to the extent not already paid to the Representative, to the Seller Stockholders and SAFE Holders in accordance with their respective Pro Rata Shares.

[SIGNATURE PAGES FOLLOW]

48

IN WITNESS WHEREOF, each of the undersigned parties has caused this Asset Purchase Agreement to be executed and delivered as of the date first written above.

**PURCHASER:**

**MCS ACQUISITION LLC**

DocuSigned by:

By: *Michael Johnson*
    D64F8F5E842F4E5...

Name: Michael Johnson

Title: Manager


Address for Notice:

4151 South Pipkin Road
Lakeland, FL 33811


with a copy (which shall not constitute notice) to:

Gunderson Dettmer Stough Villeneuve Franklin &
Hachigian LLP
1250 Broadway, 23rd Floor
New York, New York 10001
Attention: Mark Oblad
Email: moblad@gunder.com

IN WITNESS WHEREOF, each of the undersigned parties has caused this Asset Purchase Agreement to be executed and delivered as of the date first written above.

**SELLER:**

**CHROMA PROTOCOL CORPORATION**

By: _____
Name: Marcus Estes
Title: Chief Executive Officer


Address for Notice:

Chroma Protocol Corporation
4628 NE 116th Ave
Portland, Oregon 97220
Attention: Marcus Estes
E-mail: marcus.e@gmail.com

with a copy (which shall not constitute notice) to:

Perkins Coie LLP
1120 N.W. Couch Street
Tenth Floor
Portland, Oregon 97209-4128
Attention: Steven Davis and Justin Gonzales
E-mail: SteveDavis@perkinscoie.com and
JGonzales@perkinscoie.com

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

Exhibit 2                                DEF_000059

IN WITNESS WHEREOF, each of the undersigned parties has caused this Asset Purchase Agreement to be executed and delivered as of the date first written above.

**REPRESENTATIVE:**

**MARCUS ESTES**

By: _____

Address for Notice:

32520 NE Corral Creek Rd
Newberg, OR 97132
E-mail: marcus.e@gmail.com

**[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]**

Exhibit 2                DEF_000060

*Confidential*

## SCHEDULE 1.1(a)
## PURCHASED INTELLECTUAL PROPERTY

**Source Code and Repositories:**

See Schedule 2.11(m) of the Company Disclosure Letter.

**Contracts (as defined in the Company Disclosure Letter):**

1. The AWS Agreement

2. The Google Ads Agreement

3. The Cargo Agreement

4. The GitHub Agreement

**Trademarks:**

See Annex 2.11(c) of the Company Disclosure Letter.

**Domain names:**

- https://chromasignet.com/

- https://chroma.io/

- https://signet.codes/

- https://ucqr.codes/

## <u>SCHEDULE 1.2(g)</u>
### SMART ANALYTICS ASSETS

Smart Analytics software codebase.

Smart Analytics dataset containing historical entries from prior Cannabis Cup events including, but not limited to, cultivars and entries from judges.

GDSVF&H\8786071.5
161620388.6

Exhibit 2                                        DEF_000062

## <u>SCHEDULE 1.2(h)</u>
## EXCLUDED INTELLECTUAL PROPERTY

See Schedule 1.2(g) of this schedule.

## SCHEDULE 1.2(o)
### EXCLUDED ASSETS

1.  The following Contracts:

    a.  Advisor Agreement, dated as of April 7, 2022, by and between Chroma Protocol Corporation and Adrianne Rae.

    b.  Advisor Agreement, dated as of April 7, 2022, by and between Chroma Protocol Corporation and Dave Becker.

    c.  Advisor Agreement, dated as of April 7, 2022, by and between Chroma Protocol Corporation and Stephanie Barnhart.

    d.  Asset Purchase Agreement, dated as of April 7, 2022, by and between Smart Analytics, LLC and Chroma Protocol Corporation (the "***Smart Analytics APA***").

    e.  Docusign Sites & Services Terms and Conditions, last updated February 15, 2023, between the Company and DocuSign, Inc.

## SCHEDULE 1.3
## EXCLUDED LIABILITIES

1. All Liabilities in respect of any claim (whether pending, threatened or otherwise) by or on behalf of Ford Smith, U.N. Venture Fund I LLC or any of their respective Affiliates, in each case relating to Seller, the Purchased Assets or the operation of Business as operated prior to the Closing.

2. All Liabilities arising out of Seller's and its Affiliates' activities relating to Seller's operation as a crowdfunding portal (including the offering of digital tokens, cryptocurrency or other blockchain-based assets).

3. All Liabilities arising out of Seller's and its Affiliates' activities relating to Seller's operation as a marketplace lending platform.

4. All Liabilities arising out of Seller's and its Affiliates' breaches or violations of Privacy Requirements.

5. All obligations and Liabilities arising out of the Smart Analytics APA and the transactions contemplated by the Smart Analytics APA.

6. All obligations and Liabilities relating to any securities of Seller, including any promised but unissued options and other equity awards and any obligations and Liabilities relating to the Seller's noncompliance with securities laws.

7. All Liabilities in respect of any actual or potential misclassification of any Service Providers of Seller, unpaid compensation to any Service Providers of Seller and termination or furlough of or separation with any Service Providers of Seller.

8. All obligations and Liabilities of Seller, Seller Stockholders and SAFE Holders arising under the Agreement or any Ancillary Agreement.

GDSVF&H\8786071.5
161620388.6

Exhibit 2                                           DEF_000065

### <u>SCHEDULE 1.6(a)(iii)</u>
### TRANSACTION BONUSES

| RECIPIENT | BONUS AMOUNT |
|---|---|
| Marcus Estes | $183,000 |
| Leif Shackelford | $175,000 |

### SCHEDULE 1.6(b)
### PURCHASE PRICE ALLOCATION

See attached.

## SCHEDULE 1.6(b)

## METHODOLOGY FOR ALLOCATION
## OF PURCHASE PRICE

The parties agree that the amounts properly treated as consideration will be allocated for Tax purposes in accordance with Section 1.6(b) of the Agreement, including for purposes of Section 1060 of the Code, among the Purchased Assets in a manner consistent with the following methodology (in each case solely to the extent applicable).

| Asset Class | Asset Category | Allocation |
|---|---|---|
| I | Cash and Cash Equivalents | Dollar value, excluding any amount that constitutes Excluded Assets |
| II | Actively Traded Personal Property | Book value |
| III | Accounts Receivable | Book value |
| IV | Inventory | Book value |
| V | Fixed Assets and all assets other than Class I-IV, VI and VII assets (e.g. depreciable assets) | Net book value |
| VI &VII | Section 197 Intangibles | |
| | Identifiable Intangibles other than goodwill and going concern value | Book value |
| | All other Section 197 intangibles (goodwill and going concern value) | Remainder of purchase price after allocating among all other asset classes above |

GDSVF&H\8822584.1

Exhibit 2

DEF_000068

**<u>SCHEDULE 1.9</u>**
**CERTAIN CONTRACTS**

1. The AWS Agreement

2. The Google Ads Agreement

3. The Cargo Agreement

4. The GitHub Agreement

- 8 -

# EXHIBIT A

# DEFINITIONS

As herein, the following terms shall have the meanings indicated below:

"*Affiliate*" has the meaning set forth in Rule 144 promulgated under the Securities Act.

"*Agreement*" has the meaning set forth in the introductory paragraph hereof.

"*Agreement Date*" has the meaning set forth in the introductory paragraph hereof.

"*Allocation*" means an allocation of the Purchase Price plus the amount of any Assumed Liabilities (to the extent properly taken into account for Tax purposes) among the Purchased Assets, prepared by Purchaser following the Closing Date in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and the methodologies set forth on Schedule 1.6(b).

"*Ancillary Agreements*" mean the Bill of Sale and Assignment and Assumption Agreement, the Restrictive Covenants Agreements, the Trademark Assignment, the Domain Name Assignment, the Joinder Agreements and the SAFE Termination and Release Agreements.

"*Applicable Law*" means any federal, state, foreign, local, municipal or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling, order, writ, injunction, award, judgment or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"*Assumed Liabilities*" has the meaning set forth in Section 1.4.

"*Author*" has the meaning set forth in Section 2.11(f).

"*Benefit Plan*" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other plan, program, policy, practice, contract, agreement or other arrangement providing for compensation, benefits, health, vision, dental, welfare, retirement, retention, change in control, transaction, bonus, disability, vacation or other paid time off, severance, termination pay, deferred compensation, performance awards, stock or stock-related awards, fringe benefits or any other employee benefits or remuneration of any kind, whether written or unwritten or otherwise, funded or unfunded, (i) which is or has been maintained, contributed to, or required to be contributed to, by Seller or any of its ERISA Affiliates, (ii) which is covering or has covered any Service Provider of Seller (in such Service Provider's capacity as such), or (iii) with respect to which Seller or any of its ERISA Affiliates have or may have any Liability or obligation.

"*Bill of Sale and Assignment and Assumption Agreement*" means that certain bill of sale and assignment and assumption agreement to be entered into by Purchaser and Seller in the form attached hereto as Exhibit H.

GDSVF&H\8775395.10

DEF_000070

"***Business***" means the operations and activities of Seller concerning the research, development, production, maintenance, provision of services and other related activities, related directly or indirectly to, the solutions, products, services, systems, technologies, components or modules related to, or in connection with, the Seller's platforms (including without limitation Chroma Signet platform, blockchain-based NFT platform, and any platform relating to cannabis supply chain tracking), all related websites, platforms, APIs, applications, content, research, related properties and logins, data collection processes and schema, and databases, including all works-in-progress and in development and all Seller Intellectual Property and Seller Products, in each case as previously conducted, currently conducted or currently proposed to be conducted.

"***Business Day***" means any day other than (i) Saturday or Sunday and (ii) any other day on which commercial banks in New York City are authorized or required by law to close.

"***CARES Act***" shall mean the Coronavirus Aid, Relief, and Economic Security Act, Pub.L. 116-136 (03/27/2020), as may be amended, including by the CAA or the ARPA, as applicable, and any similar or successor Applicable Law, including the Paycheck Protection Program Flexibility Act, Pub.L. 116-142 (06/05/2020).

"***Claim Certificate***" has the meaning set forth in <u>Section 6.7(b)</u>.

"***Claims Period***" has the meaning set forth in <u>Section 6.6</u>.

"***Closing***" has the meaning set forth in <u>Section 1.5</u>.

"***Closing Date***" has the meaning set forth in <u>Section 1.5</u>.

"***Closing Payment Amount***" has the meaning set forth in <u>Section 1.6(a)</u>.

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Confidential Information***" has the meaning set forth in <u>Section 2.11(h)</u>.

"***Consultants***" mean all current and former consultants, independent contractors and other individual service providers who are or were engaged to provide services by Seller or any of its Affiliates.

"***Contract***" means any written or oral legally binding contract, agreement, instrument, commitment or undertaking of any nature (including leases, licenses, mortgages, notes, guarantees, sublicenses, subcontracts and purchase orders), including all amendments, supplements, exhibits and schedules thereto.

"***Deductible Amount***" as the meaning set forth in <u>Section 6.5(a)</u>

"***Employee Liabilities***" has the meaning set forth in <u>Section 4.5(b)</u>.

"*Employees*" mean all current and former employees of Seller or any of its Affiliates, regardless of Seller's classification of the same.

"*Encumbrance*" means any lien, pledge, charge, security interest, infringement, claim, mortgage, easement, encroachment, imperfection of title, title exception, title defect, right of possession, adverse claim of title or restriction on transfer, and other similar encumbrance.

"*Equity Interest*" means, with respect to any Person, any capital stock of, or other ownership, membership, partnership, joint venture or equity interest in, such Person or any indebtedness, securities, options, warrants, call, subscription or other rights or entitlements of, or granted by, such Person or any of its Affiliates that are convertible into, or are exercisable or exchangeable for, or giving any Person any right or entitlement to acquire any such capital stock or other ownership, partnership, joint venture or equity interest, in all cases, whether vested or unvested.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means each Person under common control with Seller within the meaning of Section 4001(b) of ERISA or Section 414(b), (c), (m) or (o) of the Code from time to time.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Assets*" has the meaning set forth in <u>Section 1.2</u>.

"*Excluded Liabilities*" has the meaning set forth in <u>Section 1.3</u>.

"*Excluded Taxes*" means any and all Liabilities of Seller and the equityholders of Seller or any member of any consolidated, affiliated, combined or unitary group of which Seller is or has been a member, for Taxes, including without limitation (i) any Taxes of (or imposed on) Seller or the equityholders of Seller for any taxable period, including any Taxes incident to or arising out of the negotiation, preparation, approval or authorization of this Agreement, including any Transaction Taxes borne by Seller pursuant to <u>Section 1.7(b)</u>, (ii) any Taxes of Seller or the equityholders of Seller, or any Taxes attributable to or arising out any of the Purchased Assets or the Assumed Liabilities for all periods or portions thereof up to the Closing, including any Taxes deferred under the CARES Act, or (iii) any out of pocket costs and expenses incurred with respect to any examination, audit, correction or any other action with respect to any Tax period or portion thereof ending on or prior to the Closing Date, or (iv) any Taxes of any Person for which Seller is liable as a result of being, having been or ceasing to be a member of an affiliated, consolidated, combined, or unitary group for Tax purposes prior to the Closing, or as a result of being or ceasing to be a party to any Contract entered into on or prior to the Closing or as a result of any successor or transferee liability or any law, rule or regulation, which Tax is attributable to any event or transaction or period occurring on or prior to the Closing; provided, that any amounts of Straddle Period Taxes shall be determined as in accordance with <u>Section 4.10(b)</u>.

"*Fair Labor Standards Act*" means the Fair labor Standards Act of 1938, as amended.

"*Financial Statements*" has the meaning set forth in <u>Section 2.4(a)</u>.

GDSVF&H\8775395.10

"***Founders***" has the meaning set forth in the recitals hereto.

"***Fraud***" means common law fraud under Delaware law.

"***Fundamental Representations***" has the meaning set forth in <u>Section 6.2</u>.

"***GAAP***" means generally accepted accounting principles in the United States.

"***Governmental Entity***" means any supranational, national, state, municipal, local or foreign government, any court, tribunal, arbitrator, administrative agency, commission or other governmental official, authority or instrumentality, in each case whether domestic or foreign, any stock exchange or similar self-regulatory organization or any quasi-governmental or private body exercising any regulatory, Tax or other governmental or quasi-governmental authority (including any governmental or political division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"***Holdback Amount***" means $█████.

"***Holdback Fund***" has the meaning set forth in <u>Section 6.1(a)</u>.

"***Holdback Release Date***" has the meaning set forth in <u>Section 6.1(a)</u>.

"***Indemnifiable Damages***" has the meaning set forth in <u>Section 6.7(a)</u>.

"***Indemnified Person***" has the meaning set forth in <u>Section 6.7(a)</u>.

"***Indemnifying Person***" has the meaning set forth in <u>Section 6.7(a)</u>.

"***Intellectual Property***" has the meaning set forth in <u>Section 2.11(a)(i)</u>.

"***Intellectual Property Rights***" has the meaning set forth in <u>Section 2.11(a)(ii)</u>.

"***IP Representations***" has the meaning set forth in <u>Section 6.2</u>.

"***IRS***" means the United States Internal Revenue Service.

"***Knowledge of the Seller***" or "***Seller's Knowledge***" means the knowledge of the Founders, including the knowledge that each such individual would reasonably be expected to have after making reasonable inquiry into the relevant subject matters.

"***Legal Proceeding***" means any private or governmental action, claim, proceeding, suit, hearing, litigation, audit or investigation (whether civil, criminal, administrative, judicial or investigative), or any appeal therefrom.

"***Liabilities***" mean all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, asserted or unasserted, known or unknown, including those arising under any Applicable Law or any Contract.

"**_Material Adverse Effect_**" means any change, event, violation, inaccuracy, circumstance or effect (each, an "**_Effect_**") that, individually or taken together with all other Effects that have occurred prior to the date of determination of the occurrence of such Effect, and regardless of whether or not such Effect constitutes a breach of the representations, warranties, covenants, agreements or obligations of Seller herein, (x) is, or would reasonably be likely to have a material adverse effect on the Purchased Assets, taken as a whole, or the financial condition operations or results of operations (financial or otherwise) of the Business, taken as a whole, or Seller, or (y) materially adversely affects, or would reasonably be likely to materially adversely affect, Seller's ability to perform or comply with the covenants, agreements or obligations of Seller herein or to consummate the Transactions in accordance with this Agreement and Applicable Law; provided that (i) general changes or developments in any of the industries in which the Business operates (ii) changes in global, national or regional political conditions (including any outbreak or escalation of hostilities or any acts of war or terrorism) or in general economic or political conditions or in national or global financial markets, (iii) acts of war, military action, terrorism, natural disaster, pandemic or epidemic, or (iv) changes following the date hereof in any Applicable Law or legal, regulatory or political conditions or changes following the date hereof in GAAP or other applicable accounting standards, or the interpretation or enforcement thereof, shall not constitute a Material Adverse Effect, so long as, with respect to clauses (i), (ii), (iii) and (iv), such changes or conditions do not adversely affect Seller in a materially disproportionate manner relative to other similarly situated participants in the industry or markets in which it operates.

"**_Material Contracts_**" has the meaning set forth in <u>Section 2.13</u>.

"**_Offer Letter_**" has the meaning set forth in the recitals hereto.

"**_Off-the-Shelf Software Licenses_**" means licenses in respect of commercially available, unmodified, "off-the-shelf" software from third parties under "click-wrap" agreements without negotiation of specific license terms used by Seller solely for its own internal use and not redistributed by or in connection with Business as currently conducted, for an aggregate fee, royalty or other consideration for any such software or group of related software licenses of no more than $██████.

"**_Open Source Materials_**" has the meaning set forth in <u>Section 2.11(a)(iii)</u>.

"**_Permits_**" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Entity.

"**_Permitted Encumbrance_**" shall mean (i) Encumbrances for Taxes not yet due and payable, (ii) Encumbrances for Taxes being contested in good faith by appropriate procedures and for which Seller has adequate reserves and has notified Purchaser of, (iii) mechanics', carriers', workmen's, repairmen's or other like Encumbrances arising or incurred in the ordinary course of business, (iv) easements, rights of way, zoning ordinances and other similar Encumbrances affecting real property, (v) Encumbrances arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business, and (vi) Encumbrances that will be released and discharged at or prior to the Closing.

Exhibit A

Exhibit 2

"***Person***" means any natural person, company, corporation, limited liability company, general partnership, limited partnership, trust, proprietorship, joint venture, business organization or Governmental Entity.

"***Personal Data***" has the meaning set forth in <u>Section 2.11(a)(i)</u>.

"***Pro Rata Share***" means, with respect to a Seller Stockholder and a SAFE Holder, the percentage obtained by dividing (A) the aggregate portion of the Closing Payment Amount allocated and payable to, such Seller Stockholder or SAFE Holder, as applicable, in accordance with the certificate of incorporation, other organizational documents of Seller and any applicable SAFE, as applicable, and in compliance with the Applicable Law, by (B) the total portion of the Closing Payment Amount allocated and payable to Seller Stockholders and SAFE Holders in accordance with the certificate of incorporation, other organizational documents of Seller and any applicable SAFE, as applicable, and in compliance with the Applicable Law.

"***Proprietary Information and Invention Assignment Agreement***" has the meaning set forth in the recitals hereto.

"***Proprietary Information and Technology***" has the meaning set forth in <u>Section 2.11(a)(ii)</u>.

"***Purchase Price***" has the meaning set forth in <u>Section 1.6(a)</u>.

"***Purchased Assets***" has the meaning set forth in <u>Section 1.1</u>.

"***Purchased Intellectual Property***" has the meaning set forth in <u>Section 1.1(a)</u>.

"***Purchaser***" has the meaning set forth in the introductory paragraph hereof.

"***Purchaser Ancillary Agreement***" means any Ancillary Agreement required to be executed by Purchaser.

"***Released Claims***" has the meaning set forth in <u>Section 6.12(a)</u>.

"***Released Parties***" has the meaning set forth in <u>Section 6.12(a)</u>.

"***Releasing Parties***" has the meaning set forth in <u>Section 6.12(a)</u>.

"***Requisite Stockholder Consent***" has the meaning set forth in the recitals hereto. "***Restrictive Covenants Agreement***" has the meanings set forth in the recitals hereto.

"***SAFE***" means Simple Agreements for Future Equity.

"***SAFE Holder***" means the holders of SAFEs issued by Seller.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Seller***" has the meaning set forth in the introductory paragraph hereof.

"***Seller Ancillary Agreement***" means any Ancillary Agreement required to be executed or adopted by Seller or any of Seller's stockholders, officers or directors.

"***Seller Balance Sheet***" has the meaning set forth in Section 2.5.

"***Seller Balance Sheet Date***" has the meaning set forth in Section 2.5.

"***Seller Capital Stock***" means any class or series of capital stock of Seller, collectively.

"***Seller Common Stock***" means the Common Stock, $0.0001 par value per share, of Seller.

"***Seller Consents***" has the meaning set forth in Section 2.2.

"***Seller Debt***" means, without duplication, the aggregate amount of: (i) all indebtedness for borrowed money owed to third parties; (ii) all indebtedness evidenced by notes, bonds, debentures or similar instruments, whether or not convertible; (iii) all accrued interest payable pursuant to clauses (i) and (ii) above; (iv) all obligations for the deferred purchase price of property or services (including any potential future earnout, purchase price adjustment, releases of "holdbacks" or similar payments, but excluding any such obligations to the extent there is cash being held in escrow exclusively for purposes of satisfying such obligations); (v) all obligations as lessee under leases that are required under GAAP to be treated as capital leases (excluding, for the avoidance of doubt, any real estate leases and leases that are required under GAAP to be treated as operating leases); (vi) all obligations arising out of any financial hedging, swap or similar arrangements; (vii) all obligations in connection with any drawn upon letter of credit, banker's acceptance, surety, performance or appeal bond, or similar credit transaction; and (viii) all outstanding liabilities under guarantees of the obligations described in clauses (i) through (vii) above of any other Person; and (ix) any applicable fees, penalties (including with respect to any prepayment thereof), interest and premiums payable in connection with obligations described in clauses (i) through (viii) above. For the avoidance of doubt, Seller Debt shall exclude SAFE Payments and Transaction Bonuses.

"***Seller Disclosure Letter***" has the meaning set forth in Article II.

"***Seller Equity Plan***" means the 2013 Equity Incentive Plan of Seller, any other equity plan of Seller, and any non-plan equity grant, agreement or arrangement with respect to Seller Common Stock, in each case as amended.

"***Seller Indemnifiable Damages***" has the meaning set forth in Section 6.3(a).

"***Seller Indemnifying Persons***" has the meaning set forth in Section 6.3(a).

"***Seller Intellectual Property***" has the meaning set forth in Section 2.11(a)(iii).

"***Seller Intellectual Property Agreements***" has the meaning set forth in Section 2.11(a)(iv).

"***Seller Options***" means options to purchase shares of Seller Common Stock including, but not limited to, options to purchase shares of Seller Common Stock under Seller Equity Plan.

"***Seller Owned Intellectual Property***" has the meaning set forth in Section 2.11(a)(v).

"**Seller Products**" has the meaning set forth in <u>Section 2.11(a)(vi)</u>.

"**Seller Registered Intellectual Property**" has the meaning set forth in <u>Section 2.11(a)(vii)</u>.

"**Seller Series Seed Stock**" means the Series Seed Preferred Stock, $0.0001 par value per share, of Seller.

"**Seller Series Seed 2 Stock**" means the Series Seed 2 Preferred Stock, $0.0001 par value per share, of Seller.

"**Seller Source Code**" has the meaning set forth in <u>Section 2.11(a)(viii)</u>.

"**Seller Stockholders**" means the holders of shares of Seller Capital Stock.

"**Service Provider**" means any Employee or Consultant.

"**Straddle Period Tax**" has the meaning set forth in <u>Section 4.10(a)</u>.

"**Subsidiary**" of a specified entity means any corporation, association, business entity, partnership, limited liability company or other Person of which the specified entity, either alone or together with one or more Subsidiaries or by one or more other Subsidiaries (A) directly or indirectly owns or controls securities or other interests representing more than 50% of the voting power of such Person or (B) is entitled, by contract or otherwise, to elect, appoint or designate directors constituting a majority of the members of such Person's board of directors or other governing body.

"**Tax**" (and, with correlative meaning, "**Taxes**" and "**Taxable**") means (A) any federal, state, local or non-U.S. net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, fringe benefit, profits, license, registration, estimated, withholding, payroll, employment, excise, capital, severance, stamp, documentary, occupation, premium, property (real, tangible or intangible), unclaimed property obligations, escheat, environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any governmental entity (whether disputed or not), (B) any Liability for the payment of any amounts of the type described in clause (A) of this sentence as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group for any taxable period, and (C) any Liability for the payment of any amounts of the type described in clause (A) or (B) of this sentence as a result of being a transferee of or successor to any Person, by operation of Applicable Law, Treasury Regulations Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under Applicable Law), or as a result of any express or implied obligation to indemnify any other Person.

"**Tax Authority**" means any Governmental Entity having authority with respect to Taxes.

"**Tax Return**" means federal, state, local or non-U.S. Tax return, declaration, report, statement, schedule, attachment, notice, form, or information return (including any amendment to any of the foregoing) required to be filed with respect to Taxes including, but not limited to, any

Exhibit A

Exhibit 2

return, declaration, report, statement, schedule, attachment, notice, form, or information return related to Taxes based on income, employment, property, sales or use Taxes.

"***Third-Party Claim***" has the meaning set forth in <u>Section 6.9(a)</u>**.**

"***Third Party Intellectual Property***" has the meaning set forth in <u>Section 2.11(a)(ix)</u>.

"***Transactions***" mean any transactions contemplated by this Agreement, any Ancillary Agreement, or any certificate delivered pursuant thereto.

"***Transaction Bonuses***" mean such cash bonuses approved by the board of directors of Seller, which will be payable upon the consummation of the Transactions to such recipients and in such amounts as set forth in <u>Schedule 1.6(a)(iii)</u>.

"***Transaction Taxes***" has the meaning set forth in <u>Section 1.7(b)</u>.

"***Transferred Employee***" has the meaning set forth in <u>Section 4.5(a)</u>**.**

"***Treasury Regulations***" mean the United States Treasury Regulations promulgated under the Code.

**EXHIBIT B**

**REQUISITE STOCKHOLDER CONSENT**

Exhibit 2

DEF_000079

*Confidential*

# CHROMA PROTOCOL CORPORATION

_____

## ACTION BY WRITTEN CONSENT OF STOCKHOLDERS

_____

### April 7, 2023

In accordance with Section 228 of the Delaware General Corporation Law ("*DGCL*") and the bylaws of Chroma Protocol Corporation, a Delaware corporation (the "*Company*"), the undersigned, constituting the holders of the Company's outstanding shares of capital stock (the "*Stockholders*") having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all the shares entitled to vote thereon were present and voted, hereby adopt the following recitals and resolutions effective as of the date first set forth above.

## I.  APPROVAL OF ASSET PURCHASE AGREEMENT

WHEREAS, the Board of Directors of the Company (the "*Board*") adopted resolutions that unanimously determined that it is advisable, fair to, and in the best interests of the Company and the Stockholders to enter into the Asset Purchase Agreement, dated April 7, 2023, by and among MCS Acquisition LLC (the "*Purchaser*"), the Company and Marcus Estes, solely in his capacity as the representative of the Seller Stockholders and the SAFE Holders (the "*Representative*"), attached hereto as <u>Exhibit A</u> (the "*Purchase Agreement*"), and such additional documents, agreements, certificates and other instruments contemplated thereby (the "*Transaction Documents*"), pursuant to which, among other things, the Company will sell, transfer, assign, convey and deliver to Purchaser, and Purchaser will acquire, accept and assume from the Company, certain assets of the Company and certain related liabilities in accordance with and subject to the terms and conditions of the Purchase Agreement (the "*Asset Sale*");

WHEREAS, capitalized terms used but not otherwise defined in these resolutions or the recitals herein shall have the meanings set forth in the Purchase Agreement; and

WHEREAS, the Board has adopted the Purchase Agreement and approved the Asset Sale and each of the other Transaction Documents and has declared the Purchase Agreement and the other Transaction Documents advisable, fair to, and in the best interests of the Company and the Stockholders and recommended that the Stockholders approve the Purchase Agreement, the Transaction Documents and the Asset Sale.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned Stockholders of the Company, who in the aggregate constitute the holders of a majority of the preferred stock of the Company, par value $0.0001 per share ("*Preferred Stock*") and common stock of the Company, par value $0.0001 per share ("*Common Stock*"), voting together as a single class on an as-converted basis, hereby approve the Purchase Agreement, the Transaction Documents and the Asset Sale in all

Error! Unknown document property name.
GDSVF&H\8848184.5

Exhibit 2                                                            DEF_000080

respects, including but not limited to the following terms and conditions of the Purchase Agreement:

•  the consideration to be received by the Stockholders as a result of the Asset Sale;

•  the indemnification, the release and other obligations of the Stockholders as set forth in the Purchase Agreement;

•  the Holdback Fund, the Holdback Amount, the Expense Fund and the Expense Fund Amount; and

•  the irrevocable authorization and appointment of the Representative as the true and lawful representative, agent and attorney-in-fact of the Stockholders, with full powers of substitution, to act in the name, place and stead of each undersigned Stockholder in accordance with the terms and provisions of the Purchase Agreement and the other Transaction Documents, to the extent provided in the Purchase Agreement.

## II.    EXERCISE OF DRAG-ALONG PROVISIONS OF INVESTORS' RIGHTS AGREEMENT

WHEREAS, pursuant to Section 3.3 of the Investors' Rights Agreement, dated January 24, 2020, by and among the Company and other parties thereto (the "***Investors' Rights Agreement***"), in the event that a Deemed Liquidation Event (as defined in the Company's Second Amended and Restated Certificate of Incorporation, filed with the Secretary of State of the State of Delaware on January 25, 2020, as amended (the "***Charter***")) is approved by (a) the holders of a majority of the shares of Common Stock then-outstanding (other than those issued or issuable upon conversion of the shares of Preferred Stock) (the "***Common Stock Majority***"), (ii) the holders of a majority of the shares of Common Stock then issued or issuable upon conversion of the shares of Preferred Stock then-outstanding (on an as-converted basis) (the "***Preferred Stock Majority***") and (iii) the Board, then certain stockholders of the company (the "***IRA Stockholders***") shall vote in favor of, and adopt, such Deemed Liquidation Event and take the actions set forth in Section 3.3 of the Investors' Rights Agreement (the "***Drag-Along Right***"); and

WHEREAS, the Board has approved the Asset Sale as a Deemed Liquidation Event under Section 3.3 of the Investors' Rights Agreement and has invoked the Drag-Along Right with respect to the Asset Sale and that, upon execution of this Action by Written Consent by the Common Stock Majority and the Preferred Stock Majority approving the same, the IRA Stockholders will therefore be obligated to take actions set forth in Section 3.3 of the Investors' Rights Agreement (including their obligations with respect to all shares of capital stock of the Company now or hereafter directly or indirectly owned of record or beneficially by such IRA Stockholder).

NOW, THEREFORE, BE IT RESOLVED, that the undersigned stockholders hereby acknowledge that upon the execution of this Action by Written Consent by the Common Stock Majority and the Preferred Stock Majority, the Drag-Along Right is to and will take effect, and they confirm, approve and invoke the application of the Drag-Along Right with respect to the Asset Sale, and understand and acknowledge that each IRA Stockholder is obligated to, among other things, (a) vote all of such IRA Stockholder's capital stock of the Company in favor of, and adopt, the Asset Sale, and (b) execute and deliver all related documentation and take such other

Exhibit 2                                                    DEF_000081

action in support of the Deemed Liquidation Event as may reasonably be requested by the Company to carry out the terms and provision of Section 3.3 of the Investors' Rights Agreement.

**RESOLVED FURTHER**, that, pursuant to Section 6.8 of the Investors' Rights Agreement, the undersigned stockholders waive any exceptions to the requirement to comply with the Drag-Along Right under Section 3.4 of the Investors' Rights Agreement in connection with the Asset Sale.

## III. WINDING UP AND DISSOLUTION OF THE COMPANY

**WHEREAS,** the Purchase Agreement provides that the Company shall cease operating the business immediately following the closing of the Asset Sale and shall adopt a plan of liquidation for the Company reasonably acceptable to the Purchaser within sixty (60) days of the closing of the Asset Sale;

**WHEREAS**, the Board has deemed it to be in the best interests of the Company and of its Stockholders that, following the closing of the Asset Sale, the Company be wound up, liquidated and dissolved pursuant to Section 275 of the DGCL and in compliance with the terms and conditions of Section 331 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and comparable provisions of Delaware state tax law (the "**Dissolution**");

**WHEREAS**, the Board has approved, adopted and recommended that the Stockholders of the Company approve and adopt the Plan of Dissolution in substantially the form attached hereto as Exhibit B (the "**Plan of Dissolution**"), the filing of the Certificate of Dissolution in the form attached hereto as Exhibit C (the "**Certificate**") and the resolutions of the Board approving the winding up and dissolution of the Company in the form attached hereto as Exhibit D (the "**Dissolution Resolutions**"); and

**WHEREAS**, the Board has recommended that the Stockholders consent in writing to approve the winding up, liquidation and dissolution of the Company pursuant to Section 275 of the DGCL, Section 331 of the Code and comparable provisions of state tax law, following the closing of the Asset Sale and in accordance with the Plan of Dissolution.

**NOW, THEREFORE, BE IT RESOLVED**, that the undersigned Stockholders, representing the holders of the holders of a majority of the Preferred Stock and Common Stock, voting together as a single class on an as-converted basis, hereby adopt and approve the dissolution procedures adopted by the Board, substantially as set forth in the Plan of Dissolution, the Certificate, and the Dissolution Resolutions, together with such appropriate changes and revisions that, in consultation with the Company's legal counsel, are deemed appropriate by the Company's officers and directors.

**RESOLVED FURTHER**, that the officers and directors of the Company be, and they hereby are, authorized to, following the closing of the Asset Sale, sell or otherwise liquidate any and all of the remaining properties of the Company which in their judgment should be sold or liquidated to facilitate the liquidation of the Company, pursuant to the Plan of Dissolution.

**RESOLVED FURTHER**, that, subject to the terms of the Purchase Agreement and as is legally possible, the officers and directors of the Company are authorized and directed to, following the closing of the Asset Sale and in accordance with the Plan of Dissolution, cause the Certificate to

Error! Unknown document property name.
GDSVF&H\8848184.5

Exhibit 2                                                    DEF_000082

be filed in the office of the Secretary of State of the State of Delaware under and in conformity with the provisions of Section 275 of the DGCL.

RESOLVED FURTHER, that the officers and directors of the Company are authorized, empowered and directed to execute and deliver all documents, make such filings and to do all other things that are necessary or advisable to carry out the purposes and intent of the Plan of Dissolution and to take such other actions as are necessary or advisable in connection with the winding up and dissolution of the Company.

RESOLVED FURTHER, that each undersigned Stockholder of the Company acknowledges and approves that the Board of Directors may abandon the dissolution and liquidation of the Company subject to the terms and conditions of the Purchase Agreement despite approval of the Company's Stockholders.

## IV.   APPROVAL OF AMENDMENT TO THE SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

WHEREAS, the closing of the Asset Sale is conditioned on the Company changing its name; and

WHEREAS, the undersigned Stockholders believe that it is in the best interests of the Company and its Stockholders to amend the Charter to change the name of the Company from Chroma Protocol Corporation, to Hungry Genius Corporation, as set forth in the Certificate of Amendment to the Second Amended and Restated Certificate of Incorporation in substantially the form attached hereto as Exhibit E (the "*Certificate of Amendment*").

NOW, THEREFORE, BE IT RESOLVED, that Article I of the Second Amended and Restated Certificate of Incorporation of the Company be amended and restated to read in its entirety as follows:

> "The name of this corporation is Hungry Genius Corporation (the "Corporation")."

RESOLVED FURTHER, the undersigned Stockholders hereby authorize and approve the Certificate of Amendment and the change of the name of the Company.

RESOLVED FURTHER, that the officers and directors of the Company be, and each of them hereby is, directed to file the Certificate of Amendment with the Secretary of State of the State of Delaware, and each of them is authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the Company or such officer or director, as any such officer or director may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such officer to be conclusive evidence of his or her authorization hereunder and approval thereof.

Error! Unknown document property name.
GDSVF&H\8848184.5

Exhibit 2                    DEF_000083

## V.    APPROVAL UNDER DGCL; COMMON STOCK WAIVER OF NOTICE

WHEREAS, pursuant to Section 271 of the DGCL, a corporation may not dispose of all or substantially all of its assets without the approval by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon; and

WHEREAS, the undersigned Stockholders represent holders of a majority of the outstanding stock of the Company entitled to vote on the Asset Sale.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned Stockholders hereby adopt and approve the Asset Sale and the Purchase Agreement.

RESOLVED FURTHER, that the undersigned holders of Common Stock, constituting a majority of the outstanding shares of Common Stock voting as a single class, hereby waive, on behalf of all holders of Common Stock, all notice that is or may be required under the Charter, DGCL, the bylaws of the Company, or any agreement between the Stockholders and the Company with respect to the Asset Sale.

RESOLVED FURTHER, that all lawful acts and deeds heretofore done or lawful actions taken by any director or officer of the Company in entering into, executing, acknowledging or attesting to any arrangements, agreements, instruments or documents in carrying out the terms and intentions of the foregoing resolutions are hereby ratified, confirmed and approved.

## VI.    PREFERRED STOCK WAIVER OF NOTICE

WHEREAS, Article V, Paragraph B, Section 8 of Company's Charter provides that in the event of the voluntary or involuntary dissolution, liquidation or winding-up of the Company, or any Deemed Liquidation Event (as defined in the Charter), then in each case, the Company shall send or cause to be sent to the holders of Preferred Stock a written notice specifying the effective date at which such event is to take place along with certain other information (the "***Notice***");

WHEREAS, the Company shall send the Notice at least 20 days before the earlier of the record date or effective date for the event specified in the notice;

WHEREAS, Article V, Paragraph B, Section 7 of the Charter provides that the Notice may be waived prospectively or retrospectively on behalf of the holders of Preferred Stock by the affirmative written consent of the majority of the outstanding shares of the Preferred Stock voting as a single class on an as-converted basis; and

WHEREAS, the undersigned holders of Preferred Stock represent the holders of a majority of the outstanding shares of Preferred Stock voting as a single class on an as-converted basis.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned holders of Preferred Stock hereby waive, on behalf of all holders of Preferred Stock, all notice that is or may be required under the Charter, DGCL, the bylaws of the Company, or any agreement between the Stockholders and the Company with respect to the Asset Sale.

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                        DEF_000084

**RESOLVED FURTHER**, that all lawful acts and deeds heretofore done or lawful actions taken by any director or officer of the Company in entering into, executing, acknowledging or attesting to any arrangements, agreements, instruments or documents in carrying out the terms and intentions of the foregoing resolutions are hereby ratified, confirmed and approved.

## VII.    ADDITIONAL AGREEMENTS AND ACKNOWLEDGMENTS

Each undersigned Stockholder understands, agrees to and acknowledges the following:

A.    Such undersigned Stockholder has had the opportunity to ask representatives of the Company questions with regard to all the resolutions, agreements, consents and other provisions in this Action by Written Consent and that all such questions have been answered fully and to the satisfaction of such undersigned Stockholder.

B.    Such undersigned Stockholder has had a reasonable time and opportunity to consult with such undersigned Stockholder's financial, legal, tax and other advisors, if desired, before signing this Action by Written Consent.

C.    Such undersigned Stockholder has received and reviewed and understands the terms of the Purchase Agreement and all schedules and exhibits thereto.

D.    This Action by Written Consent shall become null and void, and shall have no effect whatsoever and the undersigned Stockholder shall have no liability whatsoever hereunder, without any action on the part of any person, upon termination of the Purchase Agreement for any reason.

## VIII.    APPROVAL OF INTERESTED PARTY TRANSACTIONS

**WHEREAS**, pursuant to Section 144 of the DGCL, no contract or transaction between the Company and one or more of its directors or officers or any other corporation, partnership, association or other organization in which one or more of the directors or officers of the Company is a director or officer of, or has a financial interest in (any such party is referred to herein individually as an "***Interested Party***," or collectively as the "***Interested Parties***," and any such contract or transaction is referred to herein as an "***Interested Party Transaction***"), shall be void or voidable solely for that reason, or solely because the director or officer is present at or participates in the meeting of the Board which authorized the contract or transaction or solely because the vote of any such director is counted for such purpose, if: (i) the material facts as to the directors' or officers' relationship or interest and as to the contract or transaction are disclosed or are known to the Board, and the Board in good faith authorizes the contract or transaction by affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; (ii) the material facts as to the directors' or officers' relationship or interest and as to the contract or transaction are disclosed or are known to the Stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the Stockholders; or (iii) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified by the Board or the Stockholders;

**WHEREAS,** it is hereby disclosed to the undersigned Stockholders that one or more of the Company's directors and officers, including, without limitation, Mr. Estes, a director and an officer of the Company, and Mr. Shackelford, an officer of the Company, will each receive a bonus plan

Exhibit 2                                    DEF_000085

grant pursuant to the 2023 Change of Control Bonus Plan in the amount set forth opposite their respective name on <u>Schedule A</u> (the "**_Bonus Plan Grants_**"), execute a Change of Control Bonus Plan Participation Agreement (a "**_Participation Agreement_**") in connection with the Bonus Plan Grant, and execute an Offer Letter to become an employee of the Purchaser in connection with the Purchase Agreement and, therefore, Messrs. Estes and Shackleford are or may be Interested Parties, and the award of the Bonus Plan Grant, the execution of the Participation Agreement and the execution of the Purchase Agreement are or may be Interested Party Transactions;

WHEREAS, the undersigned Stockholders are aware of the material facts related to the Bonus Plan Grants, Participation Agreements, Purchase Agreement and have had an adequate opportunity to ask questions regarding, and investigate the nature of, the relationships and interests of Messrs. Estes and Shackleford with and in the Company in connection with the Bonus Plan Grants, Participation Agreements and Purchase Agreement;

WHEREAS, it is hereby disclosed to the undersigned Stockholders that, Marcus Estes, a director and officer of the Company, will receive an engagement fee of █5,000 in connection with his service as Representative of the Seller Stockholders and SAFE Holders under the Purchase Agreement (the "**_Engagement Fee_**");

WHEREAS, the undersigned Stockholders are aware of the material facts related to Marcus Estes' service as Representative and the Engagement Fee and have had an opportunity to ask questions regarding, and investigate the nature of, the relationships and interests of Mr. Estes with and in the Company in connection with his service as Representative and the Engagement Fee;

WHEREAS, it is hereby disclosed to the Stockholders that the loan in the amount of $█████ which Mr. Shackelford, an officer of the Company, made to the Company will be repaid (the "**_Leif Loan Repayment_**") in connection with the execution of the Purchase Agreement and the closing of the Asset Sale and, therefore, Mr. Shackleford is or may be an Interested Party, and the Leif Loan Repayment is or may be an Interested Party Transaction; and

WHEREAS, the undersigned Stockholders are aware of the material facts related to the Leif Loan Repayment and have had an adequate opportunity to ask questions regarding, and investigate the nature of, the relationships and interests of Mr. Shackleford with and in the Company in connection with the Leif Loan Repayment.

NOW, THEREFORE, BE IT RESOLVED, that the undersigned Stockholders after consideration of the facts and circumstances, including, without limitation, information disclosed to the undersigned Stockholders related to potential Interested Parties, hereby determine that each of the Bonus Plan Grants, Participation Agreements, Purchase Agreement, Engagement Fee, Mr. Estes' service as Representative and the Leif Loan Repayment are fair, just, equitable and reasonable as to the Company and its Stockholders, and that it is in the best interests of the Company and the Stockholders of the Company to enter into the Asset Sale.

## IX.    OMNIBUS RESOLUTIONS

RESOLVED, that the proper officers of the Company be, and each individually is, hereby authorized and directed to do and perform any and all such acts, including the execution, delivery,

Error! Unknown document property name.
GDSVF&H\8848184.5

Exhibit 2                    DEF_000086

and filing of any and all instruments, documents, and certificates, as such officers deem necessary or advisable, to carry out and perform the purposes and intent of the foregoing resolutions.

**RESOLVED FURTHER**, that any actions taken by such officers prior to the date of the foregoing resolutions adopted hereby that are within the authority conferred thereby are hereby ratified, confirmed, and approved as the acts and deeds of the Company.

[*Signature Page Follows*]

Exhibit 2                                    DEF_000087

**IN WITNESS WHEREOF,** by executing this Action by Written Consent of the Stockholders of the Company, the undersigned Stockholder is giving written consent with respect to all shares of the Company's capital stock held by such Stockholder in favor of the above resolutions.  This Action by Written Consent of the Stockholders of the Company may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile, or other reproduction be a complete reproduction of the entire original writing.

**STOCKHOLDER:**

_____
Marcus Estes

Exhibit 2                                              DEF_000088

**IN WITNESS WHEREOF,** by executing this Action by Written Consent of the Stockholders of the Company, the undersigned Stockholder is giving written consent with respect to all shares of the Company's capital stock held by such Stockholder in favor of the above resolutions.  This Action by Written Consent of the Stockholders of the Company may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile, or other reproduction be a complete reproduction of the entire original writing.

**STOCKHOLDER:**

_____
Leif Shackelford

PAGE 10 – ACTION BY WRITTEN CONSENT OF STOCKHOLDERS OF CHROMA PROTOCOL CORPORATION

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                    DEF_000089

**IN WITNESS WHEREOF,** by executing this Action by Written Consent of the Stockholders of the Company, the undersigned Stockholder is giving written consent with respect to all shares of the Company's capital stock held by such Stockholder in favor of the above resolutions.  This Action by Written Consent of the Stockholders of the Company may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile, or other reproduction be a complete reproduction of the entire original writing.

**STOCKHOLDER:**

_____
[●]

Date: [●]

PAGE 11 – ACTION BY WRITTEN CONSENT OF STOCKHOLDERS OF CHROMA PROTOCOL CORPORATION

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                                          DEF_000090

**EXHIBIT A**


**PURCHASE AGREEMENT**

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                DEF_000091

**EXHIBIT B**


**PLAN OF DISSOLUTION**

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                          DEF_000092

# EXHIBIT C

# CERTIFICATE OF DISSOLUTION

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2

DEF_000093

# EXHIBIT D

# DISSOLUTION RESOLUTIONS

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                                    DEF_000094

**EXHIBIT E**

**CERTIFICATE OF AMENDMENT**

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                    DEF_000095

## SCHEDULE A

### BONUS POOL ALLOCATION

| PARTICIPANT | GRANT |
|---|---|
| Marcus Estes | $183,000 |
| Leif Shackelford | $175,000 |

**Error! Unknown document property name.**
GDSVF&H\8848184.5

Exhibit 2                                                    DEF_000096

**EXHIBIT C**

**FORM OF RESTRICTIVE COVENANTS AGREEMENT**

Exhibit 2

DEF_000097

**R**ESTRICTIVE **C**OVENANTS **A**GREEMENT

This **R**ESTRICTIVE **C**OVENANTS **A**GREEMENT (this "**Agreement**"), dated _____, 2023, is made by and between _____ (the "**Key Employee**") and Metrc Inc., a Delaware corporation ("**Purchaser**").  For purposes of this Agreement, "Purchaser" shall be deemed to include Purchaser and its wholly and majority-owned direct and indirect subsidiaries that operate the Business (as defined below) of Purchaser (including MCS Acquisition LLC, a Delaware limited liability company).

**B**ACKGROUND

Purchaser and Chroma Protocol Corporation, a Delaware corporation ("**Seller**") are parties to an Asset Purchase Agreement dated on or about April 7, 2023 (as may be amended from time to time) (the "**Asset Purchase Agreement**"), pursuant to which Seller will sell, transfer and assign to Purchaser, certain assets of Seller (the "**Asset Purchase**").  Key Employee understands and agrees that he:

- is a key employee of Seller;
- is the [Chief Executive Office][Chief Technology Officer] of Seller; and
- will receive substantial consideration as a result of the Asset Purchase.

Key Employee is willing to enter into this Agreement as a condition of the Asset Purchase and becoming an employee of Purchaser and to protect Purchaser's legitimate interests as a buyer of Seller's assets (including confidential, proprietary and/or trade secret information).  Key Employee understands and acknowledges that the execution and delivery of this Agreement by Key Employee is a material inducement to the willingness of Purchaser to enter into the Asset Purchase Agreement and employ Key Employee with Purchaser, and a material condition to Purchaser consummating the transactions contemplated by the Asset Purchase Agreement. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Key Employee, intending to be legally bound, agrees as follows:

1.      **Agreement Not to Compete**.  During the Non-Compete Period (as defined below), Key Employee agrees that, except in the normal scope of Key Employee's employment with Purchaser, he will not, as an employee, agent, consultant, advisor, independent contractor, general partner, shareholder, officer, director, employee, investor, lender or guarantor of any corporation, partnership or other entity, or in any other capacity directly or indirectly:

(a) (i) participate or engage in any way in the design, development, manufacture, production, marketing, sale or servicing of any product, or the provision of any service, that directly relates to, or (ii) render any services to any business engaged in the design, development, manufacture, production, marketing, sale or servicing of any products or provision of any service, that directly relates to, in either case, the Business (as defined in the Asset Purchase Agreement) including without limitation, creating or providing a platform that provides supply chain management for cannabis producers, manufacturers, and retailers in the Restricted Territory (as defined below), or (iii) take any action intended to, or that would reasonably be expected to, negatively affect any commercial relationship or prospective commercial relationship of Purchaser (or any of its Affiliates) related to the Business; or

(b) permit Key Employee's name to be used in connection with a business that is competitive with or substantially similar to the Business.

Exhibit 2                                        DEF_000098

Notwithstanding the foregoing, Key Employee may own, directly or indirectly, solely as a passive investment, up to two percent (2%) of any class of "publicly traded securities" of any business that is competitive with or substantially similar to the Business. The term "publicly traded securities" shall mean securities that are traded on a national securities exchange or in the over the counter market.

For purposes of Section 1 of this Agreement, the restrictive period (referred to herein as the "**Non-Compete Period**") shall commence on the Closing Date (as defined in the Asset Purchase Agreement) of the Asset Purchase and shall continue until the second (2nd) anniversary of the Closing Date; *provided*, *however*, that in the event that it is determined by a court of competent jurisdiction or an arbitrator, as the case may be, that Employee has breached any provision of this Section 1, in addition to any remedy set forth in Section 4 below and available under applicable law, the Non-Compete Period shall be automatically extended by a number of days equal to the total number of days in the period from the date on which such breach shall have first occurred through the date as of which such breach shall have been fully cured.

For purposes of this Agreement, "**Restricted Territory**" shall mean the United States and its territories, and other parts of the world in which Seller or any of its Subsidiaries is doing business as of the Closing Date.

The terms of Section 1 of this Agreement shall apply regardless of whether Key Employee becomes employed by Purchaser or any of its subsidiaries on the Closing Date and shall continue to apply notwithstanding the termination of Key Employee's employment with Purchaser or any of its subsidiaries for any reason.

In the event that the Asset Purchase Agreement is terminated in accordance with its terms, this Agreement shall terminate and be of no further force or effect.

2.      **Agreement Not to Solicit.**  During the Non-Solicit Period (as defined below), Key Employee agrees that Key Employee shall not, without the prior, express written consent of Purchaser's Chief Executive Officer:

(a)      personally or through others, encourage, induce, attempt to induce, recruit, solicit or attempt to solicit (on Key Employee's own behalf or on behalf of any other Person (as defined below)), or take any other action that is intended to induce or encourage, any Purchaser Worker (as defined below), to leave his or her employment or service with Purchaser or its subsidiaries or take away any such employees;

(b)      personally or through others, encourage, induce, attempt to induce, recruit, solicit or attempt to solicit (on Key Employee's own behalf or on behalf of any other Person), or take any other action that is intended to induce or encourage any Purchaser Worker to engage in any activity in which Key Employee would, under the provisions of Section 1 of this Agreement, be prohibited from engaging; or

(c)      personally or through others, encourage, induce, attempt to induce, solicit or attempt to solicit (on Key Employee's own behalf or on behalf of any other Person), or take any other action that is intended to induce, encourage or solicit, any actual or prospective customers of Purchaser or any of its subsidiaries in respect to the Business, except in the normal scope of Key Employee's employment with Purchaser.  During the Non-Solicit Period, Key Employee further agrees not to, directly or indirectly, interfere with, disrupt or attempt to disrupt the relationship between Purchaser or any of its Subsidiaries or other Affiliates and any third party, including any customer, collaborator or supplier of Purchaser or any of its subsidiaries or other Affiliates, with respect to the Business, except in the normal scope of Key Employee's employment with Purchaser.

Exhibit 2                                    DEF_000099

For purposes of Section 2 of this Agreement, the restrictive period (referred to herein as the "**Non-Solicit Period**") shall commence on the Closing Date and shall continue until the second (2nd) anniversary of the Closing Date; *provided*, *however*, that in the event that it is determined by a court of competent jurisdiction or an arbitrator, as the case may be, that Key Employee has breached any provision of this Section 2, in addition to any remedy set forth in Section 4 below and available under applicable law, the Non-Solicit Period shall be automatically extended by a number of days equal to the total number of days in the period from the date on which such breach shall have first occurred through the date as of which such breach shall have been fully cured.

For purposes of this Agreement, "**Purchaser Worker**" means any employee, agent, director, consultant or independent contractor who has accepted an offer of employment, appointment or engagement with Purchaser or any of its Subsidiaries at or following the Closing.

For purposes of this Agreement, "**Person**" means any individual, corporation, partnership, trust, joint venture, limited liability company, association, or organization.

Notwithstanding the foregoing, for purposes of this Agreement, the placement of general advertisements that may be targeted to a particular geographic or technical area but that are not specifically targeted toward a Purchaser Worker shall not be deemed to be a breach of this Section 2.

      3.    **Acknowledgement**.  Key Employee hereby acknowledges and agrees that:

(a)  this Agreement is necessary for the protection of the legitimate business interests of Purchaser in acquiring the Purchased Asssets, including but not limited to, confidential, proprietary and trade secret information;

(b)  the execution and delivery and continuation in force of this Agreement is a material inducement to Purchaser to execute the Asset Purchase Agreement and is a mandatory condition precedent to the closing of the Asset Purchase, without which Purchaser would not close the transactions contemplated by the Asset Purchase Agreement ;

(c)  the scope of this Agreement in time, geography and types and limitations of activities restricted is reasonable;

(d)  Key Employee has no intention of competing with the business acquired by Purchaser within the area and the time limits set forth in this Agreement;

(e)  Key Employee represents and warrants that neither the execution and delivery nor the performance of this Agreement will result directly or indirectly in a violation or breach of any agreement or obligation by which Key Employee is or may be bound, and neither compliance with such agreement or such obligation would impair Key Employee's ability to perform Key Employee's obligations under this Agreement;

(f)  breach of this Agreement will be such that Purchaser will not have an adequate remedy at law because of the unique nature of the assets being acquired by Purchaser from Seller;

(g)  execution of this Agreement shall not limit Purchaser's employee policies, including without limitation the provisions set forth in Purchaser's proprietary information and invention assignment agreement (the "**Proprietary Information and Inventions Assignment Agreement**");

Exhibit 2

DEF_000100

(h) in the course of his employment with Purchaser, Key Employee will receive, acquire, or use confidential information of a special and unique nature and value relating to the Business, which information Purchaser and/or Seller has developed and will continue to develop through substantial expenditures of time, effort, and money, and which Purchaser and Seller regard as confidential and proprietary. Key Employee understands that such confidential information is vital to the viability and success of Business. Key Employee acknowledges that in order to safeguard its legitimate business interests, Purchaser has a right to protect such information; and

(i) Key Employee represents and warrants that his expertise and capabilities are such that his obligations under this Agreement (and the enforcement thereof by injunction or otherwise) will not prevent him from earning a livelihood.

4.    **Remedy**. Key Employee acknowledges and agrees that (a) the rights of Purchaser under this Agreement are of a specialized and unique character and that immediate and irreparable damage will result to Purchaser if Key Employee fails to or refuses to perform his obligations under this Agreement, and (b) Purchaser may, in addition to any other remedies and damages available, (i) obtain an injunction in a court of competent jurisdiction to restrain any such failure or refusal, and (ii) be entitled to specific performance and injunctive relief, without posting bond or other security, and without the necessity of proving actual damages.

No single exercise of any or all of the foregoing remedies shall be deemed to exhaust Purchaser's right to such remedies, but the right to such remedies shall continue undiminished and may be exercised from time to time as often as Purchaser may elect. Without limiting the generality of the foregoing, the rights and remedies of Purchaser under this Agreement, and the obligations and liabilities of Key Employee under this Agreement, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, under laws relating to misappropriation of trade secrets, under other applicable laws and common law requirements and under all applicable rules and regulations. Key Employee's obligations under this Agreement are absolute and shall not be terminated or otherwise limited by virtue of any breach (on the part of Purchaser or any other party) of any provision of the Asset Purchase Agreement or any other agreement, or by virtue of any failure to perform or other breach of any obligation of Purchaser or any other party. Nothing in this Agreement shall limit any of the rights or remedies of Purchaser under the Asset Purchase Agreement, and nothing in the Asset Purchase Agreement shall limit any of Key Employee's obligations, or any of the rights or remedies of Purchaser, under this Agreement.

5.    **Severability**. The covenants contained in Section 1 and Section 2 hereof shall be construed as a series of separate covenants, one for each country, province, state, city or other political subdivision of the Restrictive Territory. Except for geographic coverage, each such separate covenant in Section 1 and Section 2 shall be deemed identical in terms to the covenant contained in Section 1 hereof. If any provisions of this Agreement as applied to any part or to any circumstances shall be adjudged in a judicial proceeding or arbitration to be invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. Purchaser and Key Employee intend this Agreement to be enforced as written. If any provision, or part thereof, however, is held to be unenforceable because of the duration or scope thereof or the area covered thereby, all parties agree that the court (or an arbitrator) making such determination shall have the power to modify the duration, scope and/or area of such provision, and/or to delete specific words or phrases and in its reduced form such provision shall then be enforceable.

6.    **Amendment**. This Agreement may not be amended except by an instrument in writing signed by Purchaser's Chief Executive Officer, or his or her designee, and Key Employee.

Exhibit 2                                        DEF_000101

7.      **Waiver**.  No waiver of any nature, in any one or more instances, shall be deemed to be or construed as a further or continued waiver of any breach of any other term or agreement contained in this Agreement.

8.      **Headings**.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.      **Governing Law**.  This Agreement shall be construed and interpreted and its performance shall be governed by the laws of the State of Delaware without regard to conflicts of law principles of any jurisdiction.  Purchaser and Key Employee agree that the exclusive venue for any actions, suits or legal proceedings arising out of this Agreement or related thereto shall be brought in the appropriate court of competent jurisdiction in New Castle County, Delaware.  Additionally, Key Employee understands and agrees that any such action, suit or legal proceeding brought pursuant to this Agreement shall be tried without a jury.

10.      **Purchaser Assignment of Rights.**  This Agreement shall remain binding upon and shall inure to the benefit of Purchaser and its successors and assigns, specifically including, but not limited to, any subsidiary, joint venturer or related entity to Purchaser, regardless of whether such entity is in existence at the time of execution of this Agreement, or is formed or acquired thereafter, and the rights hereunder are specifically assignable by Purchaser.

11.      **Fees and Expenses**. The prevailing party in any action at law or in equity, including an action for declaratory relief, or any other legal proceeding, arising out of or related to this Agreement shall be entitled to recover all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees, in addition to any other relief to which that party may be entitled.

12.      **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and undertakings, both written and oral, between the parties, or any of them, with respect to the subject matter of this Agreement (but does not in any way merge or supersede the Asset Purchase Agreement or any other agreement executed in connection with the Asset Purchase, including the Key Employee's employment agreement or offer letter with Purchaser, if any, and Key Employee's Proprietary Information and Inventions Assignment Agreement).

**[SIGNATURE PAGE TO RESTRICTIVE COVENANTS AGREEMENT FOLLOWS]**

Exhibit 2                                    DEF_000102

**IN WITNESS WHEREOF**, Purchaser and Key Employee have executed this Agreement on the day and year first above written.

KEY EMPLOYEE

_____

Signature

_____

Name (Please Print)

PURCHASER

Metrc Inc.

By: _____

Name:

Title:

**EXHIBIT D**

**FORM OF JOINDER AGREEMENT**

Exhibit 2

DEF_000104

# JOINDER AGREEMENT

This JOINDER AGREEMENT (this "***Agreement***"), dated as of _____, 2023 (the "***Execution Date***"), is made by and among (a) the undersigned ("***Stockholder***"), (b) Chroma Protocol Corporation, a Delaware corporation ("***Seller***"), and (c) MCS Acquisition LLC, a Delaware limited liability company ("***Purchaser***"). Seller, Stockholder and Purchaser are sometimes referred to in this Agreement, each individually as a "***Party***" and collectively, the "***Parties***". Capitalized terms used but not otherwise defined herein shall have their respective meanings given to such term in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Purchaser and Seller have entered into that certain Asset Purchase Agreement, dated as of April 7, 2023 (the "***Purchase Agreement***"), by and among Purchaser, Seller and the Representative (as defined in the Purchase Agreement), pursuant to which, among other things, Seller will sell and assign to Purchaser, and Purchaser will purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities, subject to the terms and conditions set forth therein (collectively, the "***Transactions***");

**WHEREAS**, as a condition to Stockholder's receipt of payment or distributions from Seller of any portion of the Closing Payment Amount allocable to Stockholder pursuant to the terms of the certificate of incorporation and other organizational documents of Seller and the Plan of Liquidation, the Stockholder shall have delivered this Agreement; and

**WHEREAS**, in order to induce Purchaser to enter into the Purchase Agreement and to consummate the Transactions upon satisfaction of the terms and conditions set forth in the Purchase Agreement, the Parties are entering into this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the parties hereby agree as follows:

1.    <u>Agreement with respect to Seller Shares.</u>

(a)    Stockholder agrees not to, directly or indirectly, at any time prior to the Expiration Date (as defined below), (i) transfer, assign, sell, exchange, pledge, subject to any Encumbrances or otherwise dispose of or encumber any shares of Seller Capital Stock held by Stockholder (the "***Seller Shares***") or to make any offer, commitment or agreement relating to such Seller Shares, (ii) deposit any of the Seller Shares into a voting trust or enter into a voting agreement or other arrangement with respect to any Seller Shares, or grant any proxy or power of attorney with respect thereto or (iii) enter into any Contract, option or other arrangement or undertaking with respect to the transfer, assignment, sale, exchange, pledge or other disposition or encumbrance of any interest in or the voting of any of Seller Shares; <u>provided</u> that Stockholder may, if Stockholder is an individual, transfer any of the Seller Shares to any member of Stockholder's immediate family, or to a trust for the benefit of Stockholder or any member of Stockholder's immediate family solely for estate planning purposes; <u>provided</u>, <u>further</u>, that such transfer shall only be permitted if (x) such transfer is permitted by, and is effected in accordance with, the organizational documents of Seller and (y) as a condition to the effectiveness of such transfer, the transferee agrees in writing to be bound by the terms of this Agreement.  As used herein, the term "***Expiration Date***" means the earlier to occur of (1) the Closing or (2) the valid termination of the Purchase Agreement.

Exhibit 2                                              DEF_000105

(b)    On or prior to the Expiration Date, at every meeting of the Seller Stockholders and at every adjournment thereof, and in every action or approval by written consent of the Seller Stockholders, Stockholder shall vote such Stockholder's Seller Shares entitled to vote (a) in favor of approval of the Purchase Agreement, the Ancillary Agreements and the Transactions, and (b) against any offer or proposal for any sale of assets, merger, stock sale, recapitalization or other acquisition proposal (other than the Transactions) between Seller and any Person, other than Purchaser.

2.    Agreement to be Bound by the Purchase Agreement.

(a)    Stockholder hereby acknowledges and agrees that: (i) such Stockholder is party to and bound by that certain Investors' Rights Agreement, dated January 24, 2020 (as amended from time to time, the "***Investor Agreement***"); (ii) such Stockholder has received and reviewed and understands the terms of the Purchase Agreement and the rights and obligations of Seller, the Seller Stockholders (including Stockholder) and the Representative thereunder; and (iii) the consideration and other payments (including the Transaction Bonuses, if applicable) payable, directly or indirectly, to Stockholder pursuant to the terms of the Purchase Agreement, the Certificate of Incorporation of Seller (the "***Charter***", and together with the Investor Agreement, the "***Seller Governance Documents***") and/or the Plan of Liquidation provide good and sufficient consideration for each and every promise, duty, release, covenant, agreement, right, obligation and liability contained in this Agreement and the Purchase Agreement.

(b)    Stockholder hereby acknowledges and agrees to: (i) the terms and conditions of the Purchase Agreement, including the calculation of Pro Rata Share; (ii) the distribution of the Closing Payment Amount pursuant to the terms of the Purchase Agreement, the Plan of Liquidation, the Seller Governance Documents and SAFE Termination and Release Agreements; (ii) the designation of the Representative and the scope and limitations on the Representative's authority; (iii) the provisions relating to the Holdback Fund, the Holdback Amount, the Expense Fund and the Expense Fund Amount; (iv) the indemnification obligations of Seller Stockholders set forth in Article VI of the Purchase Agreement, subject to the limitations on liability set forth thereunder; and (v) the release by Seller Stockholders set forth in Section 6.12 of the Purchase Agreement.

(c)    Effective as of the Closing, Stockholder hereby acknowledges and agrees, irrevocably and unconditionally, to: (i) join in, be bound by, subject to the terms of, and to comply with, his, her or its obligations as a "Seller Stockholder", an "Indemnifying Person" (solely in the event Stockholder is a "Seller Indemnifying Person" under Article VI of the Purchase Agreement), a "Seller Indemnifying Person" and a "Releasing Party" pursuant to the terms of the Purchase Agreement with the same force and effect as if Stockholder were originally a party thereto; and (ii) to abide by, perform and discharge his, her or its indemnity, contribution, reimbursement and other payment obligations as a "Seller Stockholder", an "Indemnifying Person" (solely in the event Stockholder is a "Seller Indemnifying Person" under Article VI of the Purchase Agreement), a "Seller Indemnifying Person" or a "Releasing Party", pursuant to the terms of the Purchase Agreement with the same force and effect as if Stockholder were originally a party thereto, subject to the limitations on liability set forth in Article VI of the Purchase Agreement.

(d)    Stockholder (i) has received and reviewed a copy of the Purchase Agreement and any Ancillary Agreement to which it is a party or otherwise bound, and has had an opportunity to ask questions and receive answers concerning the terms and conditions of the Purchase Agreement and Ancillary Agreements, (ii) hereby acknowledges that it has adequate information concerning the business and financial condition of Seller to make an informed decision regarding the Transactions, (iii) has consulted with or had the opportunity to consult with its own legal counsel and financial advisors regarding this Agreement, the Purchase Agreement and the Ancillary Agreements to which it is a party or otherwise bound and (iv) hereby acknowledges that (A) this Agreement is intended to be a material inducement for Purchaser to enter into the Purchase Agreement and Ancillary Agreements and to effect the transactions contemplated

Exhibit 2                                                              DEF_000106

thereby and (B) Purchaser is relying on Stockholder's agreement to be bound by the terms hereof in determining whether to proceed to consummate the Transactions and that substantial Liabilities and damages may be incurred by such Persons if Stockholder's representations, warranties, covenants or agreements set forth herein are inaccurate or are breached.

(e)    Stockholder acknowledges and agrees that it, he or she has had an opportunity to review with its, his or her own tax advisors the tax consequences of the Purchase Agreement, the Transactions and any other transactions contemplated by the Purchase Agreement. Stockholder acknowledges and agrees that it, he or she must rely solely on its, his or her advisors and not on any statements or representations made by Purchaser, Seller or any of their agents or representatives. Stockholder acknowledges and agrees that Stockholder (and not Seller or Purchaser) shall be responsible for any tax liability of Stockholder that may arise as a result of the Purchase Agreement, the Transactions and any other transactions contemplated by the Purchase Agreement.

3.    Representations and Warranties.  In order to induce Purchaser to enter into this Agreement, the Purchase Agreement and to consummate the transactions contemplated thereby, Stockholder represents and warrants to Purchaser that the following representations and warranties are true and correct as of the Execution Date and as of Closing:

(a)    *Authorization; Enforceability.* Stockholder is either an individual or a legal entity of the type set on Stockholder's signature page hereto ("*Signature Page*"). Stockholder, if (i) an individual, is competent and has full legal capacity to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby, or (ii) a legal entity, (A) has all requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby, (B) the execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby have been duly and validly approved and authorized by all necessary action on the part of Stockholder and (C) no other act or proceeding by Stockholder is necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Stockholder, and constitutes the legal, valid and binding obligation of Seller Stockholder, enforceable against Stockholder in accordance with its terms, except to the extent that enforceability may be limited by (x) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (y) rules of law governing specific performance, injunctive relief and other equitable remedies.

(b)    *No Conflict.* The execution and delivery by Stockholder of this Agreement do not, and the consummation of the transactions contemplated hereby will not, conflict with, or result in any violation of or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any benefit under, or require any consent, approval or waiver from any Person pursuant to, (i) any organizational documents of Stockholder, (ii) any Contract applicable to Stockholder, or (iii) any Applicable Law. No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity or any other Person, is required by or with respect to Stockholder in connection with the execution and delivery of this Agreement or the consummation of the transaction contemplated hereby.

(c)    *Litigation.* There is no Legal Proceeding of any nature pending or, to Stockholder's knowledge, threatened, against Stockholder that (i) could have a material or adverse effect on Stockholder, (ii) challenges the validity or propriety of, or seeks to prevent, impair or delay consummation of, the transactions contemplated by this Agreement or the Purchase Agreement, or (iii) could otherwise prevent Stockholder from complying with the terms and provisions of this Agreement.

Exhibit 2                                    DEF_000107

(d)    *No Brokers*. Stockholder is not obligated for the payment of any fees or expenses of any investment banker, broker, advisor, finder or similar party in connection with the origin, negotiation or execution of the Purchase Agreement or in connection with the Transactions or any other transactions contemplated by the Purchase Agreement.

4.    <u>Waiver of Rights</u>. Stockholder, on behalf of himself, herself or itself and on behalf of such Person's directors and officers (in their capacities as such), representatives, agents, estates, heirs, successors and assigns, hereby irrevocably and unconditionally: (a) covenants and agrees not to bring, commence, institute, maintain, prosecute, participate in or voluntarily aid any Legal Proceeding which (i) challenges the validity of or seeks to enjoin the operation of any provision of this Agreement, the Purchase Agreement or the Transactions, or (ii) alleges that (A) the execution and delivery of this Agreement by such Stockholder, (B) the negotiation of the Purchase Agreement, the Ancillary Agreements, the Transactions or any transaction contemplated thereby by any officer of the Seller, the board of directors of Seller (the "***Seller Board***") or any member thereof or any holder of Seller Capital Stock or other securities of Seller, or (C) the approval of the Purchase Agreement or the Transactions by the Seller Board, breaches any fiduciary duty of any officer of Seller, the Seller Board or any member thereof or any holder of Seller Capital Stock or other securities of Seller or otherwise breaches any Applicable Law; and (b) waives and agrees to refrain from exercising (i) any and all notice or consent requirements with respect to the Purchase Agreement and the Transactions; and (ii) any past, present or future right of first refusal or offer, put or call right, co-sale or tag-along right, pre-emptive, anti-dilution or other similar right of Stockholder, that may be applicable to, or triggered by, the Purchase Agreement or the consummation of the Transactions, in each case, regardless of whether such requirement or right is pursuant to any Seller Governance Documents, Contract, Applicable Law or otherwise.

5.    <u>Appointment of Representative</u>. Stockholder hereby approves, authorizes, ratifies and confirms (a) his, her or its appointment of the Representative under the Purchase Agreement, (b) the Representative's power and authority set forth in the Purchase Agreement, including its power to bind Stockholder (with full power of substitution in the premises) and (c) the other provisions set forth in Section 8.12 of the Purchase Agreement. Stockholder agrees that the Purchaser shall be entitled to rely on any action taken by Representative on behalf of such Stockholder in accordance with the provisions and authorizations of Section 8.12 of the Purchase Agreement and that each such action shall be binding on Stockholder as fully as if Stockholder had taken such action.

6.    <u>Confidentiality; Public Announcement</u>.  Stockholder agrees to adhere to and not violate the provisions set forth in Section 4.6 and Section 4.7 of the Purchase Agreement (as if such provisions apply to Stockholder, individually).

7.    <u>Amendment</u>. Any provision of this Agreement may be amended, waived or modified only by the written consent of Purchaser, Seller, and Stockholder. No waiver of any term or provision hereof shall be effective unless in writing signed by the party waiving such term or provision.

8.    <u>Legal Counsel</u>. The parties hereto acknowledge that Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP ("***Gunderson***") has represented Purchaser and Perkins Coie LLP ("***Perkins Coie***") has represented Seller, in each case in connection with the negotiation and execution of this Agreement, the Purchase Agreement, the Ancillary Agreements, the Transactions and any other transactions contemplated thereby, and neither Gunderson nor Perkins Coie has undertaken to represent any other party in connection therewith.

9.    <u>Miscellaneous</u>. The following Sections of the Purchase Agreement are incorporated into this Agreement by reference, *mutatis mutandis*: Section 8.1 (Notices), Section 8.3 (Counterparts), Section 8.4 (Entire Agreement), Section 8.5 (Assignment), Section 8.6 (Severability), Section 8.7 (Specific

Exhibit 2                    DEF_000108

Performance), Section 8.8 (Governing Law; Jurisdiction; Consent to Service of Process), Section 8.9 (Attorneys' Fees), Section 8.10 (Waiver of Jury Trial), and Section 8.11 (Interpretation; Rules of Construction).

[*Signature Pages Follow*]

Exhibit 2                                    DEF_000109

       IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**STOCKHOLDER:**

ENTITY:

_____
Name

By:_____

Name: _____

Title: _____

INDIVIDUAL:

_____

Name:_____

[SIGNATURE PAGE TO JOINDER AGREEMENT]

Exhibit 2                                                    DEF_000110

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**PURCHASER:**

**MCS ACQUISITION LLC**

By:_____
Name:
Title:

[SIGNATURE PAGE TO JOINDER AGREEMENT]

Exhibit 2                                    DEF_000111

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLER:**

**CHROMA PROTOCOL CORPORATION**


By:_____
Name:
Title:

**EXHIBIT E**

**<u>TRADEMARK ASSIGNMENT</u>**

Exhibit 2

DEF_000113

## TRADEMARK ASSIGNMENT AGREEMENT

This **TRADEMARK ASSIGNMENT AGREEMENT** ("**Assignment**") dated _____, 2023, is made by and between Chroma Protocol Corporation, a Delaware corporation ("**Seller**") and MCS Acquisition LLC, a Delaware limited liability company ("**Purchaser**").

WHEREAS, Seller and Purchaser are party to that certain Asset Purchase Agreement, dated as of even date herewith (the "**Asset Purchase Agreement**"), pursuant to which Purchaser has agreed to purchase from Seller certain assets of Seller, including, without limitation, all of Seller's right, title and interest in and to all of the trademarks, trade names, service marks, in each case that are part of the Purchased Assets, whether registered or unregistered, and all applications and registrations thereof and all worldwide and common law rights thereto, including but not limited to the trademarks, trade names and service marks identified on <u>Exhibit A</u> attached hereto (collectively, the "**Marks**") for Purchaser's exclusive use thereof in connection with the Purchased Assets being transferred to Purchaser from Seller under the Asset Purchase Agreement.

NOW, THEREFORE, in accordance with the terms of the Asset Purchase Agreement and in consideration of the promises and mutual covenants and agreements contained herein and therein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Assignment**. Seller hereby irrevocably assigns, sells, conveys and transfers unto Purchaser all rights, title and interests in and to the Marks, together with (a) the applications for registration and registrations of the Marks; (b) all worldwide and common law rights that Seller may have in the Marks; (c) the right to prosecute such applications or any new applications for the Marks, and enjoy the benefits of any registrations resulting therefrom worldwide; (d) the goodwill of the business symbolized by and associated with the Marks, and pursuant to Section 10 of the Lanham Act, 15 U.S.C. §1060, such assignment includes the portion of the business of Purchaser to which the Marks pertain, which business is ongoing and existing; and (e) the right to sue (including filing and prosecuting opposition, cancellation and similar proceedings) and recover for, and the right to profits or damages due or accrued, arising out of or in connection with, any and all past, present or future infringements or dilution of or damage or injury to the Marks or such associated goodwill. Seller hereby authorizes the United States Patent and Trademark Office and any other official or organization whose duty it is to assign and/or maintain any of the Marks to record Purchaser as the assignee and owner of all Marks currently in the name of Seller.

2. **Further Assurances**. Seller hereby agrees with Purchaser that Seller, upon request, shall execute any and all further instruments regarding the assignments, conveyances and transfers contemplated by this Assignment, which may be reasonably required in order to better secure to Purchaser the use and benefit of any and all of the Marks, and that Seller has not executed and will not execute any agreement in conflict with this Assignment. Seller hereby irrevocably designates and appoints Purchaser and its duly authorized officers and agents, as Seller's agents and attorneys-in-fact to act for and in behalf and instead of Seller, to execute and file any documents and to do all other lawfully permitted acts to further the above purposes with the same legal force and effect as if executed by Seller. Seller hereby covenants and agrees that it shall not challenge or assist others to challenge any of the Marks or attempt to register or cause to be registered (or make any filing with respect to) any of the Marks or any marks, logos or trade names confusingly similar thereto, anywhere in the world.

3. **No Third Party Beneficiaries**. Without limiting the rights of any party to the Asset Purchase Agreement set forth therein, this Assignment shall be binding upon and inure solely to the benefit of

Exhibit 2                                    DEF_000114

the parties hereto and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Assignment.

4.      **Severability**.  In the event that any one or more of the provisions contained in this Assignment or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Assignment and any other application thereof shall not in any way be affected or impaired thereby; provided, however, that to the extent permitted by applicable Law, any invalid, illegal, or unenforceable provision may be considered for the purpose of determining the intent of the parties in connection with the other provisions of this Assignment.

5.      **Terms of the Asset Purchase Agreement**.  The parties hereto acknowledge and agree that this Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Seller and Purchaser with respect to the Purchased Assets and Assumed Liabilities. The representations, warranties, covenants, agreements and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern. Capitalized terms used but not defined in this Assignment shall have the meanings set forth in the Asset Purchase Agreement.

6.      **Counterparts**.  This Assignment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. The exchange of copies of this Assignment and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Assignment as to the parties and may be used in lieu of the original Assignment for all purposes.  This Assignment shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

7.      **Governing Law; Submission to Jurisdiction**.  This Assignment shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to its conflicts of law rules. All legal proceedings arising out of or relating to this Assignment shall be resolved in accordance with the Asset Purchase Agreement.

8.      **Miscellaneous**. Any breach of this Assignment by Seller will cause Purchaser irreparable harm for which damages would not be an adequate or sufficient remedy, and therefore, in addition to any other remedies at law, Purchaser shall be entitled to obtain injunctive and other forms of equitable relief (including, without limitation, specific performance) in order to fully exercise its rights hereunder, without any obligations to post a bond. In any action or proceeding to enforce rights under this Assignment, the prevailing party will be entitled to recover costs and reasonable attorneys' fees. This Assignment can be modified, supplemented or waived only by a mutually signed writing. The failure of any party to enforce any terms or provisions of this Assignment shall not waive any of its rights under such terms or provisions.

[SIGNATURE PAGE TO TRADEMARK ASSIGNMENT AGREEMENT FOLLOWS]

Exhibit 2                                           DEF_000115

**IN WITNESS WHEREOF**, Purchaser and Seller have caused this Trademark Assignment Agreement to be executed and delivered by their respective duly authorized representatives as of the date first above written.

**PURCHASER:**

**MCS ACQUISITION LLC**

By:    _____

Name:  Michael Johnson

Title:   Chief Executive Officer

**SELLER:**

**CHROMA PROTOCOL CORPORATION**

By:    _____

Name:  Marcus Estes

Title:   Chief Executive Officer

Exhibit 2                                    DEF_000116

<u>**EXHIBIT A**</u>

**TRADEMARK REGISTRATIONS/APPLICATIONS**

| Trademark | Countries | Classes | Serial No. | App No. | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| CHROMA SIGNET | CHINA | 42 | | 59200146 | 9/14/2021 | |
| CHROMA SIGNET | CHINA | 42 | | 63242928 | 3/14/2022 | |
| CHROMA SIGNET | USA | 09; 35; 42; 45 | | 88881617 | 4/21/2020 | 8/31/2021 |

Exhibit 2

DEF_000117

**EXHIBIT F**

**DOMAIN NAME ASSIGNMENT**

Exhibit 2                    DEF_000118

### DOMAIN NAME ASSIGNMENT AGREEMENT

This **DOMAIN NAME ASSIGNMENT AGREEMENT** ("**Assignment**") dated _____, 2023, is made by and between Chroma Protocol Corporation, a Delaware corporation ("**Seller**") and MCS Acquisition LLC, a Delaware limited liability company ("**Purchaser**").

WHEREAS, Seller and Purchaser are party to that certain Asset Purchase Agreement, dated as of even date herewith (the "**Asset Purchase Agreement**"), pursuant to which Purchaser has agreed to purchase from Seller certain assets of Seller, including, without limitation, all of Seller's right, title and interest in and to all of the domain names that are comprised within the Purchased Assets, as set forth in the Asset Purchase Agreement, including, without limitation, those applicable domain names listed in Exhibit A hereto, and, all applicable sub-domains, variations and mirror sites of the domain names listed in Exhibit A hereto (collectively, the "**Domain Names**"), and all applications and registrations related to the Domain Names (the applicable registry entities may be collectively referred to as the "**Registry**").

NOW, THEREFORE, in accordance with the terms of the Asset Purchase Agreement and in consideration of the promises and mutual covenants and agreements contained herein and therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   **Assignment**. Seller hereby irrevocably sells, assigns, transfers and conveys to Purchaser the entire worldwide right, title and interest in and to the Domain Names, exclusively throughout the world and free and clear of any and all Encumbrances whatsoever (other than Permitted Encumbrances).  Seller further waives all claims it has to the Domain Names and agrees to cease all use of the Domain Names, as a domain name, trade name, trademark or service mark or otherwise, as of the date written above.

2.   **Further Assurances**.  Seller shall use reasonable efforts to assist Purchaser in every proper way to evidence, record and perfect the Section 1 assignment and to perfect, obtain, maintain, enforce, and defend any rights assigned hereunder.  Seller shall perform all acts necessary to effect the re-registration of the Domain Names from Seller to Purchaser according to the Registry's policy, including, without limitation, any changes to the Domain Name's registrar records and other acts as reasonably directed by Purchaser, and including, without limitation, after the Effective Date.

3.   **No Third Party Beneficiaries**.  Without limiting the rights of any party to the Asset Purchase Agreement set forth therein, this Assignment shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Assignment.

4.   **Severability**.  In the event that any one or more of the provisions contained in this Assignment or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Assignment and any other application thereof shall not in any way be affected or impaired thereby; provided, however, that to the extent permitted by applicable Law, any invalid, illegal, or unenforceable provision may be considered for the purpose of determining the intent of the parties in connection with the other provisions of this Assignment.

5.   **Terms of the Asset Purchase Agreement**.  The parties hereto acknowledge and agree that this Assignment is entered into pursuant to the Asset Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Seller and Purchaser with respect to the Purchased Assets and Assumed Liabilities. The representations, warranties, covenants, agreements and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset

Exhibit 2                                                                         DEF_000119

Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern. Capitalized terms used but not defined in this Assignment shall have the meanings set forth in the Asset Purchase Agreement.

6.      **Counterparts**.  This Assignment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. The exchange of copies of this Assignment and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Assignment as to the parties and may be used in lieu of the original Assignment for all purposes.  This Assignment shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

7.      **Governing Law; Submission to Jurisdiction**.  This Assignment shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to its conflicts of law rules.  All legal proceedings arising out of or relating to this Assignment shall be resolved in accordance with the Asset Purchase Agreement.

8.      **Miscellaneous**. Any breach of this Assignment by Seller will cause Purchaser irreparable harm for which damages would not be an adequate or sufficient remedy, and therefore, in addition to any other remedies at law, Purchaser shall be entitled to obtain injunctive and other forms of equitable relief (including, without limitation, specific performance) in order to fully exercise its rights hereunder, without any obligations to post a bond. In any action or proceeding to enforce rights under this Assignment, the prevailing party will be entitled to recover costs and reasonable attorneys' fees. This Assignment can be modified, supplemented or waived only by a mutually signed writing. The failure of any party to enforce any terms or provisions of this Assignment shall not waive any of its rights under such terms or provisions.

[SIGNATURE PAGE TO DOMAIN NAME ASSIGNMENT AGREEMENT FOLLOWS]

Exhibit 2                                    DEF_000120

**IN WITNESS WHEREOF**, Purchaser and Seller have caused this Domain Name Assignment Agreement to be executed and delivered by their respective duly authorized representatives as of the date first above written.

**PURCHASER:**

**MCS ACQUISITION LLC**

By:     _____

Name:   Michael Johnson

Title:   Chief Executive Officer

**SELLER:**

**CHROMA PROTOCOL CORPORATION**

By:     _____

Name:   Marcus Estes

Title:   Chief Executive Officer

Exhibit 2                                    DEF_000121

**EXHIBIT A**

**DOMAIN NAMES**

| **Domain Name** | **Expiration Date** | **Registrar** |
|---|---|---|
| https://chromasignet.com/ | December 5, 2023 | Name Cheap |
| https://chroma.io/ | February 17, 2024 | Name Cheap |
| https://signet.codes/ | June 2, 2023 | Name Cheap |
| https://ucqr.codes/ | May 13, 2023 | Name Cheap |

Exhibit 2                              DEF_000122

**EXHIBIT G**

**<u>CHARTER AMENDMENT</u>**

Exhibit 2                                    DEF_000123

# CERTIFICATE OF AMENDMENT
## OF THE
## SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## CHROMA PROTOCOL CORPORATION

**(Pursuant to Section 242 of the
General Corporation Law of the State of Delaware)**

Chroma Protocol Corporation, a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "General Corporation Law").

**DOES HEREBY CERTIFY**:

**FIRST**: That the name of this corporation is Chroma Protocol Corporation and that this corporation was originally incorporated pursuant to the General Corporation Law on March 12, 2013 under the name Chroma Games, Inc.

**SECOND**: That the Board of Directors of this corporation duly adopted resolutions setting forth a proposed amendment to the Second Amended and Restated Certificate of Incorporation of this corporation, declaring said amendment to be advisable and in the best interests of this corporation and its stockholders, which resolution setting forth the proposed amendment is substantially as follows:

**NOW, THEREFORE, BE IT RESOLVED**, that Article I of the Second Amended and Restated Certificate of Incorporation of the corporation be amended and restated to read in its entirety as follows:

"The name of this corporation is Hungry Genius Corporation (the "Corporation")."

**THIRD**: That said amendment has been duly adopted in accordance with the provisions of Section 242 of the General Corporation Law.

\* \* \* \*

Exhibit 2                    DEF_000124

**IN WITNESS WHEREOF**, this Certificate of Amendment of the Second Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on _____, 2023.

_____

Marcus Estes, President

**EXHIBIT H**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

Exhibit 2

DEF_000126

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

**THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**, effective as of _____, 2023 (this "***Agreement***"), is made by and between Chroma Protocol Corporation, a Delaware corporation ("***Seller***") and MCS Acquisition LLC, a Delaware limited liability company ("***Purchaser***"). Capitalized terms used but not otherwise defined herein shall have their respective meanings given to such term in that certain Asset Purchase Agreement, dated as of April 7, 2023 (the "***Asset Purchase Agreement***"), by and among Seller, Purchaser and the other parties named therein.

**RECITALS**

**WHEREAS**, Pursuant to the Asset Purchase Agreement, Seller has agreed to sell, transfer, convey, assign and deliver to Purchaser, free and clear of any and all Encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in and to the Purchased Assets, and Purchaser has agreed to purchase and acquire from Seller the Purchased Assets and to assume the Assumed Liabilities; and

**WHEREAS**, Purchaser and Seller desire to document, and set forth the terms of the sale, assignment, transfer, conveyance, and delivery of good and valid title and interest in and to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and the assumption of the Assumed Liabilities.

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the promises and mutual agreements set forth in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

**1. Sale.** Under the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances), good and valid title to all of the Purchased Assets.

**2. Assumption**. Under the terms and subject to the conditions set forth in the Asset Purchase Agreement, Purchaser hereby assumes the Assumed Liabilities. Notwithstanding anything in this Agreement, the Asset Purchase Agreement or the other related documents to the contrary, other than the Assumed Liabilities, Purchaser shall not be the successor to Seller or any of its Affiliates, and Purchaser expressly does not assume and shall not become liable to pay, perform or discharge, any of the Excluded Liabilities. All Excluded Liabilities are retained by and remain liabilities and obligations of Seller.

**3. Terms of Asset Purchase Agreement**. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall govern. All matters relating to the transfer of the Purchased Assets to Purchaser and not expressly regulated hereunder, shall be deemed to be regulated by the Asset Purchase Agreement.

**4. Execution of Agreement**. This Agreement may be executed in several counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one (1) agreement. The exchange of a fully executed Agreement (in counterparts or otherwise) delivered electronically (including without limitation transmission by .pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com)) shall be sufficient to bind the parties to the terms and conditions of this Agreement.

Exhibit 2                                                        DEF_000127

**5. Governing Law**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to any conflicts of law principles. Any dispute, difference, controversy, claim or disagreement arising out of or in relation to this Agreement, its meaning, construction, effect, performance, breach, termination or post termination rights and obligations of the parties, or the claimed breach thereof, shall be determined under the terms and conditions of Section 8.8 of the Asset Purchase Agreement. Each of the parties to this Agreement hereby irrevocably consents to service of process or notices in the manner provided for notices in Section 8.1 of the Asset Purchase Agreement. Nothing in this Agreement shall affect the right of any party to this Agreement to serve process or notices in any other manner permitted by applicable legal requirement.

**6. Further Assurances**.  Seller hereby covenants that it shall do such further acts, and execute and deliver such further instruments, that Purchaser may reasonably request in order to more fully effectuate Seller's sale and assignment of the Purchased Assets to Purchaser and the vesting of title to the Purchased Assets in Purchaser. Purchaser hereby covenants that it shall do such further acts, and execute and deliver such further instruments, that Seller may reasonably request in order to more fully effectuate Purchaser's assumption of the Assumed Liabilities.

**7. Successors and Assigns.** Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either party hereto without the prior written consent of the other party hereto; provided, that, notwithstanding the foregoing, this Agreement and a party's rights, interests or obligations hereunder may be assigned in the same manner and to the extent permitted under the Asset Purchase Agreement. This Agreement will be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

[Signature Page to Follow]

-2-

Exhibit 2                    DEF_000128

**IN WITNESS WHEREOF**, the undersigned have executed this Bill of Sale and Assignment and Assumption Agreement as of the date first set forth above.

**SELLER**

**CHROMA PROTOCOL CORPORATION**

By:_____

Name:

Title:

**PURCHASER**

**MCS ACQUISITION LLC**


By:_____
Name:
Title:

**EXHIBIT I**

**FORM OF SAFE TERMINATION AND RELEASE AGREEMENT**

Exhibit 2

DEF_000131

## SAFE TERMINATION AND RELEASE AGREEMENT

This SAFE TERMINATION AND RELEASE AGREEMENT (this "***Agreement***") is made and entered into as of [●], 2023, by and among Chroma Protocol Corporation, a Delaware corporation ("***Seller***"), MCS Acquisition LLC, a Delaware limited liability company ("***Purchaser***"), and the undersigned holder ("***Holder***") of one or more Simple Agreement for Future Equity. Capitalized terms used but not otherwise defined herein shall have their respective meanings given to such term in the Purchase Agreement (as defined below).

## RECITALS

**WHEREAS**, Purchaser and Seller have entered into that certain Asset Purchase Agreement, dated as of April 7, 2023 (the "***Purchase Agreement***"), by and among Purchaser, Seller and the Representative, pursuant to which, among other things, Seller will sell and assign to Purchaser, and Purchaser will purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities, subject to the terms and conditions set forth therein (such transactions, collectively, the "***Asset Sale***");

**WHEREAS**, Holder holds one or more Simple Agreement for Future Equity issued by Seller (each, a "***SAFE***") on the date(s) and in the amount(s) set forth on Exhibit A hereto (such amount(s), collectively, the "***Purchase Amount***");

**WHEREAS**, Seller intends to cease operating the Business following the closing of the Asset Sale and adopt a plan of liquidation within sixty (60) days of the closing of the Asset Sale in accordance with the terms of the Purchase Agreement (the "***Dissolution***");

**WHEREAS**, pursuant to Section 1(b) of each SAFE, the closing of the Asset Sale will constitute a Liquidity Event (as defined in each SAFE) and cause each SAFE to automatically be entitled to receive a portion of the proceeds of the Assets Sale in accordance with the terms of Sections 1(b) and 1(d) of each SAFE, due and payable to Holder immediately prior to, or concurrent with, the closing of the Asset Sale;

**WHEREAS**, pursuant to Section 1(c) of each SAFE, the termination of the operation of the Business and adoption of the Plan of Liquidation following the closing of the Asset Sale will constitute a Dissolution Event (as defined in each SAFE) and cause each SAFE to automatically be entitled to receive its Cash-Out Amount (as defined in each SAFE) in accordance with the terms Sections 1(c) and 1(d) of each SAFE, due and payable to Holder immediately prior to the Dissolution Event;

**WHEREAS**, the Purchase Agreement provides that Seller may not (a) repurchase or redeem any Seller Capital Stock, (b) make any distribution to its equityholders or (c) dissolve or liquidate, in each case unless (i) Seller has satisfied any creditor claims for which Purchaser could reasonably become liable, including as a result of any failure by either Purchaser or Seller to comply with the requirements of any applicable bulk sales or transfer laws, and (ii) all Delayed Purchased Assets have been transferred and assigned to Purchaser or appropriate arrangements have been made with respect to all of the Delayed Purchased Assets pursuant to the Purchase Agreement;

**WHEREAS**, following the Asset Sale, Seller will determine the amount required to satisfy any indebtedness and other creditor claims, which payments shall be senior to any payments to the SAFE Holders and the holders of preferred stock of Seller, in each case in compliance with Applicable Law and Seller's obligations under the Purchase Agreement;

Exhibit 2                                    DEF_000132

WHEREAS, to facilitate the Asset Sale and ensure compliance with Seller's obligations under the Purchase Agreement and Applicable Law, Holder desires to waive and terminate any and all rights Holder may have under each SAFE under Sections 1(b) and 1(c) thereof in connection with the Asset Sale and the Dissolution in exchange for the right to receive the SAFE Consideration (as defined below) concurrently with payments to holders of preferred stock of Seller (the "*Preferred Stock*") following the Dissolution;

WHEREAS, as condition and inducement to the willingness of Purchaser to enter into the Purchase Agreement, Purchaser has required the receipt of the consideration payable to Holder in connection with the Transactions to be conditioned upon Holder entering into this Agreement; and

WHEREAS, Holder acknowledges and agrees that (i) the obligations contained in this Agreement are a material inducement to Purchaser to enter into the Purchase Agreement and to perform its obligations thereunder, and (ii) Purchaser will not obtain the benefit of the bargain set forth in the Purchase Agreement as specifically negotiated if Holder breaches any of the provisions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the parties hereby agree as follows:

1. <u>Treatment of the SAFEs; Payment</u>. Effective immediately prior to and contingent upon the Closing, without further action on the part of any of the parties hereto, each SAFE shall be cancelled and extinguished, and shall be converted automatically into the right to receive an amount in cash equal to such SAFE's pro rata share (as determined by reference to the full payment such SAFE would have been entitled to under Section 1(c) as a result of a Dissolution Event relative to the full payment all SAFEs and Preferred Stock would have been entitled as a result of a Dissolution Event) of the cash legally available for distribution to SAFEs and the Preferred Stock, including any portion of the Holdback Fund and/or Expense Fund released for distribution to Seller Stockholders and SAFE Holders (if any) (such amount, the "*SAFE Consideration*"), which SAFE Consideration shall be paid concurrently with any post-Dissolution payments or release of a portion of the Closing Payment Amount, Holdback Fund or Expense Fund with respect to the Preferred Stock; <u>provided</u> that such right is (i) junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into capital stock of Seller), (ii) on par with payments for other SAFEs and/or Preferred Stock, and (iii) senior to payments for common stock of Seller. Holder acknowledges and agrees that, in exchange for the right to receive the SAFE Consideration, effective immediately prior to and contingent on the Closing, without further action on the part of any of the parties hereto, all obligations under each SAFE shall be deemed paid, performed and discharged in full, and any other obligations of Seller under each SAFE shall be deemed terminated. Holder acknowledges and agrees that the Holder is not entitled to the SAFE Consideration unless the Closing occurs.

2. <u>Holder Acknowledgments</u>. Holder hereby:

(a) acknowledges and agrees that Purchaser and its Affiliates will not assume any SAFEs at any time or substitute with any equivalent option or right to purchase or otherwise acquire any capital stock or other securities of Purchaser or its Affiliates upon the Closing and will not assume any obligations with respect to the SAFE Consideration (provided, the foregoing shall not modify Purchaser's obligations with respect to the Holdback Fund under the Purchase Agreement);

2

Exhibit 2                                                    DEF_000133

(b)    irrevocably elects, notwithstanding the terms of each SAFE and in lieu of any payments contemplated by each SAFE, including Sections 1(b) and 1(c) thereof, to receive the SAFE Consideration (when and if payable pursuant to <u>Section 1</u>) in full satisfaction of Seller's obligations under each SAFE and irrevocably waives any right to receive any equity interest in Seller;

(c)    acknowledges and agrees that, effective as of immediately prior to the Closing, the SAFEs shall automatically terminate and be of no further force and effect;

(d)    acknowledges and agrees that (i) the SAFE Consideration, when and if payable pursuant to <u>Section 1</u>, represents all consideration to which Holder is entitled to in respect of Holder's SAFEs and (ii) by accepting the right to receive the SAFE Consideration under this Agreement, Seller, Purchaser and their respective Affiliates and representatives shall be deemed to have no further obligations to Holder with respect to the SAFEs;

(e)    acknowledges and agrees that (i) a portion of the SAFE Consideration to which he, she or it is entitled to hereunder shall be retained by Purchaser as part of the Holdback Fund to satisfy potential post-closing claims by Purchaser, and retained by the Representative as part of the Expense Fund to satisfy any fees, costs and expenses incurred while serving in such capacity on behalf of the Seller Stockholders and SAFE Holders, and (ii) he, she or it shall only be entitled to all or a portion of (x) the Holdback Fund, if, as and when such amounts become payable in accordance with the provisions of the Purchase Agreement and (y) the Expense Fund, if, as and when such amounts are released by the Representative after full and complete satisfaction of its duties contemplated by the Purchase Agreement;

(f)    with respect to the transactions contemplated by the Purchase Agreement and this Agreement, Holder hereby irrevocably waives all of the notice, consent or similar rights set forth in the Seller's certificate of incorporation or Seller's bylaws (as amended and/or restated and in effect as of the date hereof, together, the "***Charter Documents***"), the SAFEs, or any other agreements or documents between Seller and Holder, and any notice to which Holder may be entitled pursuant to the Delaware General Corporation Law and other state laws that may apply or purport to apply; and

(g)    acknowledges and agrees that the SAFE Consideration provides good and sufficient consideration for every promise, duty, release, obligation, agreement and right contained in this Agreement.

3.    <u>Representations and Warranties of Holder</u>.  Holder hereby represents and warrants to Purchaser and Seller, that the statements contained in this <u>Section 3</u> are true and correct as of the Closing Date (or, if made as of a specified date, as of such date):

(a)    <u>Ownership</u>.  Holder represents that (i) Holder owns exclusively, beneficially, and of record each SAFE and each share of Seller Capital Stock set forth opposite Holder's name on <u>Exhibit A</u>, and (ii) the SAFEs and Seller Capital Stock set forth opposite Holder's name on <u>Exhibit A</u> represents Holder's entire ownership of equity securities of Seller and Holder does not own any other equity securities of Seller or any other option, warrant, purchase right, subscription right, conversion right, exchange right, or other contract or commitment that could require Seller to issue, sell or otherwise cause to become outstanding any equity securities of Seller, whether vested or unvested.  Holder has good and valid title to each SAFE, free and clear of any Encumbrances.

(b)    <u>Authority and Enforceability</u>.  Holder has the requisite power and authority to execute and deliver this Agreement and all other agreements and documents contemplated by the Purchase

3

Exhibit 2                              DEF_000134

Agreement to be executed and delivered by Holder (this Agreement and such other Agreements, if any, the "***Holder Agreements***") and to perform its obligations contemplated hereby and thereby. The execution and delivery by Holder of this Agreement and such other Holder Agreement and the performance by Holder of Holder's obligations hereunder and thereunder have been, if Holder is not a natural person, duly and validly authorized by all necessary action on the part of Holder. This Agreement has been and, upon Holder's execution thereof, each such other Holder Agreement to which Holder will be a party will have been (assuming due authorization, execution and delivery by each other party thereto) duly executed and delivered by Holder. This Agreement constitutes and, upon Holder's execution thereof, each such other Holder Agreement to which Holder will be a party will constitute (assuming due authorization, execution and delivery by each other party thereto) the legal, valid and binding obligations of Holder, enforceable against Holder in accordance with its terms, except to the extent that enforceability may be limited by (x) applicable bankruptcy and other similar laws affecting the rights of creditors generally and (y) rules of law governing specific performance, injunctive relief and other equitable remedies.

(c)    <u>No Conflict</u>. The execution, delivery, and performance by Holder of this Agreement and the Holder Agreements does not and will not (i) violate (with or without the giving of notice or lapse of time, or both) any Applicable Law applicable to Holder, (ii) require any consent, approval or authorization of, declaration, filing or registration with, or notice to, any Person applicable to Holder, in each case, which would adversely affect Holder's performance under this Agreement or the consummation of the transactions contemplated hereby, (iii) result in the creation of any Encumbrance on any SAFE held by Holder (other than under applicable securities laws), or (iv) if Holder is not a natural person, conflict with or result in a breach of or constitute a default under any provision of Holder's governing documents.

(d)    <u>Litigation</u>. There is no Legal Proceeding of any nature pending or, to Holder's knowledge, threatened, against Holder arising out of or relating to: (i) Holder's beneficial ownership of securities of Seller or any right to acquire the same, (ii) Holder's capacity as a Holder, or (iii) the Purchase Agreement, the Holder Agreements, or any of the transactions contemplated hereby or thereby.

(e)    <u>No Brokers</u>. Holder is not obligated for the payment of any fees or expenses of any investment banker, broker, advisor, finder or similar party in connection with the origin, negotiation or execution of the Purchase Agreement or in connection with the Transactions or any other transactions contemplated by the Purchase Agreement or this Agreement.

(f)    <u>Tax Matters</u>. Holder has had an opportunity to review with its, his or her own tax advisors the tax consequences of this Agreement. Holder understands that it, he or she must rely solely on its, his or her advisors and not on any statements or representations made by Seller or any of their agents or representatives. Holder understands that Holder (and not Seller or Purchaser or their respective Affiliates) shall be responsible for any tax liability of Holder that may arise as a result of this Agreement.

(g)    <u>Spousal Consent</u>. If Holder is a natural person, unless the signature of Holder's spouse appears following the signature page of this Agreement, Holder is not married, or that, if married, the SAFEs are not community property.

4.    <u>Other Agreements and Acknowledgments of Holder.</u>

(a)    Holder has reviewed his, her, or its obligations under (i) this Agreement and (ii) the Purchase Agreement, a copy of which is attached as <u>Exhibit B</u>, including his, her, or its indemnification obligations pursuant to Article VI of the Purchase Agreement and release obligations pursuant to Section 6.12 of the Purchase Agreement.

4

Exhibit 2                                    DEF_000135

(b)    Holder hereby acknowledges and agrees to: (i) the terms and conditions of the Purchase Agreement, including the calculation of Pro Rata Share; (ii) the distribution of the Closing Payment Amount pursuant to the terms of the Purchase Agreement, the Plan of Liquidation, the certificate of incorporation and other organizational documents of Seller and the terms herein; (iii) the designation of the Representative and the scope and limitations on the Representative's authority; (iv) the provisions relating to the Holdback Fund, the Holdback Amount, the Expense Fund and the Expense Fund Amount; (v) the indemnification obligations of SAFE Holders set forth in <u>Article VI</u> of the Purchase Agreement, subject to terms and the limitations on liability set forth thereunder; and (vi) the release by SAFE Holders set forth in Section 6.12 of the Purchase Agreement.

(c)    Effective as of the Closing, Holder hereby acknowledges and agrees, irrevocably and unconditionally, to: (i) join in, be bound by, subject to the terms of, and to comply with, his, her or its obligations as a "SAFE Holder", a "Seller Indemnifying Person", an "Indemnifying Person" (solely in the event Holder is a "Seller Indemnifying Person" under Article VI of the Purchase Agreement) and a "Releasing Party" pursuant to the terms of the Purchase Agreement with the same force and effect as if Holder were originally a party thereto; and (ii) to abide by, perform and discharge his her or its indemnity, contribution, reimbursement and other payment obligations as a "SAFE Holder", a "Seller Indemnifying Person", an "Indemnifying Person" (solely in the event Holder is a "Seller Indemnifying Person" under Article VI of the Purchase Agreement) or a "Releasing Party" pursuant to the terms of the Purchase Agreement with the same force and effect as if Holder were originally a party thereto, subject to the limitations on liability set forth in Article VI of the Purchase Agreement.

(d)    Holder agrees that, except to the extent arising out of, in connection with or related to any breach by Purchaser of this Agreement or by Purchaser of the Purchase Agreement or any Ancillary Agreement, as applicable, he, she or it will not bring, commence, institute, maintain, prosecute, voluntarily participate in or voluntarily aid any Legal Proceeding, in law or in equity, in any court or before any Governmental Entity, which (i) challenges the validity of or seeks to enjoin the operation of any provision of the Purchase Agreement, the Ancillary Agreements, this Agreement or, if applicable, any other agreement or the consummation of the Transactions or (ii) alleges that any actions taken (or omitted) in connection with or in furtherance of the Transactions or any of the other transactions contemplated by the Purchase Agreement, the Ancillary Agreements, this Agreement or, if applicable, any other agreement breaches any fiduciary duty, whether of the board of directors of Seller or any member thereof, of any officer of Seller or of any holder of Seller Capital Stock or other securities of Seller.

(e)    Holder acknowledges and understands that the representations, warranties and covenants by Holder set forth herein and, if applicable, the other Ancillary Agreements and any covenants set forth in the Purchase Agreement will be relied upon by Purchaser, Seller, and their respective Affiliates and counsel, and that substantial Liabilities may be incurred by such Persons if Holder's representations, warranties, or covenants set forth herein and the other Ancillary Agreements and any covenants set forth in the Purchase Agreement applicable to Holder are inaccurate or are breached.

(f)    Holder acknowledges that Holder (a) has received a copy of the Purchase Agreement, this Agreement, and each other Holder Agreement and has had the opportunity to carefully read each such agreement, understands it, and agrees to be bound by its terms and conditions, and has been granted the opportunity to ask questions of, and to receive answers from, Holder's legal counsel concerning the terms and conditions of the Purchase Agreement, this Agreement, and each other Holder Agreement, (b) Holder has been advised to seek independent legal advice and has received such advice or has, without undue influence, elected to waive the benefit of any such advice, and (c) Holder is entering into this Agreement voluntarily.

5

Exhibit 2                                                    DEF_000136

5.     <u>Confidentiality</u>.  Holder agrees to adhere to and not violate the provisions set forth in Section 4.6 and Section 4.7 of the Purchase Agreement (as if such provisions apply to Holder, individually, *mutatis mutandis*).

6.     <u>Amendment and Waiver of SAFEs</u>. Holder and Seller acknowledge that each SAFE may be amended, waived or modified by written consent of Holder and Seller. Holder and Seller hereby agree and consent to: (a) effectively immediately prior to the Closing and contingent upon the Closing, the waiver of any and all rights under each SAFE under Sections 1(b) and 1(c) thereof in connection with the Asset Sale and the Dissolution; and (b) the amendment of the SAFEs to provide that (i) each such SAFE shall be cancelled and extinguished, and shall be converted automatically into the right to receive an amount in cash equal to the SAFE Consideration, which SAFE Consideration shall be paid concurrently with any post-Dissolution payments or release of a portion of the Closing Payment Amount, Holdback Fund or Expense Fund with respect to the Preferred Stock in accordance with <u>Section 1</u>, (ii) that effective immediately prior to the Closing and contingent upon the Closing, without further action on the part of any Person, all obligations under each such SAFE shall be deemed paid, performed and discharged in full, and any other obligations of Seller under each such SAFE shall be deemed terminated and (iii) notwithstanding any express or implied right otherwise, Seller has, and shall have, no obligation to deliver notice of a Liquidity Event or Dissolution Event to any holder of such SAFE in connection with the Asset Sale or the Dissolution.

7.     <u>Further Assurances</u>.  Holder agrees to execute and deliver, or cause to be executed and delivered, all further documents and instruments as may be reasonably necessary, at Seller's request, to consummate and make effective the transactions contemplated hereby. Holder agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary under Applicable Laws to consummate the Transactions and the other transactions contemplated by the Purchase Agreement on the terms and subject to the conditions set forth therein.

8.     <u>Appointment of Representative</u>. Holder hereby approves, authorizes, ratifies and confirms (a) his, her or its appointment of the Representative under the Purchase Agreement, (b) the Representative's power and authority set forth in the Purchase Agreement, including its power to bind Holder (with full power of substitution in the premises) and (c) the other provisions set forth in Section 8.12 of the Purchase Agreement. Holder agrees that Purchaser shall be entitled to rely on any action taken by the Representative on behalf of such Holder in accordance with the provisions and authorizations of Section 8.12 of the Purchase Agreement and that each such action shall be binding on Holder as fully as if Holder had taken such action.

9.     <u>Miscellaneous</u>

(a)     <u>Amendment</u>. Any provision of this Agreement may be amended, waived or modified only by the written consent of Purchaser, Seller, and Holder. No waiver of any term or provision hereof shall be effective unless in writing signed by the party waiving such term or provision.

(b)     <u>Incorporated Provisions</u>. The following Sections of the Purchase Agreement are incorporated into this Agreement by reference, *mutatis mutandis*: Section 8.1 (Notices), Section 8.3 (Counterparts), Section 8.4 (Entire Agreement), Section 8.5 (Assignment), Section 8.6 (Severability), Section 8.7 (Specific Performance), Section 8.8 (Governing Law; Jurisdiction; Consent to Service of Process), Section 8.9 (Attorneys' Fees), Section 8.10 (Waiver of Jury Trial), and Section 8.11 (Interpretation; Rules of Construction).

*(Signature page follows)*

6

Exhibit 2                                                                    DEF_000137

IN WITNESS WHEREOF, the parties hereto have caused this SAFE Termination and Release Agreement to be duly executed as of the day and year set forth above.

<u>**SELLER**</u>**:**

**CHROMA PROTOCOL CORPORATION**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this SAFE Termination and Release Agreement to be duly executed as of the day and year set forth above.

**<u>PURCHASER</u>:**

**MCS ACQUISITION LLC**


By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this SAFE Termination and Release Agreement to be duly executed as of the day and year set forth above.

**HOLDER**:

**[Holder Name]**

By: _____

Name: _____

Title: _____

Spouse Name (if applicable):


Spouse Signature (if applicable):


Address:

_____

_____

Email: _____

## EXHIBIT A

**SAFE AND SAFE CONSIDERATION**

| Holder | Issuance Date | Purchase Amount under the SAFE |
|---|---|---|
|  |  |  |
|  |  |  |

## CAPITAL STOCK OF SELLER

| Holder | Type of Capital Stock | Number of Shares |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

Exhibit 2

DEF_000141

# **EXHIBIT B**

**PURCHASE AGREEMENT**

Exhibit 2

DEF_000142