IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

METRC, INC., METRC ID, LLC

    Plaintiffs,

v.

MARCUS ESTES,

    Defendant.

Case No. 8:24-cv-01252-WFJ-CPT

## Declaration of David Eagleson

I, David Eagleson, being duly sworn, depose and say:

1. I am over 18 years of age, and I make this declaration truthfully and based upon my personal knowledge as well as the business records of Metrc, which records are regularly maintained in the ordinary course of business by individuals whose responsibility it is to maintain the accuracy of such records.

2. I am Metrc's Vice President of Product Management.

3. As the Vice President of Product Management, I am familiar with Metrc's acquisition of the assets of Chroma Signet, the hiring of Marcus Estes, Estes's responsibilities and duties while Metrc employed him, Estes's performance in the role of Executive Vice President, Chroma Signet, and Estes's involvement and relationships with Metrc's customers and prospective customers.

4.  While I was not in my current Vice President role during the acquisition, I am aware that Metrc purchased and acquired Chroma Signet, which was co-founded by Estes, for the specific purpose of acquiring the Chroma Signet QR code technology to speed up the development of Metrc's desired Retail ID product. Chroma Signet was engaged in developing open-source barcode labeling software to create NFT-enabled QR codes that could be encoded with data to supply chain partners and end consumers of cannabis-containing products.

5.  Metrc sought to acquire and further develop the Chroma Signet technology to create its own proprietary QR code technology, which was subsequently named Retail ID. Since the purchase of the assets of Chroma Signet, Metrc has modified and improved the product to be a single source of compliance data, having direct linkage to real-time lab tests, Certificates of Analysis, and other cannabis-related product information, by way of its new product Retail ID. Retail ID makes the supply chain transparent, creating a seamless Metrc user experience.

6.  Retail ID acts as an identifier for finished good cannabis product to seamlessly move through the supply chain without additional scanning, increasing efficiency and workflow for the operating businesses leveraging it. For the end consumer purchasing the product at a retail location, the consumer can scan the Retail ID QR code for further product information, including specific ingredients, the aforementioned Certificates of Analysis and specific data points about the product.

7.  The goal of Retail ID is to demonstrate that products are legal, lab-tested, and safe for consumption. This further improves regulatory compliance and increases

consumer confidence in the cannabis marketplace. It also allows cannabis brands, distributors, retailers, and consumers to validate that their product is legal, which acts as a deterrent to illicit activity and protects the brands' reputations. Retail ID further allows enhanced communications with brands, distributors, and retailers for product recalls in the event that recalls are necessary.

8. My Retail ID development team and I have spent countless hours developing and improving this Retail ID technology to get it ready to introduce to a wider market. This includes both marketing and implementing pilot programs with our early Retail ID adoption customers.

9. Under Estes' oversight, Retail ID developments and adoption were at a standstill. I was asked to become more involved and engaged in Retail ID to make adoption improvements. Thereafter, I worked closely with Estes to further the production and rollout of Retail ID, and Estes was heavily involved with Metrc's clients and prospective clients, including Wyld and Khalifa Kush, as part of this process.

10. Unfortunately, during his employment with Metrc, it became apparent that the Chroma Signet technology required more technical development than was originally anticipated. The Chroma Signet technology had significant deficiencies in its underlying programming, was not ready to market to prospective partners, and required substantial additional work by Metrc's development team before it could be introduced to the market.

11.     When I came onboard to the Retail ID project, it was also apparent that Estes had overstated the brands' and distributors' willingness to adopt the Chroma Signet technology as "early adopters." It was Estes's sole responsibility to market Chroma Signet and its successor technology, Retail ID, to prospective customers for early adoption and pilot testing. But in the year that Estes was employed with Metrc, Estes was unable to personally garner any meaningful early adopters of the technology, with the exception of one or two partners with whom he had a relationship prior to Metrc's acquisition of Chroma Signet. All other Retail ID prospects during Estes's employment were secured by other Metrc personnel and representatives.

12.     Throughout Defendant's employment with Metrc, there was also significant tension between Estes, Metrc's CTO, VP of Product Management, and the Retail ID development team. Despite the shortcomings of the Chroma Signet technology, Estes was resistant to the development team's efforts to properly triage and correct any underlying software issues. The Retail ID development team struggled with Estes's: (1) refusal to adopt Metrc's Scrum processes for addressing underlying software issues and building new features, (2) inattentiveness to Retail ID refinement and backlog; (3) undermining the development team with respect to their hiring of software engineers, and (4) use of the Retail ID development team's engineers for projects that were not a priority for Retail ID.

13.     Furthermore, Estes had the responsibility of determining client requirements for Retail ID demonstrations, including label printing, *prior* to any on-site demonstrations of the Retail ID product. Ensuring successful on-site

demonstrations was paramount to garnering a prospective partner's early adoption of Retail ID. However, for various reasons including: (1) a lack of proper planning on Estes's part, and (2) a lack of communication between Estes and the product development team, Estes conducted several unsuccessful Retail ID product demonstrations, which further hampered early product adoption.

14. The compounding effects of Estes's: (1) inability to garner Retail ID adoption to any significant degree, (2) undermining of the product development team, and (3) poor communication and planning leading to failed on-site demonstrations ultimately led Metrc's then-CTO Sam Peterson to terminate Estes.

15. After Estes was terminated, CTO Sam Peterson left Metrc. At that time, I requested that I be able to attempt to work with Estes and keep him employed with Metrc. I had this discussion with Estes and made him this offer, but given his response and demands, it was clear to me that he was more motivated by additional compensation versus actually delivering meaningful results around the new product.

16. After Estes's separation on April 9, 2024, it became apparent that Estes was interfering with Metrc's relationships and prospective relationships with early adopters.

17. In April 2024, I had been working to secure an appointment with prospective client Khalifa Kush. Khalifa Kush is a cannabis manufacturer that engages in the production of specialized cannabis strains. Khalifa Kush is currently sold in retail locations across the Western, Southeastern, and Northeastern United States.

Having Khalifa Kush as an early adopter of Retail ID would have been impactful to Retail ID's prospects of gaining more significant market share.

18. Via emails with Khalifa Kush's Vice President of Marketing, Stephanie Arakel, I had secured an appointment with the company for April 29, 2024 at 12 p.m. to discuss their adoption of Retail ID. I anticipated that the meeting would proceed as planned. Attached as **Exhibit 8** to the Summary Judgment Motion are true and correct copies of my emails with Ms. Arakel.

19. Then, on April 29, 2025, just fifteen minutes or so prior to the start of the scheduled meeting with Khalifa Kush, Ms. Arakel abruptly cancelled the meeting, purportedly due to "medical complications." **Exhibit 8.**

20. Thereafter, I requested Ms. Arakel to let us know when her schedule reopened so that we could re-engage, but she never did.

21. I only later discovered during the litigation that Estes had been in touch with Ms. Arakel, told her that Metrc and Retail ID were somehow corrupt, and convinced her to refrain from adopting Retail ID.

22. During Estes's employment with Metrc, I and Metrc's marketing team were able to secure an early adoption customer in Wyld. Wyld is a leading cannabis infused product developer and distributor in the United States, and has a significant share of the United States cannabis edibles market. We spent significant time and expense marketing Retail ID to Wyld and creating the goodwill required for a successful product launch and business relationship.

23. Ultimately, we were successful in our efforts and Wyld became an early adopter of Retail ID. While I believe Estes overstated his contribution to securing Wyld as an early adopter, he was involved in implementing Retail ID at Wyld, including troubleshooting any issues that would arise during Wyld's implementation and use of the technology. Estes developed a relationship with Wyld as a result.

24. We considered Wyld's early adoption of Retail ID as a key early success story for Retail ID, as Wyld's involvement was critical so that we could build out Retail ID, obtain sufficient market saturation, and ultimately encourage other MSOs and consumers to use the technology. Estes was well aware of how critical Wyld's participation as an early adopter of Retail ID was to Metrc.

25. Initially, Wyld was an early adopter for the use of Retail ID in Maryland only. But we had several discussions with Wyld regarding the adoption of Retail ID for its products in other markets and jurisdictions across the United States. We (Metrc and Wyld) contemplated that after a successful rollout of Retail ID in Maryland, they would quickly adopt Retail ID in other states.

26. After Estes's termination in April 2024, Metrc CEO Michael Johnson and I had discussions with Wyld, in which Wyld informed us that they had spoken with Estes, and had concerns about their continued relationship with Metrc in light of Estes's statements and representations regarding Retail ID. Wyld specifically instructed both me and Michael Johnson to refrain from engaging in any press or media discussing Wyld's relationship with Retail ID for the foreseeable future.

27. In addition, while Metrc conducted a successful rollout of Retail ID in Maryland, and the parties had contemplated and verbally agreed to near immediate adoption of Retail ID in other markets and jurisdictions, Wyld no longer had any interest in serving as our flagship early adoption partner in other markets due to Estes's statements. Instead, Wyld delayed its adoption of Retail ID in other markets.

28. For this reason, we had to pivot our go to market strategy. Instead of using a few brands with significant market position in limited jurisdictions as early adopters, Metrc had to spend considerable time and effort locating smaller early adopters across multiple jurisdictions.

29. While Wyld continued as a more limited adopter of Retail ID in the months after Estes's statements to Wyld in Maryland, it took nearly a year to convince them to return to what we had originally planned and adopt Retail ID in jurisdictions outside Maryland.

**IN ACCORDANCE WITH THE PROVISIONS OF 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON THIS 21st DAY OF JULY, 2025.**

*Signed by:*
*David Eagleson*
8EAA8C8ECA414E8...

David Eagleson