CONFIDENTIAL

1          IN THE UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF FLORIDA

3                   TAMPA DIVISION

4
                                    )
5      METRC, INC., METRC ID, LLC,  )
                                    )
6              Plaintiffs,          )
                                    )
7              vs.                  )  Case No.
                                    )  8:24-cv-01252-
8      MARCUS ESTES,                )  WFJ-CPT
                                    )
9              Defendant.           )
                                    )
10

11                  CONFIDENTIAL

12         VIDEOCONFERENCE DEPOSITION OF

13                  MARCUS ESTES

14

15         Taken in behalf of Plaintiffs

16

17                  *   *   *

18

19              April 8, 2025

20

21             Astoria, Oregon

22

23

24     Teresa L. Dunn, CSR, CCR, RPR

25     Court Reporter

Veritext Legal Solutions

Exhibit 4

CONFIDENTIAL

Page 39

1    serializing their products.  Sonoma Hills was an

2    exception because they had an interesting

3    manufacturing process that kind of precluded it.

4         Q.    Was EMBR a customer at the time of

5    Metrc's acquisition of Chroma Signet?

6         A.    Technically I believe they were.

7         Q.    Did we do any additional work for them

8    after you came on board with Metrc?

9         A.    No, we did not.

10         Q.    Did they just end the relationship

11    because of the acquisition or was it prior to

12    the acquisition?

13         A.    I think it was somewhat prior.  There

14    was a sense that, you know, it was clear that we

15    were only going to be sold as a company and I

16    think they just basically opted to stop using

17    the software.

18              Interestingly enough they would have

19    still been customers for the fact we were still

20    hosting the data for the products on the

21    shelves, but I think they began to stop printing

22    new products at some point.

23         Q.    When we talk about these QR codes were

24    there specific domains that these QR codes were

25    linked to so when -- I will use the improper

CONFIDENTIAL

Page 40

1    term, but when it is scanned they -- the

2    customer would get the information from the

3    domain?

4        A.    Yes.

5        Q.    What were those domains prior to the

6    acquisition by Metrc?

7        A.    I believe the QRs were encoded with the

8    URL Chroma.io.

9        Q.    Was that the only domain you had in

10   using with Chroma Signet prior to the

11   acquisition?

12       A.    No.

13       Q.    Do you recall what the others were?

14       A.    I believe ChromaSignet.com was our

15   marketing front-end and Signet.codes was the web

16   address of the web application.

17           We also employed a domain UCQR.codes

18   which was used as kind of an industry -- a

19   publication of an industry standard that we were

20   seeking to develop.

21       Q.    As part of the acquisition is it fair to

22   say that you sold the rights to those domains to

23   this entity MCS Acquisition?

24       A.    That is correct.

25       Q.    Again, a lot of time I will ask really

CONFIDENTIAL

Page 41

1    generalized questions because I want you to

2    explain it to me like I'm a layman.

3           How in general does the QR code interact

4    with the domain?  And perhaps let's go back to

5    the camera level.  Is it a camera that scans the

6    QR code?  Is there a dedicated scanner port?

7           Tell me how generally how that process

8    works for an end customer.

9    A.    I will be very -- as comprehensive as I

10   can here and kind of academic without going into

11   unnecessary technical detail.

12          Generally speaking you can say that a

13   consumer would be using their personal mobile

14   device to scan a QR code.  Most phones have

15   native support for QR scanning.  You usually use

16   your camera and the phone basically reads the QR

17   and inside the QR by virtue of those black and

18   white dots a URL is contained inside of that QR

19   as information.

20          So the phone then says, hey, I found the

21   URL, let me go ahead and load that up into the

22   phone's operating system.

23          From that point because of our use of a

24   kind of at the time novel technology, something

25   referred to on iOS called App Clips rather than

CONFIDENTIAL

Page 42

1    necessarily loading a web browser session we are

2    going to load something like an app.

3              That app would be calling to the domain

4    to get the information needed to display the

5    information on the phone to the consumer.

6        Q.    When we talk about API, that acronym

7    API, do you know what that means?

8        A.    I do, yes.

9        Q.    Can you describe for the record what

10   that acronym stands for?

11       A.    I believe it is application program or

12   programmatic interface.

13       Q.    And when you are talking about the

14   potential scanner on the camera interacting with

15   the QR code and interacting with the domain

16   which also interacts with the app, is that kind

17   of what we are talking about when we talk about

18   API, it's these different formats communicating

19   with each other and working together?

20       A.    I don't think that's quite a properly

21   described context for the acronym API, no.

22       Q.    So with Chroma Signet was it using API

23   as part of its technology?

24       A.    Yes.

25       Q.    Can you describe how API was implemented

CONFIDENTIAL

Page 43

1    with respect to Chroma Signet?

2       A.    Our API was primarily used by as

3    mentioned before our point-of-sale partners.

4       Q.    Can you describe a little bit more what

5    you mean by that?

6       A.    Yeah, so if a QR code shows up at a

7    retailer and the retailer is looking to either

8    ingest the product into its inventory you might

9    say behind the scenes or to help check that

10   product out at the register the way that you

11   would a bar code, the point-of-sale software has

12   to take that URL and code it on the QR and go

13   ask, in this case, you know, in the legacy sense

14   when Chroma Signet was a stand-alone company, go

15   ask our servers about that QR and get

16   information.

17          So when you have a piece of software

18   talking to a piece of software and they're

19   different pieces of software that's usually

20   where the API is utilized.

21      Q.    Understood.  We are going to switch

22   gears a little bit here and talk about some

23   documents.

24          Throughout the day I will be showing you

25   documents.  Your attorney has a copy of this.  I

CONFIDENTIAL

Page 44

1   don't know if he sent it to you, but I will

2   share my screen so we can talk about this.  Take

3   your time, review the document, and when you are

4   ready to answer questions about it look up and I

5   will start asking.

6           So we will introduce what will be marked

7   as Defense Exhibit 1.

8           When you want me to scroll down -- you

9   don't have to read it word for word if you know

10  what the document is, but if you want me to

11  scroll down let me know.

12      A.   I will let you know when I reach the

13  bottom of the screen.  I am familiar with this

14  document in the abstract, but I don't think I've

15  read the details recently so I'm catching up on

16  it.  I've read that page.

17      Q.   Let's read the top paragraph of the

18  second page.

19      A.   The top half you said?

20      Q.   The top paragraph.

21      A.   Oh, yeah.  Interesting, I notice your

22  copy is not signed.  Oh, there it is.

23      Q.   First of all, Mr. Estes, do you

24  recognize this document?

25      A.   I do, yeah.

CONFIDENTIAL

Page 45

1    Q.   Is this the offer letter that you were

2  provided when you were first offered employment

3  with Metrc?

4    A.   I believe it is, yeah.

5    Q.   And is it accurate to say that pursuant

6  to the terms of this offer letter you were

7  provided with a one-time cash award of $100,000?

8    A.   Yes.

9    Q.   And you did receive that $100,000.  Is

10  that accurate?

11    A.   It was subject to taxation and so I did

12  not receive the entirety of the $100,000, but

13  otherwise, yes.

14    Q.   Now, if we look here where it says

15  One-Time Signing Bonus in the second sentence --

16  this is DEF 000143 -- this is the third line, If

17  your employment with the company terminates

18  prior to the second-year anniversary of your

19  start date for any reason you agree to repay the

20  company the gross amount of the signing bonus

21  within 30 days following the effective date, and

22  it continues on the next page, of your

23  termination of employment.

24         Do you see that?

25    A.   I do.

CONFIDENTIAL

Page 46

1    Q.   Did you understand that if you did not

2  make it to your second anniversary with Metrc

3  and that you were terminated for any reason

4  whatsoever you would be expected to return that

5  signing bonus?

6    A.   I will admit here, although it's not

7  defensible, that my understanding of that

8  because it was narratively different than the

9  way it was described to me by Michael Johnson I

10  had slightly poor understanding of it, but I do

11  admit that, yes, I signed this agreement.  I

12  don't dispute that.

13    Q.   At the time you signed this agreement

14  had you not retained counsel in connection with

15  your Asset Purchase Agreement?

16    A.   I did, yes.

17    Q.   Did you have your counsel review this

18  offer letter?

19    A.   Because this was a matter of my personal

20  employment I don't think they were able to do

21  that.

22    Q.   When you say you don't think they were

23  able to do that did they tell you it like was a

24  conflict or something?

25    A.   I don't recall, but my memory is they

Exhibit 4

CONFIDENTIAL

Page 47

1    said this is a personal matter and you will have

2    to deal with that yourself.

3        Q.    Who were your attorneys assisting you in

4    the Asset Purchase Agreement?

5        A.    The law firm of Perkins Coie.

6        Q.    Was there any particular attorney that

7    you were working more closely with at that firm?

8        A.    Yes, but I don't recall his name.

9        Q.    All right.  I'm going to ask you to go

10   to DEF 000144 and it states here at the bottom

11   of the contract or the agreement letter that,

12   Your employment at the company is on an at-will

13   basis which means that employment may be

14   terminated with or without cause and with or

15   without notice at any time at the discretion of

16   either the company or the employee.

17        Did you have an understanding of what

18   at-will employment meant when you executed this

19   offer letter?

20        A.    Yes.

21        Q.    I will enter what will be marked

22   Exhibit 2.  And, Mr. Estes, I will represent

23   this is the Asset Purchase Agreement.

24        This is a big agreement and I won't ask

25   you to review it page by page, but I will ask

CONFIDENTIAL

Page 50

1    agreement with the purchaser in a form attached

2    hereto as Exhibit C.

3          Do you recall executing what I will just

4    dub a non-solicitation agreement in connection

5    with the Asset Purchase Agreement?

6        A.    Yes.

7        Q.    If we drop down here to Purchase and

8    Sale, and this is section 1.1 on the same page,

9    it says the, Purchaser agrees to purchase from

10   seller and seller agrees to sell, transfer,

11   convey, assign, and deliver to purchaser free

12   and clear of any and all encumbrances other than

13   permitted encumbrances all of seller's right,

14   title, and interest in and to the purchased

15   assets.

16          Did I read that correctly?

17       A.    I believe so, yes.

18       Q.    Now, tell me what your general

19   understanding of what the purchased assets were

20   when you entered into this agreement?

21       A.    This would be a subset of the

22   intellectual property owned by the company that

23   would include the trademarks, not all of the

24   trademarks but a subset of the trademarks, the

25   code base, the code that we developed, a subset

CONFIDENTIAL

Page 60

1    and I'm saying if you have a case that says

2    that, because I've never heard of that, if you

3    have a case that says that I would like to see

4    it.

5         MR. ANDREWS:  Do you want to take a

6    break so I can pull a case?  I don't have a case

7    citation off the top of my head, but if we need

8    to look for it we will get it done for you.

9         I will suggest here that we come back to

10   this question.  I will table it.  I will get you

11   the case in the interim, but I recommend that we

12   proceed with the deposition at this point.

13        MR. DeWEESE:  He's asking to speak with

14   me so we're going to take a break and we will

15   come back.

16        (Recess from 10:37 a.m. to 10:40 a.m.)

17   Q.   (By Mr. Andrews) For the record I'm

18   going to ask, Mr. Estes, what you discussed with

19   your counsel during the prior break?

20        MR. DeWEESE:  And I'm going to object

21   and instruct him not to answer.

22        MR. ANDREWS:  We will certify that

23   question and we can deal with it at the

24   conclusion.

25   Q.   (By Mr. Andrews) Turning back to the

CONFIDENTIAL

Page 70

1   qualified answer.  My job description was never
2   very clearly defined.
3            I heard various descriptions of things
4   that they believed I would be doing before and
5   after the transaction and it would often change.
6   Part of my claim is that I was a little unsure.
7       Q.   Well, did Sam Peterson specifically tell
8   you that he wanted you to start reaching out to
9   brands and securing pilots in different markets?
10      A.   Yes, I believe he did during my
11  employment set that as part of my objective,
12  yeah.
13      Q.   Do you know approximately when he first
14  set that objective for you?
15      A.   I do not recall.
16      Q.   Was it fairly early in your employment
17  with Metrc?
18      A.   I believe so.
19      Q.   All right.  So is it fair to say,
20  Mr. Estes, that in the first few months of
21  Chroma Signet's relationship with Metrc that the
22  product had a rocky beginning, I'll put it that
23  way?
24      A.   No.
25      Q.   Did you think that the product was

CONFIDENTIAL

Page 168

1    objectives, nor do I remember them at this

2    moment.

3        Q.    So because there were no objectives

4    there was no way for the product itself to be

5    running behind.

6            Is that what you are testifying to?

7        A.    Let me see if I can assent to that

8    logically.  I think that it would need further

9    definition here for me to agree or disagree with

10   that.

11       Q.    Let me ask the question this way, by

12   November of 2023 had we successfully

13   demonstrated the capabilities of Retail ID and

14   began a pilot with any customer that was not

15   already a customer prior to the acquisition?

16       A.    Well, I don't recall.  I'm beginning

17   this think, yes, by this time, but I don't

18   recall precisely.

19       Q.    If you are beginning to think yes who do

20   you think that client or customer would have

21   been?

22       A.    Well, some quick summary, and I want to

23   be careful to stay within the contours of your

24   question, we were originally asked to focus on

25   California and then we were told to focus on

CONFIDENTIAL

Page 169

1  Nevada and then very quickly told to focus on a

2  different state, Maryland.

3          So these commands of focus necessarily

4  required big initiatives to start over again.  I

5  think by late November we were looking at the

6  state of Nevada, I'm sorry, Maryland to be

7  clear, but maybe just barely starting to look at

8  that state, but unfortunately I don't have

9  specific date recollections here, but just back

10  of the napkin if we were in this era beginning

11  our penetration into the state of Maryland one

12  of the earlier Maryland prospects I did persuade

13  to use our software immediately was Holistic.

14      Q.   Are you aware of any other prospects

15  that went to pilot in Maryland other than

16  Holistic during your time with Metrc?

17      A.   Many, yes.

18      Q.   Who are the others?

19      A.   Honestly it's hard to recall.  I don't

20  have notes in front of me.  The names of these

21  cannabis companies, most of which I never heard

22  of because I don't live in Maryland, but in

23  short because Maryland had issued a regulatory

24  QR requirement all of a sudden it became

25  relatively easy to find these prospects because

CONFIDENTIAL

Page 170

1    they had a problem that had to be solved without

2    the point-of-sale software having completed

3    their integration as I have described.

4            So there was a reason to talk to many

5    companies back to back and I don't recall the

6    names.  Holistic is the one and Wyld.  Holistic

7    and Wyld were both operating in Maryland.

8       Q.    All right.  Who kind of created the

9    relationship with Wyld?  Was that you?

10      A.    No.

11      Q.    How about Holistic, was that your doing

12   creating the relationship with Holistic?

13      A.    No.

14      Q.    Who kind of was the genesis of the

15   relationship with Wyld at Metrc?

16      A.    I don't recall.

17      Q.    How about Holistic?

18      A.    I don't recall.

19      Q.    All right.  Here's another message from

20   Ms. Alexander to Mr. Daley.  It says, Jose Lisam

21   and Adem have all tried to explain how Scrum

22   works.  JT has tried.  I will say Leif is

23   showing up more than he was, but it's still a

24   struggle.  Marcus is practically nonexistent

25   except go to market.

CONFIDENTIAL

Page 232

1    that would be necessary, but to be clear

2    Mr. Shackelford wasn't himself seeking access.

3        Q.    And are you saying that you didn't turn

4    over access to those domains because of legal

5    action that was threatened against you?

6        A.    No, that's not what I'm saying.

7        Q.    Okay.  Well, what legal action was

8    threatened against you as of let's call it

9    April 8th, 2024?

10       A.    I think only implicitly it was suggested

11   that if I did not sign those agreements, for

12   instance, that I would be sued for recovery of

13   my signing bonus.

14       Q.    Isn't that something you had agreed to

15   pursuant to the offer letter agreement?

16       A.    My belief is that because Metrc was

17   involved in illicit activity that I was wrongly

18   terminated and, thus, not compelled to repay

19   that bonus.

20       Q.    Were you trying to bring Metrc to the

21   bargaining table by essentially holding onto

22   those domains, kind of holding them hostage?

23       A.    No.

24       Q.    What did you expect to accomplish by not

25   turning over access to the domains?

CONFIDENTIAL

Page 240

1    date offhand, no.

2        Q.   And you are telling Mr. Mushrush, Worse

3    than that they tried forcing me to sign a

4    document saying I wouldn't tell you or anyone

5    else what I saw working there.  I declined that

6    and will be speaking out across the whole

7    industry with support from my attorneys.

8            And then you continue on, There are some

9    good people there, but in the end I don't think

10   you guys should be one of the few MSOs to back

11   them on this QR code.

12           Do you see that?

13       A.   Yes, I do.

14       Q.   Again, just for the record what does MSO

15   stand for?

16       A.   Multistate operator.

17       Q.   And is it fair to say that you were

18   directly telling Mr. Mushrush not to continue

19   his company's project with Retail ID with Metrc?

20           MR. DeWEESE:  Objection.  The document

21   speaks for itself, but you can answer.

22           THE WITNESS:  Yeah, I did not presume

23   Eric was able to decide that on behalf of Wyld

24   whatsoever.  That was not his function.

25       Q.   (By Mr. Andrews) Okay.  But you did tell

CONFIDENTIAL

Page 241

1    him you did not think he should continue with

2    Retail ID?

3       A.    I'll let the document speak for itself.

4             MR. DeWEESE:  Objection.  Hold on,

5    Marcus, you got to let me --

6       Q.    (By Mr. Andrews) He can object to the

7    form of the question and that's it.  This is not

8    state court.

9             If I ask you the question I'm still

10   asking you did you tell him not to continue with

11   the Retail ID project?

12            MR. DeWEESE:  Objection, the document

13   speaks for itself.  You can answer.

14            THE WITNESS:  I can only say that the

15   document -- asking me to interpret my own words

16   there, my words are on the screen.  I'll read

17   them to you if that's useful, Nick.

18            There are some good -- do you wish to

19   cut me off there or do you wish me to continue?

20      Q.    (By Mr. Andrews) You are not answering

21   and it's nonresponsive.

22            Was it your intent to interfere with

23   Metrc's relationship with Wyld?

24      A.    No.

25      Q.    Did you not believe that this message to

CONFIDENTIAL

Page 242

1    Eric Mushrush could potentially interfere with

2    Metrc's relationship with Wyld?

3        A.    Frankly, no.

4        Q.    Why is that?  Why did you not believe

5    that?

6        A.    Eric is not the guy to decide this kind

7    of thing.  I developed a more collegiate,

8    friendly relationship with him and to be texting

9    on a personal device reflects that.

10            I do believe as a personal matter it

11    would be better for the brand of Wyld not to be

12    associated with a product or company that very

13    well could be in the middle of a scandal.

14    However, as can be evidenced Wyld continued to

15    work with Metrc.

16            Let me add some color.  Now, the person

17    that could have stopped Wyld from working with

18    Metrc I also had her contact information.

19            Eric I don't think is management.  He's

20    just a guy that kind of helps the people at Wyld

21    above him.  I had their relationships, but I did

22    not go to them and make these same claims.

23            I did not even initiate this

24    conversation with Eric.  I'm simply responding

25    it to him texting me on my phone.  So man to man

CONFIDENTIAL

Page 243

1    I discussed with him as a citizen as if you

2    would be discussing a sports team.

3        Q.    Well, I'll represent that Eric Mushrush

4    is the director of new market operations for

5    Wyld.

6        A.    Was he at the time of this message?

7        Q.    He was.

8        A.    Okay.

9        Q.    So, I'm sorry, the other individual you

10   claim could have stopped this relationship with

11   Metrc and Retail ID, who was that?

12       A.    Eric's supervisor that was located at

13   the headquarters in Portland, Oregon, where I'm

14   also roughly located.  I don't recall her name

15   at the moment, but she would have been a lot

16   more -- she was the boss of the meetings and she

17   made the final decision.

18       Q.    Just to be clear you are saying this is

19   Eric Mushrush's direct supervisor?

20       A.    I don't know whether --

21       Q.    I apologize, it's my fault, sometimes

22   I'm slow with my questions.  Let me get it all

23   out before you answer.

24            Are you saying it is Eric Mushrush's

25   direct supervisor who was the individual who

CONFIDENTIAL

Page 244

1  made the final decision as to whether or not

2  Wyld would continue a Retail ID relationship

3  with Metrc?

4      A.   I do not know whether this person was

5  Eric Mushrush's direct supervisor.

6      Q.   But you did know that this individual

7  worked with Eric Mushrush?

8      A.   Yeah, they were both employees of Wyld.

9      Q.   Let's take a look at Exhibit 58.  For

10  the record this is a seven-page document DEF 329

11  to 335.  My apologies.

12      A.   Okay.  I've read that.  Read that.  Read

13  that.  Read that.

14      Q.   Apologies for one second.  Let me move

15  this out of the way.

16      A.   Okay.  Okay.  One more.  Okay.  Yep.

17      Q.   All right.  So just for the record are

18  these text message that you exchanged with John

19  Brown?

20      A.   Yes.

21      Q.   And John Brown is the CTO at Holistic

22  that we have discussed throughout the day,

23  correct?

24      A.   That is correct.

25      Q.   Let's back up to what appears to be a

CONFIDENTIAL

Page 262

1      A.    Yeah, I've read that.

2      Q.    Okay.  So my understanding is that this

3  document is a collection of text messages

4  between you and an individual named Stephanie

5  Arkel; is that correct?

6      A.    Yes, that's correct.

7      Q.    Go ahead and finish reviewing this and

8  I'll ask you some questions.

9      A.    Okay.  Yep.

10     Q.    First of all, who is Stephanie Arkel?

11     A.    She is a friend more than anything at

12 this point who has worked in kind of a different

13 role for various cannabis companies.

14     Q.    Okay.  Which cannabis companies has she

15 worked for?

16     A.    She used to work for, what's the name of

17 that company in LA.  To be honest with you I

18 don't remember.  I don't recall.

19     Q.    You have no idea who she worked for at

20 all?  Because it says in these text messages she

21 actually had a meeting scheduled with Metrc.

22     A.    Yeah, I don't know on behalf of who at

23 this point.  I think she may be kind of a

24 consultant to multiple companies so I don't

25 recall exactly which one she may or may not have

CONFIDENTIAL

Page 289

1               C E R T I F I C A T E

2

3          I, Teresa L. Dunn, a Certified Shorthand

4     Reporter for Oregon, do hereby certify that,

5     pursuant to stipulation of counsel for the

6     respective parties hereinbefore set forth,

7     MARCUS ESTES appeared virtually before me at the

8     time and place set forth in the caption hereof;

9     that at said time and place I reported in

10    Stenotype all testimony adduced and other oral

11    proceedings had in the foregoing matter; that

12    thereafter my notes were reduced to typewriting

13    under my direction; and that the foregoing

14    transcript, pages 1 to 290, both inclusive,

15    constitutes a full, true and accurate record of

16    all such testimony adduced and oral proceedings

17    had, and of the whole thereof.

18          Witness my hand and CSR stamp at

19    Vancouver, Washington, this 14th day of April,

20    2025.

21

22

23          TERESA L. DUNN,

24          Certified Shorthand Reporter

            Certificate No. 00-0367

25          Expiration Date:  6/30/2026