**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**METRC, INC. and METRC ID, LLC**,

    Plaintiffs,

v.                                                         Case No. 8:24-cv-1252-WFJ-CPT

**MARCUS ESTES**,

    Defendant.
_____/

**ORDER**

Before the Court are Plaintiffs Metrc, Inc. ("Metrc") and Metrc ID, LLC's Motion for Partial Summary Judgment, pursuant to Federal Rule of Civil Procedure 56(a). Dkt. 55. Defendant Marcus Estes ("Estes"), proceeding *pro se*, Dkt. 88, has filed a response in opposition, Dkts. 60, and Plaintiffs have replied. Dkt. 65. After careful consideration of the applicable law, the submissions of the parties, and the entire file, the Court grants-in-part Plaintiffs' motion.

**BACKGROUND**

**I.    Factual History**

This action arises out of the employment—and eventual termination—of Marcus Estes by Metrc, a company that contracts with state regulatory agencies overseeing legalized cannabis programs to provide its software-as-a-service ("SaaS") product. Dkt. 55-1 ¶ 4. This product works in conjunction with radio-frequency identification ("RFID") technology to track cannabis growth, harvesting,

processing, testing, transport, and sale. *Id.* Metrc's stated goal is to "ensure that every cannabis plant and every cannabis product is accounted for from growth/production to consumption, preventing illicit and/or unregulated cannabis from entering the supply chain." *Id.* ¶ 6.

Defendant Estes was the founder and CEO of Chroma Protocol Corporation ("Chroma"), which developed Chroma Signet—an "open-source barcode labeling software to create NFT-enabled QR codes that could be encoded with data to supply chain partners and end consumers of cannabis-containing products." *Id.* ¶¶ 7–9. On April 7, 2023, Metrc, through its subsidiary Metrc ID, LLC, *id.* ¶ 5, acquired the assets of Chroma via an Asset Purchase Agreement. Dkt. 55-2. With the sale of the assets of Chroma, Metrc "acquired all assets, properties, and contractual rights to Chroma Signet, [and] also all of the goodwill associated with the company and its assets." Dkt. 55-1 ¶ 8. Through this purchase, Metrc sought to "further develop the Chroma Signet technology to create its own proprietary QR code technology, which was subsequently named Retail ID." *Id.* ¶ 10.

As part of this acquisition, Metrc hired Estes as an Executive Vice President. *Id.* ¶ 13. Metrc provided Estes with an Offer Letter Agreement that detailed aspects of his employment—including a signing bonus of $100,000, with the stipulation that he would be required to repay that amount within thirty days if his employment with Metrc "terminate[d] prior to the second-year anniversary of [his] start date for any reason." Dkt. 55-5 at 1–2. The Offer Letter Agreement also stipulated that Estes'

2

"employment with [Metrc] is on an 'at will' basis which means that employment may be terminated with or without cause and with or without notice at any time[.]" *Id.* at 2. As a condition of his employment, Estes was also required to sign an Assignment of Inventions, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement (the "Non-Solicitation Agreement"), which created a two year bar on "contact[ing] any past, present or potential customer of the Company . . . for the purpose of . . . attempting to induce the entity to . . . reduce the amount of business previously done or contemplated to be done by the Company . . . for such entity or entities[.]" Dkt. 55-6 § 1(a)(iii). Estes acknowledged that any breach of this section "will cause irreparable harm and damage to the Company . . . , the monetary amount of which may be virtually impossible to ascertain." *Id.* § 1(b).

After Metrc acquired Chroma Signet, Estes allegedly posted on LinkedIn about the acquisition. Dkt. 63-1 ¶¶ 49–50. However, Michael Johnson, CEO of Metrc, reportedly texted Estes, directing him to take down the photo because the acquisition "was never supposed to be announced and creates a really big issue for several reasons." *Id.* ¶ 51 (including copies of the texts). Johnson further texted Estes that "Metrc can't be publicizing that it invests in or owns companies that sell to licensees," as this prohibition is "in some of [Metrc's] state contracts." *Id.* Estes claims that he believed that Johnson was admitting to breaching provisions of contracts that Metrc held with state regulatory agencies. *Id.* ¶ 52.

3

Mertc contends that Estes' objective as Executive Vice President was to "continue to market Chroma Signet/Retail ID to brands and distributors for early adoption of the Retail ID technology." Dkt. 55-1 ¶ 15. Metrc claims that this gave Estes the opportunity to build relationships with many of Metrc's present and potential customers. *Id.* ¶ 16. One of the "early adopters" of Retail ID was Wyld—a "leading cannabis infused product developer and distributor in the United States"—which Metrc maintains it considered essential to the success of the Retail ID product. Dkt. 55-1 ¶¶ 17, 19. Mertc asserts that Estes was highly involved in Wyld's post-adoption integration of Retail ID, including tailoring the product to their needs and addressing their technological concerns. *Id.* ¶ 18; *see, e.g.*, Dkt. 55-10 (showing text messages between Estes and Wyld's Director of New Market Operations discussing the implementation of Retail ID).

Prior to his termination, Estes claims that he began to believe that Metrc was involved in a vast criminal conspiracy—along with California's cannabis regulatory body—to divert cannabis products to the illicit market. Dkt. 63-1 ¶¶ 38–43. Estes states that this belief arose from Metrc's alleged refusal to use its software to identify and flag irregular data. *Id.* On June 12, 2023, Estes reportedly met with James Daley, Metrc's Head of Product, and expressed his concern that Metrc was violating and enabling others to violate California and federal law by not automatically flagging irregular data. *Id.* ¶ 44. Daley allegedly dismissed Estes' concerns, reportedly saying "I wouldn't talk to anyone about this," and that it was "not our job" to flag irregular

4

data. *Id.* ¶ 45. Estes claims that he did not perceive this to be a clear directive not to discuss this matter; thus, on August 2, 2023, during a sales call with the Director of Operations for Catalyst—a potential customer of Metrc—Estes states that he opined that the alleged conspiracy could easily be confirmed or disproven via a review of Metrc's data. *Id.* ¶ 47.

On September 5, 2023, Metrc's general counsel, Andrea Kiehl, allegedly met with Estes in an effort to determine what Estes had told Catalyst about Metrc's capabilities regarding their data. *Id.* ¶ 54. Estes claims that Kiehl instructed him not to talk to anyone regarding the conspiracy allegations. *Id.* ¶ 55. After this meeting, Estes further claims that Metrc began to remove his responsibilities related to Retail ID. *Id.* ¶¶ 56–57.

On April 9, 2024, Metrc terminated Estes' employment—reportedly for "poor performance in the role of Executive Vice President." Dkt. 55-1 ¶ 21. Specifically, Metrc lists the following issues with Estes' performance: "(1) inability to garner Retail ID adoption to any significant degree, (2) undermining of the product development team, and (3) poor communication and planning leading to failed on-site demonstrations[.]" Dkt. 55-3 ¶ 14. Metrc subsequently asked Estes to return his $100,000 signing bonus per the Offer Letter Agreement, but Estes refused. Dkt. 55-7 ¶ 3.

On March 7, 2024, Metrc presented Estes with a proposed Separation Agreement and General Release. Dkt. 63-1 ¶ 62. According to Estes, this proposed

5

agreement would have released any employment-related claims Estes may have had against Metrc and subjected him to additional non-competition and non-solicitation restrictions. *Id.* Estes did not sign this proposed agreement. *Id.* ¶¶ 62–63.

Following his termination, Estes began communicating with Metrc's present and potential customers. For example, on April 11, 2024, Estes sent a text message to Metrc's Product Owner, Mark Goetz, informing Goetz that he had just spoken with a Metrc customer—John Brown of Holistic. Dkt. 55-11. Within this message, Estes asserted, "I don't think you guys are going to have any customers left when I'm done sharing my side of this story." *Id.*

As another example, on April 22, 2024, Estes sent a text message to Eric Mushrush, the Director of New Market Operations for Wyld. Dkt. 55-10; Dkt. 61 ¶ 1. Estes told Mushrush, "Metrc fired me without cause" and that "they tried forcing me to sign a document saying I wouldn't tell you or anyone one [sic] else what I saw working there. I declined that and will be speaking out across the whole industry[.]" Dkt. 55-10. Further, Estes warned against the use of Retail ID by saying, "I don't think you guys should be one of the few MSOs to back them on this QR code." *Id.* Subsequently, Wyld expressed "concerns about their continued relationship with Metrc in light of Estes's statements and representations regarding Retail ID." Dkt. 55-1 ¶ 23. Wyld then specifically instructed Metrc to "refrain from engaging in any press or media discussing Wyld's relationship with Retail ID for the foreseeable future." *Id.* Contrary to previous conversations, Wyld then "delayed its agreement

6

to expand Retail ID into other markets until Metrc could establish itself in other jurisdictions and markets with other adoption partners." *Id.* ¶ 24. Mushrush has since stated that he "was not directly involved in the final decision to adopt or not adopt Retail ID, nor the scope of that adoption across [Wyld], nor in the decision whether Wyld's name would be associated with the launch press release." Dkt. 61 ¶ 3.

As a final example of Estes' communications, on April 24, 2024, Estes sent text messages to another of Metrc's customers, Stephanie Arakel, the Vice President of Marketing for Khalifa Kush. Dkt. 55-3 ¶ 18; Dkt. 55-9; Dkt. 62 ¶ 1. Estes communicated the following to Arakel: "Metrc fired me without cause"; "[t]hey're a bunch of fucking weasels"; "with Metrc in control I wouldn't touch it, they're totally corrupt"; "I'm going to be leading a campaign against them in the press. I saw some corrupt shit go down and they're trying to muzzle me with legal action"; "I highly recommend you bail on that project"; "They're looking for brands to get behind them but their end goal is corrupt"; and "Don't align with the cops!" Dkt. 55-9. On April 29, Arakel had a call scheduled with Metrc to discuss Khalifa Kush's adoption of Retail ID. Dkt. 55-3 ¶ 18. Immediately prior to this call, Arakel cancelled and did not re-engage. *Id.* ¶¶ 19–20; Dkt. 55-8 at 9. In their text messages, Arakel reported to Estes, "I cancelled my meeting with them" and "I only scheduled it because they emailed me and said your name[.]" Dkt. 55-9. Arakel has since stated that after "reviewing the available information about Retail ID, [she] determined that Khalifa Kush would not participate in [Retail ID][.]" Dkt. 62 ¶ 3.

7

## II.   Procedural History

On May 23, 2024, Metrc initiated the instant action by filing their Complaint against Estes alleging: Breach of Contract based upon Estes' failure to repay the $100,000 signing bonus, as described in the Offer Letter Agreement (Count I); Breach of Contract based upon Estes' alleged attempted inducement of Metrc's present and potential customers to reduce their business with Metrc, as described in the Non-Solicitation Agreement (Count II); and Tortious Interference with Metrc's business relationships (Count III). Dkt. 1. On July 21, 2025, Metrc filed the present motion, seeking partial summary judgment as to Counts I and II. Dkt. 55.

The Court notes that on August 27, 2025, the instant action was consolidated with a subsequent action brought by Estes against Metrc, which was originally filed in the United States District Court for the District of Oregon. Dkt. 66. However, on February 13, 2026, the Court dismissed all of Estes' consolidated claims. Dkt. 87. Only the previously referenced claims against Estes remain pending before the Court.

**LEGAL STANDARD**

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is

"genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e), (c). The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

## DISCUSSION

### I.     Count I: Breach of Offer Letter Agreement

Metrc seeks summary judgment as to the claimed breach of the Offer Letter Agreement, based upon Estes' failure to repay the $100,000 signing bonus. Dkt. 55.

"The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)).

Here, Estes does not dispute the validity of the Offer Letter Agreement, *see generally* Dkt. 55-4 at 7:6–10:20[1]; Dkt. 60 at 5–8, and further recognizes that he reviewed and signed it. Dkt. 55-4 at 9:6–12. The relevant section of the Offer Letter Agreement reads as follows:

> Within fifteen 15 days following your start date, the Company will pay you a one-time cash award of $100,000 (the "**Signing Bonus**"). The Signing Bonus is considered taxable wages and is subject to deductions for taxes and other withholdings as required by law. If your employment with the Company terminates prior to the second-year anniversary of your start date for any reason, you agree to repay to the Company the gross amount of the Signing Bonus within thirty (30) days following the effective date of your termination of employment.

Dkt. 55-5 at 1–2. Estes admits that he received this amount and has yet to return it. Dkt. 55-7 ¶ 3.

Instead of arguing that he did not breach the terms of the Offer Letter Agreement as to the Signing Bonus, Estes instead contends that he is not liable for this breach because he was "terminated by Metrc in retaliation for his whistleblowing and objections internally, after he discovered the company's role in

---

[1] All page citations in this Order are to the PDF page numbers automatically generated by CM/ECF.

illegal and criminal diversions of cannabis product."[2] Dkt. 60 at 3. The arguments of wrongful termination and whistleblower retaliation function as affirmative defenses in the manner they are presently asserted, as he argues that "Metrc's termination of Mr. Estes constituted an unlawful act of retaliation against a whistleblower for engaging in protected activity, which as a matter of law would entitle Mr. Estes to reinstatement as though the termination never occurred[.]" *Id.* at 8; *see* Dkt. 55-7 ¶ 3 ("Defendant did not return the $100,000 signing bonus to Metrc because Metrc wrongfully terminated Defendant[.]"). Accordingly, because Estes does not deny the validity of the repayment provision or his failure to repay the signing bonus, but instead seeks to avoid enforcement based on alleged wrongful termination and whistleblower retaliation, these arguments operate as affirmative defenses in the present matter. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1303 (11th Cir. 1999) ("An affirmative defense is generally a defense that, if established, requires judgment for the defendant even if the plaintiff can prove his case by a preponderance of the evidence.").

---

[2] Estes further mentions in his answer to Metrc's interrogatories that he is not liable for breach "because returning the $100,000 would have been financially burdensome for Defendant." Dkt. 55-7 ¶ 3. The Court declines to consider the financial burden of repayment, as such inconvenience is not a viable excuse for breach of contract. *See Marshall Constr., Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So. 2d 845, 848 (Fla. 1st DCA 1990) (citing *Bumby & Stimpson, v. Peninsula Utilities Corp.*, 169 So.2d 499 (Fla. 3d DCA 1964)) ("It is a well-settled contract principle that unexpected difficulty, expense, or hardship does not excuse a party from performance of its obligations under a contract."); *City of Tampa v. City of Port Tampa*, 127 So. 2d 119, 120 (Fla. 2d DCA 1961) ("Inconvenience or the cost of compliance, though they might make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful.").

However, Defendant Estes failed to plead these as affirmative defenses in his initial Answer, Dkt. 26 at 10, in his First Amended Answer, Dkt. 42 at 10–11, and in his Second Amended Answer. Dkt. 76 at 7. Instead of bringing these as affirmative defenses, Defendant Estes strategically attempted to bring these arguments as separate claims in the District of Oregon. *See* Dkt. 87 at 10. In this prior Oregon action, Defendant Estes asserted that these Oregon claims were "completely dissimilar [to] and involve none of the same facts" as the instant action. Response to Motion to Dismiss, *Marcus Estes v. Metrc, Inc. and Metrc ID, LLC*, No. 8:25-cv-2067-WFJ-CPT (M.D. Fla. May 23, 2025), Dkt. 15 at 3. The Court notes that these claims were later consolidated, Dkt. 75, then dismissed as unduly delayed compulsory counterclaims.[3] Dkt. 87.

Beyond merely failing to assert his wrongful termination and whistleblower retaliation arguments as affirmative defenses in his Answer, Defendant Estes also denied Metrc the opportunity to conduct discovery on these arguments. Estes objected to and refused to provide any substantive responses to multiple interrogatories that touched upon Estes' alleged wrongful termination and whistleblower status. Dkt. 65-4 ¶ 14 ("14. Identify with specificity every law, rule,

---

[3] Federal Rule of Civil Procedure 8(c) establishes that "[i]f a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated[.]" The Court finds that Estes has been attempting to employ a certain litigation strategy regarding his arguments of wrongful termination and whistleblower retaliation. This led to a failure to assert these arguments as affirmative defenses, Dkt. 26 at 10; Dkt. 42 at 10–11; Dkt. 76 at 7, and dismissal of these arguments as unduly delayed compulsory counterclaims. Dkt. 87. Accordingly, the Court declines to construe these arguments are merely "mistakenly designated."

12

and/or regulation you contend Metrc violated, a citation to the specific statute, regulation, rule and/or other law you contend Metrc violated, a description of the specific acts in which you allege Metrc engaged to violate said laws, rules, and/or regulations, the date you allegedly complained about these alleged violations, the individual(s) to whom you allegedly complained about these violations, whether on each occasion you complained orally or in writing, and how Metrc responded to your alleged complaint(s). *ANSWER:* . . . Defendant . . . objects to this interrogatory on the basis that the operative pleadings in this matter do not currently encompass the subject matter of this interrogatory, and therefore it is not reasonably calculated to lead to the discovery of admissible evidence."); Dkt. 65-5 ¶ 14 (same).

Federal Rule of Civil Procedure 8(c) requires that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]" "The purpose of Rule 8(c) is . . . to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." *Hassan v. United States Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988) (citation omitted). By failing to plead his wrongful termination and whistleblower retaliation arguments as affirmative defenses, asserting that such claims are "completely dissimilar and involve none of the same facts" as the instant action, 8:25-cv-2067, Dkt. 15 at 3, and failing to substantively respond to relevant interrogatories, the Court finds that Defendant Estes failed to provide Metrc sufficient notice, and thus waived these arguments as affirmative defenses and

cannot now raise them. *See Hassan*, 842 F.2d at 263 (citation omitted) ("[T]he general rule is that, when a party fails to raise an affirmative defense in the pleadings, that party waives its right to raise the issue at trial."); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010) (citing *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992, 1012 (11th Cir. 1982)) ("Failure to plead an affirmative defense generally results in a waiver of that defense.").

The Court emphasizes that in the valid Offer Letter Agreement, Estes acknowledged that his employment with Metrc was on an "'*at will*' basis," meaning that Metrc could terminate his employment "with or without cause and with or without notice at any time." Dkt. 55-5 at 2 (emphasis added). Estes additionally agreed to repay the Signing Bonus if he were to be terminated by Metrc "prior to the second-year anniversary of [his] start date *for any reason*[.]" *Id.* at 1–2 (emphasis added). There is no genuine dispute that Estes' failure to repay his Signing Bonus after being terminated within two years of his start date at Metrc violates his Offer Letter Agreement.

Finally, the damages that Metrc requests are not disputed, as the Offer Letter Agreement required Estes to repay the $100,000 Signing Bonus.[4] *See* Dkt. 55 at 16; Dkt. 60 at 5–8. In sum, even after drawing all factual inferences in favor of

---

[4] In their Complaint, Plaintiffs seek relief for Count I of "damages and/or restitution in the amount of at least $100,000, plus pre- and post-judgment interest accruing from May 9, 2024;" and "such other damages, restitution and interest as allowed by Law." Dkt. 1 at 10. In the present motion, Plaintiffs only request summary judgment as to damages of $100,000. Dkt. 55 at 16. The Court only considers the relief requested in the present motion, and reserves ruling as to any further relief for trial.

Defendant Estes, the Court finds that there are no genuine disputes as to any material facts regarding Count I. The validity of the Offer Letter Agreement and the damages are undisputed, thereby establishing the first and third elements of the breach of contract claim. Regarding the second element, Defendant Estes undisputedly failed to return the Signing Bonus, breaching the terms of the Offer Letter Agreement. Defendant Estes also waived the affirmative defenses that he argued excused his breach and did not provide discovery on the same. The Court finds that no reasonable jury could find for Defendant Estes on the breach of contract claim. Therefore, the Court grants summary judgment in favor of Plaintiffs as to Count I, specifically regarding the requested damages of $100,000.

## II.   Count II: Breach of Non-Solicitation Agreement

Metrc additionally seeks summary judgment as to the claimed breach of the Non-Solicitation Agreement, based upon Estes' attempted inducement of Metrc's present and potential customers to reduce their business with Metrc. Dkt. 55 at 19. Specifically, Metrc seeks summary judgment regarding the breaches related to Estes' contact with customers Wyld and Khalifa Kush.[5] *Id.* at 20 n.7. The elements of a breach of contract action are described above. *See Beck, LLC*, 175 F.3d at 914.

---

[5] Plaintiffs "concede[] that there are material issues of fact as to whether Estes breached the Non-Solicitation Agreement with respect to his [communications with] Metrc customer Holistic[.]" Dkt. 55 at 20 n.7. The Court reserves ruling as to Claim II regarding Holistic for trial.

Here, Estes does not dispute the validity of the Non-Solicitation Agreement, *see generally* Dkt. 55-4 at 11:3–6; Dkt. 60 at 8–9, and further recognized its reasonableness. Dkt. 55-6 § 1(c) ("The parties agree that the covenants contained in this Section 1 impose reasonable restraint on the Employee[.]"). The relevant section of the Non-Solicitation Agreement reads as follows:

> The Employee agrees that he or she shall not, during the term of the Employee's employment with the Company and for a period of two (2) years following termination of the Employee's employment with the Company (the *"Noncompete Period"*) . . . :
> . . .
> [C]ontact any past, present or potential customer of the Company . . . for the purpose of . . . inducing or attempting to induce the entity to cease doing business with the Company . . . , or reduce the amount of business previously done or contemplated to be done by the Company . . . for such entity or entities[.]

*Id.* § 1(a)(iii). Estes does not dispute that he contacted Eric Mushrush with Wyld and Stephanie Arakel with Khalifa Kush, *see* Dkt. 60 at 8–9, as detailed in his text messages with each of them. Dkt. 55-10; Dkt. 55-9.

Instead, Estes argues that he did not breach the terms of the Non-Solicitation Agreement (1) because he contacted Mushrush and Arakel "for the purpose of expressing concerns of public importance, not for the purpose of damaging Plaintiff's business relationships," and (2) because Wyld and Khalifa Kush "made their business decisions not because of what Mr. Estes said, but for other reasons." Dkt. 60 at 8.

16

Regarding Estes' first argument, it is evident from his text messages that Estes contacted Mushrush, the Director of New Market Operations for Wyld—a present customer, who had an ongoing relationship with Metrc—and Arakel, the Vice President of Marketing for Khalifa Kush—a potential customer, who had an upcoming meeting scheduled with Metrc—for the purpose of attempting to induce these entities to reduce their business with Metrc as to the Retail ID product. Specifically, Estes urged Mushrush by saying, "I don't think [Wyld] should be one of the few [multistate operators] to back [Metrc] on [Retail ID]." Dkt. 55-10. He further messaged Arakel, stating, among other things, "with Metrc in control I wouldn't touch [Retail ID], they're totally corrupt"; "I highly recommend you bail on [Retail ID]"; and "Don't align with the cops!" Dkt. 55-9. These messages, in and of themselves, evince that Estes was attempting to induce Wyld and Khalifa Kush to reduce their Metrc business involving Retail ID.

As to Estes' second argument regarding the influence of his contact with Mushrush and Arakel, Estes has submitted substantially similar declarations from both Mushrush and Arakel. Dkts. 61, 62. They both state that they were not the "final decision maker" at their respective companies, and that their "role was to provide evaluation, input, and recommendations, which were considered alongside other factors in the company's decision-making process." Dkt. 61 ¶ 4; Dkt. 62 ¶ 4. Mushrush and Arakel also express that their "company's decision in regards to the free-of-charge Retail ID pilot was made independently and was not influenced by

17

any text messages or other communications from Marcus Estes following his departure from Metrc." Dkt. 61 ¶ 5; Dkt. 62 ¶ 5. Nonetheless, the Non-Solicitation Agreement forbids mere "contact" with such entities "for the purpose of . . . attempting to induce the entity to . . . reduce the amount of business previously done or contemplated to be done[.]" Dkt. 55-6 § 1(a)(iii). Per its terms, Estes did not have to be successful in his inducement to breach the Agreement. As such, there is no genuine dispute that Estes' communications with Mushrush and Arakel—which were within two years of his termination—violated Section 1 of the Non-Solicitation Agreement.

Finally, damages have already been agreed upon within the Non-Solicitation Agreement. Estes acknowledged that any breach of Section 1 of the Agreement "will cause irreparable harm and damage to [Metrc] . . . , the monetary amount of which may be virtually impossible to ascertain." *Id.* § 1(b). Plaintiffs appear to only request permanent injunctive relief in their present motion,[6] *see* Dkt. 55 at 2, 8; *see also* Dkt. 65 at 3, which would prohibit "Defendant from further violating the Non-Solicitation Agreement." *See* Dkt. 1 at 12. This was also agreed upon within the Non-Solicitation Agreement. Dkt. 55-6 § 1(b). Estes acknowledged that such breach shall entitle

---

[6] In their Complaint, Plaintiffs seek relief for Count II of "permanent injunctive relief prohibiting Defendant from further violating the Non-Solicitation Agreement;" "compensatory damages associated with Defendant's breach of the Non-Solicitation Agreement, together with pre- and post-judgment interest thereon;" and "attorneys' fees and costs as permitted under the Non-Solicitation Agreement." Dkt. 1 at 12. In the present motion, Plaintiffs appear to only request permanent injunctive relief. Dkt. 55 at 2, 8; Dkt. 65 at 3. The Court only considers the relief requested in the present motion, and reserves ruling as to any further relief for trial.

18

Metrc to "an injunction from any court of competent jurisdiction enjoining and restraining [this] violation[,]" and "that such right to injunction shall be cumulative and in addition to whatever other remedies [Metrc] . . . may possess at law or in equity[.]" *Id.*

Thus, even after drawing all factual inferences in favor of Defendant Estes, the Court finds that there are no genuine disputes as to any material facts regarding Count II. The validity of the Non-Solicitation Agreement is undisputed, fulfilling the first element of the breach of contract claim. Regarding the second element of breach—Defendant Estes' contacts with Mushrush and Arakel were clearly made with the purpose of inducing Wyld and Khalifa Kush to reduce their business with Metrc for the Retail ID product, thereby breaching the terms of the Non-Solicitation Agreement. The Agreement further stipulated that such a breach would cause irreparable harm and damage, establishing the third element of damages. The Court finds that the evidence presented could not lead a reasonable jury to find for Defendant Estes. Therefore, the Court grants summary judgment in favor of Plaintiffs as to Count II related to Estes' communications with Wyld and Khalifa Kush, specifically regarding the requested permanent injunction.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that Plaintiffs Metrc, Inc. and Metrc ID, LLC's Motion for Partial Summary Judgment, Dkt. 55, is **GRANTED**.

(1) Plaintiffs are **GRANTED** summary judgment as to Count I. Defendant Marcus Estes is liable to Plaintiffs Metrc, Inc. and Metrc ID, LLC for Breach of the Offer Letter Agreement in the amount of $100,000. Further requests for relief as to Count I shall proceed to trial; and

(2) Plaintiffs are **GRANTED** summary judgment as to Count II. Defendant Marcus Estes is liable to Plaintiffs Metrc, Inc. and Metrc ID, LLC for Breach of the Non-Solicitation Agreement related to communications with Wyld and Khalifa Kush, and is thus permanently enjoined from further violating the Non-Solicitation Agreement. Further requests for relief as to Count II shall proceed to trial. Plaintiffs' claims under Count II regarding Holistic shall proceed to trial.

**DONE AND ORDERED** at Tampa, Florida, on March 3, 2026.

> /s/ William F. Jung
> **WILLIAM F. JUNG**
> **UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO:**</u>
Counsel of Record
Defendant, *pro se*